## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | | |
|---|---|---|
| PLATINUMTEL COMMUNICATIONS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 08 CV 1062 |
| | ) ) | Judge JOAN H. LEFKOW |
| ZEFCOM, LLC d/b/a TELISPIRE, TELISPIRE, INC, et al., | ) ) ) | |
| Defendants | ) ) ) | |

### SEPARATE APPENDIX OF UNPUBLISHED CASES CITED IN DEFENDANT EZ STREAM'S MEMORANDUM OF LAW IN SUPPORT OF IT MOTION TO DISMISS

Akram Zanayed (6192587)
Hanna Mraibie (6275561)
Akram Zanayed & Associates
Attorneys for Defendant EZ Stream
8550 S. Harlem Suite G
Bridgeview, IL 60455
Phone 708-237-9000

# TABLE OF CONTENTS

**TAB   CASE**

1.  *Keystone Nissan Company v. Rosen Motors, Inc.*, 1993 WL 420882 (N.D. Il Oct. 18, 1993).

2.  *American Hardware Manufacturers Association v. Reed Elsevier, Inc.*, 2004 WL 3363844 (N.D. Il Dec. 28, 2004).

# TAB 1

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1993 WL 420882 (N.D.Ill.), 1994-1 Trade Cases P 70,514
**(Cite as: Not Reported in F.Supp.)**

**C**
Keystone Nissan Co. v. Rosen Motors, Inc.
N.D.Ill.,1993.

United States District Court, N.D. Illinois, Eastern
Division.
KEYSTONE NISSAN COMPANY, an Illinois Cor-
poration, Plaintiff,
v.
ROSEN MOTORS, INC., an Illinois Corporation,
Defendants.
**No. 92 C 5394.**

Oct. 18, 1993.


MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.
*1 Keystone Nissan Company, ("Keystone"), a li-
censed Nissan dealer located in Waukegan, Illinois,
filed a seven count complaint, in which it sued Nis-
san Division, Nissan Motor Corporation in U.S.A.
("Nissan"), and Rosen Motors, Inc. ("Rosen"), for
allegedly violating the Lanham Trademark Act, 15
U.S.C. Section 1125(a). Keystone has voluntarily
dismissed Nissan as a party in this lawsuit, and ac-
cordingly, has dismissed Counts VI and VII, which
were directed against Nissan.

Defendant Rosen operates an automobile dealership
within ten miles of Keystone's Waukegan location.
Keystone alleges that, while Rosen is not duly au-
thorized to sell and service new Nissan automobiles
from its Waukegan location, Rosen has produced
advertising and/or promotional material holding it-
self out to the public as a Nissan dealer authorized
to sell and service new Nissan automobiles in
Waukegan. Keystone has attached copies of
Rosen's business cards which advertise that Rosen's
Waukegan location sells Nissans.

Rosen has filed two motions to dismiss Keystone's
complaint. First, Rosen requests that the Court dis-
miss Count I of Keystone's Complaint, alleging a

violation of the Lanham Act, 15 U.S.C. § 1125(a),
for failure to state a cause of action. Fed.R.Civ.P.
12(b)(6). Second, Rosen argues that upon dismissal
of Count I, the Court will no longer have original
jurisdiction over the remaining claims, and should
decline to assert supplemental jurisdiction. 28
U.S.C. § 1367.

On a Rule 12(b)(6) motion to dismiss, the Court's
role is solely to determine the legal sufficiency of
the complaint. A court should not dismiss a com-
plaint unless it is clear and beyond doubt that a
plaintiff can prove no set of facts which entitle him
or her to relief. *Conley v. Gibson,* 355 U.S. 41,
45-46 (1957). When it considers a motion to dis-
miss, the district court accepts all well-pleaded al-
legations as true and limits its review to the four
corners of the complaint. *Gomez v. Illinois State
Bd. of Educ.,* 811 F.2d 1030, 1039 (7th
Cir.1987).FN1

First, Rosen argues that Keystone has failed to state
a cause of action under the Lanham Act (15 U.S.C.
Section 1125(a)). Alternatively, Rosen argues that,
even if it had violated the Lanham Act by circulat-
ing its business cards, any such violation is now
moot because it now circulates new business cards
advertising only its Milwaukee address as a Nissan
dealership. Further, Rosen argues that Keystone's
damages are de minimis.

To adequately plead a claim under the Lanham Act,
a plaintiff must allege the following five elements:
(1) the defendant has made false statements of fact
as to its own product or services, with such falsity
stemming from actual misstatements, partially cor-
rect statements, or failures to disclose; (2) those
statements actually deceived or have a tendency to
deceive a substantial section of their audience; (3)
the deception is material in that it is likely to influ-
ence purchasing decisions; (4) the defendant's
falsely advertised goods have entered interstate
commerce; and (5) there exists the likelihood of in-
jury, stemming either from a decline in sales or loss

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1993 WL 420882 (N.D.Ill.), 1994-1 Trade Cases P 70,514
**(Cite as: Not Reported in F.Supp.)**

in good will. *Grove Fresh Distrib. v. New England Apple Prod.,* 969 F.2d 552, 557 (7th Cir.1992) (citing *Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974)).

*\*2* The Court finds that Keystone has sufficiently pled the requisite five elements of a Lanham Act claim. First, Keystone has alleged that Rosen produces advertising and/or promotional material in which it presents itself to the public as a Nissan dealer, authorized to sell and service Nissan automobiles, in Waukegan. Second, Keystone has pled that Rosen's false and misleading advertising claims have a tendency to deceive a substantial segment of Keystone's customers and potential customers into falsely believing that (a) Rosen is authorized to sell and repair Nissans from its Waukegan location; (b) Nissan allows Rosen to sell and service new Nissan automobiles; (c) Rosen, not Keystone, is the authorized New Nissan Sales and Service Dealer in that particular Primary Market Area; and (d) Nissan has authorized Rosen, not Keystone, to sell and service Nissan automobiles. Third, Keystone alleges in its complaint that Rosen's deception is material in that it is likely to influence a customer's choice of where to shop for automobile purchases and repairs, and where to make those purchases. Fourth, Keystone has alleged that Rosen has entered its falsely advertised goods into interstate commerce. Fifth, Keystone has alleged in its complaint that as a result of the foregoing, it has suffered and will continue to suffer injury by: (a) a direct diversion of customers and sales from Keystone to Rosen; (b) a lessening of the goodwill which Keystone enjoys with its customers and the purchasing public; and (c) damage to Keystone's reputation. Therefore, the Court finds that Keystone's complaint contains the requisite elements of a Lanham Trademark Act claim.

Next, the Court finds Rosen's mootness and de minimis claims to be meritless. Even if Rosen has remedied the problem with its business cards, Keystone's allegations of a Lanham Act violation were not limited to this act. Further, if the Court estab-

lishes that Rosen violated the Act, it may be liable to Keystone for past damages regardless of whether it remedied the problem. Therefore, Keystone's claim is not moot. Rosen's subjective view that Keystone's damages are de minimis is irrelevant to a Rule 12(b)(6) determination. Even if Keystone's actual damages are in fact de minimis, this does not affect its claims for injunctive relief and punitive damages. Finally, since Count I provides this court with original jurisdiction, it will continue to assert supplemental jurisdiction, under Section 1367, over the remaining counts. After discovery, a motion for summary judgment may be appropriate, but defendant's motion to dismiss Count I and to decline to assert supplemental jurisdiction is denied.

> FN1. Rosen has submitted an affidavit in support of its motion to dismiss, with which it seeks to contradict material statements of fact alleged in Keystone's complaint. However, at this stage of litigation, the Court will not weigh the validity of the allegations by Keystone, *Burnham,* 910 F.2d at 1477, nor will it consider evidence outside of the pleadings. *Gomez,* 811 F.2d at 1039.

N.D.Ill.,1993.
Keystone Nissan Co. v. Rosen Motors, Inc.
Not Reported in F.Supp., 1993 WL 420882 (N.D.Ill.), 1994-1 Trade Cases P 70,514

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**H**
American Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation, Plaintiff,
v.
REED ELSEVIER, INC., a Massachusetts corporation, et al., Defendants.
No. 03 C 9421.

Dec. 28, 2004.

Michael Joseph Hayes, Bell, Boyd & Lloyd LLC, Gordon B. Nash, Jr., William Patrick Farrell, Jr., Scott Jared Fisher, Michael Anthony Nicolas, Jared D. Solovay, Gardner Carton & Douglas LLP, Chicago, IL, for Plaintiff.
Michael I. Rothstein, Jon Jeffrey Patton, Karina H. Dehayes, Daniel I. Konieczny, Mary Beth Wynn-Smith, Mark R. Bagley, Tabet Divito & Rothstein, LLC, Benjamin J. Randall, Randall & Kenig LLP, Anthony Joseph Carballo, Fred L. Foreman, Aren Lance Fairchild, Garry L. Wills, Freeborn & Peters, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MORAN, Senior J.
*1 Plaintiff American Hardware Manufacturers Association (AHMA) brought this diversity action against defendants Reed Elsevier, Inc.; two of its divisions, Reed Exhibitions and Association Expositions & Services (collectively "Reed"); and Freeman Decorating Co. and Freeman Decorating Services, Inc., (collectively "Freeman"), alleging thirteen counts, including common law and statutory fraud, civil conspiracy, breach of contract and violation of the Lanham Act. Reed and Freeman now move to dismiss all counts, some with prejudice

and some without. Both parties' motions are granted in part and denied in part.

### BACKGROUND

Trade, professional, and industry conventions are big business for both the entities that run them and the cities that host them. Metropolitan areas vie to attract conventions-no matter whether catering to marketers, the auto industry, or pharmaceutical companies-hoping to benefit from the financial windfall provided by exhibitors and attendees. This dispute involves the sponsor and manager of one such convention, the National Hardware Show.

The following facts are taken from plaintiff's first amended complaint, which, for purposes of this motion, are accepted as true. Plaintiff is a non-profit trade association of manufacturers, representatives and trade publications in the hardware and home improvement industry. In 1975, plaintiff began sponsoring the National Hardware Show, an annual trade show in Chicago. In 1977, plaintiff entered into an agreement with Reed Publishing Corporation, a predecessor of Reed, regarding the operation of the hardware show. Under the terms of the agreement AHMA sponsored and conducted the show, while Reed Publishing Corporation and later Reed managed the event. Plaintiff alleges that the agreement established its control over various aspects of the show, including the location and its right "to share significantly in all revenue derived from the Show" (cplt.¶ 18). The show agreement enumerated the parties' obligations as well. Reed was responsible for executing contracts with show exhibitors (agrmt.¶ 7), collecting all revenue from the show, and paying all expenses (¶ 10). After paying AHMA its share of revenue in accord with the agreement, Reed also had to provide a certificate from an independent certified accountant, attesting to the accuracy of its accounting. The agreement barred Reed from conducting, sponsoring, or managing any other trade show related to hardware,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

lawn and garden, or home improvement products, any where in the United States (¶ 11).

AHMA and Reed established the terms of revenue-sharing in the show agreement, its amendments, and various subsequent agreements that are preserved in annual financial reports and minutes from meetings between the parties. In 1977, when AHMA and Reed entered into the show agreement, the show's only source of revenue was the sale and rental of exhibit space. The agreement detailed the formula for dividing this revenue. Over the years the parties' agreed to pursue additional sources of revenue and determined how to allocate it. Under their new agreements they split revenue from some sources, such as kiosk advertising, show directory sales, and website sales, equally; other revenue was shared in accordance with more elaborate arrangements. Reed never informed AHMA of revenue received from Freeman, the hardware show's general contractor.

**\*2** Despite alleged disputes that arose between AHMA and Reed during their 25-year association, the hardware show grew in revenue from 1977 through 2000. However, its growth came to a halt in 2001, when the amount of rented exhibit space dropped dramatically-a trend that continued for the next two years. By 2003, the hardware show filled less than half the space it did in 1999. Studies commissioned jointly by the parties revealed that the cost of exhibiting was the primary reason for exhibitor decline. In addition to the cost of renting space, exhibitors found costs for services provided by Freeman, the hardware show's general contractor, to be excessive.

In a letter dated September 4, 2001, Freeman informed plaintiff that the fees for exhibitors at the hardware show were inflated because the company was providing Reed with free services and shifting the costs to the exhibitors. A representative for Freeman later estimated that this cost-shifting had increased the exhibitors' costs by 20%. When plaintiff told defendant to end cost-shifting and to accept bids for general contractors for the 2002

hardware show, defendant refused, revealing that it had contracted Freeman until 2009 for numerous trade shows including the hardware show. Plaintiff alleges that in order to secure the contract, Freeman agreed to pay Reed kickbacks from its profits servicing exhibitors, and to provide Reed with free goods and services. After Freeman serviced the 2002 show, AHMA renewed its request that Reed accept bids from different contractors for the 2003 show, but Reed again refused.

In early 2002, plaintiff decided to terminate its relationship with defendant. AHMA and Reed executed a separation agreement on February 26, 2003. The agreement terminated their show agreement effective August 16, 2003, after the 2003 hardware show. It stated that "[t]he Show Agreement shall remain in full force and effect from the date hereof until [August 16, 2003]." Despite this, the separation agreement did allow the parties to begin to promote future exhibitions upon execution of the agreement, provided that they observed certain limitations, such as not directly or indirectly "sell[ing] exhibit space, sponsorships, advertising or media opportunities to exhibitors" prior to July 4, 2003. The separation agreement also included a restrictive covenant, which prohibited Reed from engaging in, sponsoring or managing any trade show for the hardware, home improvement, and/or lawn and garden industries within 50 miles of Chicago for a two-year period following the separation agreement's execution. Under the terms of the separation agreement Reed agreed to discontinue any use of AHMA trademarks except in connection with the 2003 hardware show.

The separation agreement also contained a mutual release of liabilities for both parties. The release states, in part, that AHMA "covenants not to sue and forever discharges Reed ... from any and all claims" that it may have "relating to, arising out of or in connection with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement, for the period from the beginning of time through the date

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

hereof...." The release further states that it does not affect defendant's liability pursuant to the terms of the separation agreement or the show agreement for acts or omissions occurring after February 26, 2003, the signature date on the separation agreement. As consideration for the agreement Reed paid AHMA two million dollars.

*3 Plaintiff alleges that during negotiations leading up to the parties' separation agreement, Dennis MacDonald, Senior Vice President of Reed, assured AHMA that Reed would comply with the terms of the show agreement through August 16, 2003. MacDonald allegedly stated that Reed had no intention of conducting any trade show that would compete with AHMA or violate the terms of their show agreement. During negotiations MacDonald stated that Reed would not use AHMA trademarks. Reed also agreed to pay all of its expenses for the 2003 hardware show and not shift costs to show exhibitors. Allegedly, all of these statements were false at the time they were made because Reed intended to breach these promises. Within thirty days of the execution of the separation agreement Reed conducted three trade shows: the Midwest Builders Show, the International Security Conference and Exposition, and the Home Automation Show, which allegedly violated the terms of the show agreement. According to plaintiff, Reed also engaged in cost-shifting at the 2003 hardware show and used AHMA's trademarks to promote its 2004 hardware show in Las Vegas.

In response, AHMA filed its complaint. The heart of this thirteen-count complaint rests in the allegations that Reed made secret arrangements with Freeman, resulting in plaintiff receiving less revenue than it was due, exhibitors paying higher prices for their exhibiting costs, and attendance at the hardware show declining sharply. As manager of the hardware show Reed was obligated to pay the expenses and collect the revenues, and after paying AHMA a percentage of the show's revenue, Reed kept the remainder. Like all for-profit ventures, Reed had an incentive to keep its expenses low to

maximize its profit. Plaintiff alleges that Reed negotiated free services from Freeman by allowing the contractor to increase exhibitor's set-up costs. AHMA also alleges that Freeman paid Reed a percentage of its profits from those exhibitor set-up fees, in exchange for the opportunity to serve as general contractor for the show. AHMA was allegedly unaware of these arrangements, and it contends that Reed's cost-shifting and revenue from Freeman violate both its contractual obligations and legal duties to AHMA. Furthermore, it argues that these practices, which created higher costs for hardware show exhibitors, led to a sharp decline in show attendance and profit for AHMA.

### DISCUSSION

A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir.1989). In deciding a motion to dismiss, the court must assume the truth of all well-plead allegations, making all inferences in the plaintiff's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420 (7th Cir.1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### Actions Prior to February 26, 2003

*4 Defendants maintain that all of plaintiff's claims should be dismissed either with or without prejudice. Though both Reed and Freeman filed their own motions to dismiss addressing the individual claims against them, Freeman also joined in Reed's motion. Therefore, when discussing arguments brought by Reed, we attribute them to Reed and to both defendants interchangeably. Defendants first argue that any of plaintiff's claims based on acts or omissions occurring before February 26, 2003,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

must be dismissed due to the mutual release included in the parties' separation agreement. Plaintiff refers to the separation agreement in its complaint and attached it to the pleadings, and, therefore, the court may look to the agreement in ruling on this motion without converting it to a motion for summary judgment. *See* *Thompson v. Illinois Dept. of Professional Regulation,* 300 F.3d 750, 753 (7th Cir.2002).

AHMA's release under section 7(b) of the separation agreement states:

AHMA on behalf of itself and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, hereby releases, covenants not to sue and forever discharges Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns from any and all claims, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorney's fees), causes of actions, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns have, may have had, or may have in the future against Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors, and assigns whether known or unknown, for any and all matters, including, without limitation, all matters relating to, arising out of or in connection with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement, for the period from the beginning of time through the date hereof; provided however, except as set forth in paragraph c. of this Section 7, nothing herein is intended to or shall be construed to affect or limit the liability or obligation of Reed and its affiliates and respective officers, directors, employees, agents, predecessors, successors and assigns, if any, to AHMA pursuant to the terms of this Agreement or under the Show Agreement, with respect to acts or omissions occurring after the date

hereof.

The plain language of this release affirms that plaintiff discharged defendants from any liability for actions taken prior to February 26, 2003, relating to the hardware show or their show agreement. Yet, plaintiff states in its complaint that the separation agreement and its release are a nullity because Reed fraudulently induced AHMA to enter into the agreement. Defendants counter that plaintiff fails to state a claim for fraudulent inducement and thus its attempt to void the release also fails.

\*5 In order for claims to survive after a defendant has established the existence of a release that is valid on its face, the plaintiff must sufficiently allege and prove that a material issue of fact exists that would invalidate the release. *Meyer v. Murray,* 70 Ill.App.3d 106, 114, 26 Ill.Dec. 48, 387 N.E.2d 878, 884 (1st Dist.1979); *Thornwood, Inc. v. Jenner & Block,* 344 Ill.App.3d 15, 23, 278 Ill.Dec. 891, 799 N.E.2d 756, 764 (1st Dist.2003). Allegations of fraud, duress, mutual mistake, or, in some cases, unconscionability in the formation of the release create an issue of fact which, if proven, would likely defeat the defense of release. *See* *Carlile v. Snap-On Tools,* 271 Ill.App.3d 833, 840-42 648 N.E.2d 317 (4th Dist.1995); *Thornwood, Inc.,* 344 Ill.App.3d at 23, 799N, 279 Ill.Dec. 907, 801 N.E.2d 581.E.2d at 764. Plaintiff alleges that Reed induced AHMA's participation in the separation agreement through promissory fraud-misrepresenting its intent (1) to conform with the show agreement's restriction on managing competing shows, (2) to refrain from using AHMA's trademark other than to promote the 2003 hardware show, and (3) to cease the practice of cost-shifting at the 2003 show.

Aware that any breach of contract could potentially result in a promissory fraud claim, Illinois courts limit its availability. *Sa'Buttar Health & Medical, P.C. v. Tap Pharmaceuticals, Inc.,* 2004 WL 1510023 at \*3 (N.D.Ill.2004)(citing *Doherty v. Kahn,* 289 Ill.App.3d 544, 562, 224 Ill.Dec. 602, 682 N.E.2d 163, 176 (1997)). Generally, promis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

sory fraud is only actionable where a party's promise or stated intention is the scheme used to accomplish the fraud, such as when "a party makes a promise without intending to keep the promise, but intending for another party to rely on it and the other party does rely on the promise to his detriment."*Sa'Buttar Health & Medical, P.C.,* 2004 WL 1510023 at *3. Because the claim is easy to allege and difficult to disprove, a plaintiff pleading promissory fraud faces a high burden. *Bower v. Jones,* 978 F.2d 1004, 1012 (7th Cir.1992); *Hollymatic Corp. v. Holly Systems, Inc.,* 620 F.Supp. 1366, 1369 (N.D.Ill.1985). In addition to satisfying Rule 9(b)'s heightened standards for fraud, "[i]n order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent-a scheme or device."*Bower,* 978 F.2d at 1012.[FN1]Courts have repeatedly found that plaintiffs have failed to plead the specific objective manifestations of fraudulent intent, *see e.g.,Bower,* 978 F.2d at 1012;*Bors v. Duberstein,* 2004 WL 1588271 at *5 (N.D.Ill.2004); *Nese v. Nordic Construction Services, Inc.,* 2004 WL 1179387 at *5-6 (N.D.Ill.2004), but few have actually discussed what constitutes an objective manifestation. It is clear what does not suffice. Broken promises are not manifestations of defendant's intent never to have kept the promises.*Rosenblum v. Travelbyus.com, Ltd.,* 2002 WL 31487823 at *3 (N.D.Ill.2002); *Bower,* 978 F.2d at 1012 ("As Judge Posner has observed in discussing a claim of promissory fraud, 'A change of mind can be a breach of contract ... but it is not fraud.' "). Defendants maintain that AHMA fails to allege specific, objective manifestations of fraudulent intent, and instead supports its fraud claim only with allegations of Reed's broken promises.

> FN1. Plaintiff cites *Cooper v. Durham School Services,* 2003 WL 22232833 (N.D.Ill.2003) to support its argument that it has plead all the required elements of promissory fraud. However, Illinois' pleading requirement for specific objective manifestations of fraudulent intent is not

an additional element of promissory fraud, and it was not addressed in *Cooper,* where the promissory fraud claim was dismissed for failure to satisfy Fed.R.Civ.P. 9(b)'s heightened pleading requirement for fraud claims.

*6 We agree that plaintiff's complaint fails to state specific, objective manifestations of Reed's fraudulent intent. However, the court may infer such intent where a breach of promise occurs soon after the promise is made. *Zic v. Italian Government Travel Office,* 130 F.Supp.2d 991, 995-96 (N.D.Ill.2001)(citing *Pepper v. Marks,* 168 Ill.App.3d 253, 119 Ill.Dec. 26, 522 N.E.2d 688, 691 (1st Dist.1988)); *Brdecka v. Gleaner Life Insurance Society,* 2002 WL 1949743 at *3 (N.D.Ill.2002); *see also,AAR International Inc., v. Vacances Heliades S.A.,* 202 F.Supp.2d 788, 798-99 (N.D.Ill.2002)("One such manifestation of fraudulent intent is a breach that follows so close on the heels of the promise that the intent not to keep the promise may be inferred."). In *Pepper,* the fraudulent intent was inferred where the breach occurred four days after the promise, and in *AAR International, Inc.* the breach occurred a week after the promise. While we have not found a decision that declares a clear time limit after which a breach no longer creates an inference of fraud, courts have found that the passage of a year, *Zic,* 130 F.Supp.2d at 996, and the passage of "several months," *Sa'Buttar Health & Medical, P.C.,* 2004 WL 1510023 at *4, eliminate any such inference.

MacDonald, a Senior Vice President at Reed, allegedly made his promises regarding cost-shifting, trademarks and competing trade shows on February 17, 2003, at a meeting with AHMA representatives. According to the complaint, Reed did not breach its promise not to cost-shift until several months later during the preparation for the 2003 hardware show, nor did it breach its promise not to use AHMA's trademarks (other than for the promotion of the 2003 show) until it was promoting its 2004 hardware show in Las Vegas. Thus, even accepting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

plaintiff's claims as true, too much time elapsed between promise and breach for the court to infer fraudulent intent. However, the court can infer fraudulent intent as to Reed's participation in competing trade shows. The three allegedly competing shows occurred on March 18-21, 2003 and March 26-28, 2003, just over a month after MacDonald made his promises.

Arguing against an inference of fraudulent intent for any of the promises, Reed cites our decision in *Razdan v. General Motors Corp.,* 979 F.Supp. 755 (N.D.Ill.1997). In *Razdan,* General Motors promised plaintiff a full-time position at an annual salary of $72,800, if he worked for two to three months as a contract employee. *Id.* at 757.Almost a year later, plaintiff was finally offered a full-time position at a significantly reduced annual salary.*Id.* We noted that even though the defendant's altered offer was made relatively soon after the original employment promise, it did not support a fraud claim because the facts as alleged in the complaint indicated that defendant negotiated in good faith and communicated its limitations. 979 F.Supp. at 759. AHMA's claim is significantly different from that in *Razdan.*First, the time between Reed's promise and its breach was much shorter than in *Razdan.*Given that the trade shows occurred about one month after the February 17th meeting, it is conceivable that Reed was preparing for them at the same time that MacDonald was assuring plaintiff it would not participate in any competing shows. Second, unlike in *Razdan,* we do not note factual allegations by plaintiff that undermine its claim that Reed schemed to fraudulently induce plaintiff to sign the separation agreement.

*7 Citing *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill.1989), Reed also argues that the inference created by proximate breaches can only support an allegation of fraud where there is a larger scheme of deceit. In fact, in *HPI Health Care Services, Inc.,* the Illinois Supreme Court merely affirmed what we stated above-a false

promise of future conduct is only actionable when it "is alleged to be the scheme employed to accomplish the fraud."137 Ill.Dec. 19, 545 N.E.2d at 682. AHMA has alleged that Reed used these promises to secure plaintiff's acceptance of the separation agreement and release.

Defendants maintain that AHMA's claims regarding Reed's participation in competing trade shows fails to support its promissory fraud claim for other reasons as well. First, Reed argues that plaintiff could not reasonably rely on MacDonald's oral promises that Reed would not participate in any competing trade shows. Reed contends that plaintiff could only rely on the promise made in the separation agreement, which contained a provision stating that it superseded all prior oral understandings. Generally, whether a party's reliance was reasonable is a question of fact. *Talton v. Unisource Network Services, Inc.,* 2004 WL 2191605 at *7 (N.D.Ill.2004); *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.,* 250 F.3d 570, 574 (7th Cir.2001). However, Reed maintains that even accepting AHMA's pleadings as true, no reasonable trier of fact could find that plaintiff reasonably relied on MacDonald's oral promises.

Paragraph 13 of the separation agreement reads: "This Agreement and the exhibits attached hereto embody the entire agreement and understanding of the parties with respect to the transaction contemplated hereby and supersede all prior or contemporaneous written or oral commitments, arrangements or understandings with respect hereto."Reed contends that this provision is a "non-reliance clause" that precludes a fraud claim rooted in oral representations. *See**Rissman v. Rissman,* 213 F.3d 381, 383-384 (7th Cir.2000). Plaintiff counters that this "integration clause," while relevant for contract claims, does not bar its fraud claim. *See**Tricontinental Industries Ltd. v. Anixter,* 215 F.Supp.2d 942, 950 (N.D.Ill.2002)(denying motion to dismiss fraud claim based on extra-contractual misleading report, despite contract with merger clause).

Though Reed equates the clause in the separation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 7
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

agreement with the non-reliance clause described in *Rissman,* they are notably different. The contract in *Rissman* states that "[t]he parties further declare that they have not relied upon any representation of any party ..." and "no promise or inducement for this Agreement has been made ..." and "this Agreement is executed by [plaintiff] freely and voluntarily, and without reliance upon any statement or representation...."213 F.3d at 383. In contrast, the clause in the separation agreement concerns the delineation of the contract's terms and does not mention reliance. Nonetheless, the clause is very similar to those discussed in two cases upon which the Seventh Circuit relied in reaching its decision in *Rissman.Id.* (citing *Jackvony v. RIHT Financial Corp.,* 873 F.2d 411, 416 (1ˢᵗ Cir.1989)(precluding fraud claim based on misleading oral statements because parties' agreement states that it "constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral ... with respect to the subject matter...."); *One-O-One Enterprises, Inc. v. Caruso,* 848 F.2d 1283, 1286-87 (D.C.Cir.1988)(finding no reasonable fraud claim based on oral representation where subsequent agreement between parties stated the agreement "supersede[d] any and all previous understandings and agreements.")). The Seventh Circuit described both of the clauses in those two cases as non-reliance clauses.

*\*8* Though the clause in the parties' separation agreement could arguably be construed as a non-reliance clause, "the issue of reasonable reliance has always depended upon an analysis of all relevant circumstances."*Rissman,* 213 F.3d at 388 (Rovner, J., concurring). Courts have refrained from following *Rissman* where the alleged oral representation does not contradict a written provision of the contract. *SeeSequel Capital, LLC v. Rothman,* 2003 WL 22757758 at *17 (N.D.Ill.2003)("Sequel seeks relief not for prior oral agreements that contradict statements contained in the Purchase Agreement but, instead, because the defendants, in an attempt to induce Sequel to sign the Purchase Agreement, presented Sequel with al-

legedly misleading information."). Reed argues that MacDonald's statements do contradict the written provisions of the separation agreement. A section on "Restrictive Covenants" states that Reed will not sponsor or conduct any competing trade show "within a fifty (50) mile radius of Chicago, Illinois."It maintains that since MacDonald's alleged oral promise not to participate in a competing trade show anywhere in the United States is broader than this limited written restriction, it contradicts the written agreement and therefore cannot be reasonably relied upon. However, this written restriction, while narrower in geographic scope, is much broader in temporal scope-it restricts Reed's activities not until August 16, 2003, but until two years after that date.

At this stage we cannot find that plaintiff's reliance on MacDonald's alleged oral misrepresentations was unreasonable because provisions in the separation agreement support representations that Reed would not participate in a competing trade show during the term of the show agreement. The separation agreement states: "The Show Agreement shall remain in full force and effect from the date hereof until the Effective Date [August 16, 2003]." A subsection on "Future Exhibitions" further provides that after August 16, 2003, the parties can sponsor and conduct trade shows subject only to the restrictions in the separation agreement, but before that date their activities related to future trade shows are limited by more stringent restrictions. Neither of these provisions indicates that after the execution of the separation agreement Reed could participate in any trade show except competing shows within fifty miles of Chicago.

Defendant also argues that AHMA has not plead enough detail regarding Reed's participation in the relevant trade show to meet the pleading standards for a fraud claim. Rule 9(b) sets out heightened pleading standards for fraud claims separate from Illinois' specific objective manifestation requirement for promissory fraud. The rule provides that "circumstances constituting fraud or mistake shall

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

be stated with particularity."In other words, plaintiffs must state "the who, what, where, and when of the alleged fraud."*Ackerman v. Northwestern Mutual Life Insurance Co.,* 172 F.3d 467, 469 (7th Cir.1999). Though Reed contends that plaintiff's allegations do not come close to meeting the standards of Rule 9(b), AHMA does allege the who, what, where and when with particularity. As discussed at length above, plaintiff describes Mac-Donald's alleged oral representations made to representatives of AHMA on February 26, 2003, at a meeting in the Grand Hyatt Hotel in New York City. The representations included that Reed would adhere to the show agreement through August 16, 2003, and would not participate in competing trade shows in accordance with the terms of the separation agreement. Plaintiff attached the show agreement and separation agreement containing written provisions regarding the parties' participation in competing trade shows. The complaint further alleges that despite these representations, "Reed subsequently presented, conducted, sponsored and/or managed three trade shows in violation of the Show Agreement ... (1) the Midwest Builders Show (March 18-21, 2003), (2) the International Security Conference and Exposition (March 26-28, 2003), and (3) the Home Automation Show (March 26-28, 2003)." These allegations provide the particulars required for pleading fraud. Defendants contend that the complaint fails to plead facts supporting the allegation that these trade shows primarily relate to "hardware, lawn, garden and/or home improvement products," and thus breach promises made by Reed. But, for purposes of this motion, the names of at least two of the shows (Midwest Builders Show and Home Automation Show), along with plaintiff's allegations, suffice to support this claim.

**\*9** We deny defendants' motions to dismiss all claims to the extent that they relate to action or omissions occurring prior to February 26, 2003. By implication, their motion to dismiss all remaining counts without prejudice, for failure to separate claims involving actions prior to that date, from claims involving only actions occurring after that

date, is also denied.

*Breach of Contract*

We now turn to Reed's argument regarding plaintiff's breach of contract claim-an argument that implicates other claims in the complaint. Count V alleges that Reed breached the show agreement and corollary agreements in a variety of ways. Though Reed does not move to dismiss count V in its entirety, it does call for much of the count to be stricken.

Reed contends that the show agreement attached to the complaint contradicts plaintiff's allegations that Reed was obligated to share all revenue from and pay all expenses for the hardware show. AHMA counters that Reed's argument is an improper factual argument, irrelevant to a motion to dismiss. Plaintiff misses the mark. While the court accepts the plaintiff's allegations as true for purposes of a motion to dismiss, "when a written instrument contradicts allegations in a complaint to which it is attached, the exhibit trumps the allegations."*Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998). Documents attached to the complaint are part of the pleadings and if those documents do not support the allegations, then a plaintiff can effectively plead itself out of court.*Thompson v. Illinois Department of Professional Regulation,* 300 F.3d 750, 754 (7th Cir.2002)("[W]here a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim."); *In the Matter of Wade,* 969 F.2d 241, 249 (7th Cir.1992). And so, our inquiry is not whether AHMA is entitled to a percentage of all revenues from the hardware show under the parties' agreements, but whether the instruments attached to AHMA's complaint negate plaintiff's claim to a percentage of all revenues.

The show agreement establishes AHMA's entitlement to a percentage of the revenues from the sale or rental of space at each show, which, plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

points out, was the only source of revenue at the time the parties entered into the agreement.[FN2]The show agreement has no provision concerning all revenue derived from the show or concerning any revenue streams developed in the future. However, plaintiff's claim to a portion of all revenue does not rest solely on the show agreement. The complaint states that numerous agreements subsequent to the show agreement, which were recorded in annual financial reports and meeting minutes, "required that all lawful revenue derived from the Show and collected by Reed would be shared with AHMA" (cplt.¶ 35). The federal pleading rules do not require plaintiff to attach the referenced agreements, see*Lynch v. Maerklin of America, Inc.,* 1989 WL 82002 at *5 (N.D.Ill.1989)(citing 5 C. Wright & A. Miller, Federal Practice & Procedure § 1363 (1969)), and it has not done so.

> FN2. AHMA notes several times that the sale and rental of exhibit space was the only source of revenue when the parties entered into the show agreement. AHMA's implication is that since this was the only source of revenue, it was all the revenue, and thus, from the beginning, the parties contracted for plaintiff to receive a portion of all the revenue. This implication alone does not support AHMA's allegations. For even if the parties had a limited view of the show's revenue sources in 1977, they came to recognize that the sale and rental of exhibit space was not the only potential source of revenue. Over the course of AHMA's and Reed's relationship they developed several other revenue streams, making it obvious that revenue could flow from many other sources. The question then becomes whether AHMA and Reed had an agreement to share all of this revenue and potential revenue or rather just revenue from specific sources.

*10 An amendment to the show agreement, which is attached to the complaint, undermines plaintiff's

allegations regarding these subsequent agreements as well. The second amendment to the show agreement states that the parties "have from time to time agreed to allocate specific items of expense or revenue, as applicable, in a manner different from that provided in the [show agreement]." Thus, these agreements did not purport to address the allocation of all revenue, but rather specific sources of revenue. Furthermore, even though federal pleading does not require plaintiff to attach these agreements, it must sufficiently plead the elements of its claim. For a contract claim, plaintiff must identify "the relevant agreement, the basic contents of that agreement, and the pertinent parties."*Moore v. Fidelity Financial Services, Inc.,* 869 F.Supp. 557, 560-61 (N.D.Ill.1994); *Hoopla Sports and Entertainment, Inc. v. Nike, Inc.,* 947 F.Supp. 347,356 (N.D.Ill.1996). Plaintiff has not identified an agreement that entitles AHMA to a share of all revenues from the hardware show. Plaintiff has stated that the parties entered into various agreements which addressed assorted sources of revenue, including kiosk advertising, website sales, and directory sponsorship. Perhaps plaintiff's assumption is that these various agreements for specific sources of revenue cover the field of revenue and create the inference that AHMA was entitled to a percentage of all revenue. However, plaintiff's breach of contract pleading cannot rely on such an assumption, it must meet the minimal requirements for pleading breach of contract.

As plaintiff has failed to state a claim for breach based on its entitlement to all revenue, it also fails to state a claim for breach based on Reed's failure to report all revenue in its accounting statements. Paragraph 10(d) of the show agreement requires Reed to present AHMA with a certificate from an independent certified public accountant attesting to the fact that Reed correctly calculated its payments to AHMA in accordance with the terms of the agreement. AHMA alleges that the accountings did not reflect payments Reed received from Freeman. However, as the pleadings fail to allege that plaintiff was entitled to such revenue under the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 10

terms of their agreements, they also fail to support the claim that Reed was contractually required to provide such information under the agreement.

Reed maintains that plaintiff fails to state a claim for breach of contract based on cost-shifting as well. Paragraph 10(a) of the show agreement states: "[Reed] shall be responsible for ... paying all expenses, except those incurred directly by [AHMA] without the consent of [Reed], incurred in conducting the Shows." The complaint asserts that Reed violated this provision by conspiring with Freeman to shift expenses for conducting the show to exhibitors. Reed counters that plaintiff does not plead a claim based on its failure to pay expenses *incurred,* but rather, based on its success in reducing expenses incurred. Cost-shifting is the result of legitimate efforts to reduce its expenses, Reed argues, and neither the show agreement nor any other agreement between the parties barred it from reducing its costs. Reed argues that the court would need to accept a "tortured characterization" of the show agreement to find that it failed to pay expenses incurred by negotiating that the expenses never be charged (or be charged for less).

*11 Unlike plaintiff's allegations that it was entitled to all revenue from the show-which were contradicted by the attached agreements and relied on insufficient allegations of other contracts-plaintiff's allegations regarding Reed's payment obligations cannot be dismissed at this stage. The show agreement does not clearly contradict plaintiff's allegations. Determining whether or not Reed failed to pay expenses incurred through cost-shifting requires contract interpretation and consideration of evidence regarding Reed and Freeman's transactions, and, thus it is inappropriate for a motion to dismiss.

Other claims also remain in count V. Plaintiff has alleged that Reed failed to report revenue gained from certain hardware show vendors and from the sales of exhibit space, and failed to pay AHMA a percentage of these revenues. AHMA has also sufficiently plead a claim of breach of contract based

on Reed's management of allegedly competing trade shows.

Concerned that discovery resources will be spent exploring dismissed claims, Reed requests that portions of the complaint asserting dismissed claims be stricken. Where a count cannot be dismissed in its entirety, but only in part, Reed seeks to excise certain paragraphs. In count V, Reed moves to strike paragraphs 138-141, addressing plaintiff's failed claim for breach of contract based on its entitlement to a portion of all revenue derived from the hardware show. Under Rule 12(f), the court may strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading. However, we deny Reed's request to strike these and any other paragraphs because it is unnecessary and in some instances improper. For example, while paragraphs 138 through 141 assert that Reed was required to pay AHMA a share of all revenue derived from the hardware show, they also assert that Reed failed to pay AHMA the proper amount of revenue derived from exhibit space sales, as well as other sources of revenue. Thus, these paragraphs contain statements implicating both a dismissed claim and a sufficiently-plead claim. The court is not going to copy-edit plaintiff's complaint-sifting through the complaint to strike all offending sentences and references. Our ruling on defendants' motions to dismiss plaintiff's counts, whether in whole or in part, will provide sufficient guidance for the parties as to what is relevant for discovery.

### Breach of Fiduciary Duty

In count IV plaintiff brings a claim for breach of fiduciary duty against Reed. The complaint states that Reed's duty stems from the parties' principal-agent relationship and Reed's "conduct, course of dealings, and other agreements" with AHMA. In its motion to dismiss, Reed argues that it only owed AHMA a fiduciary duty as to the execution of exhibitor contracts.

An agent is a fiduciary. *Citicorp Savings of Illinois*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Rucker,* 295 Ill.App.3d 801, 809, 230 Ill.Dec. 153, 692 N.E.2d 1319, 1325 (1st Dist.1998). However, under Illinois law an agent's fiduciary duty is limited to the scope of his agency. *SeeMartin v. Heinold Commodities, Inc.,* 117 Ill.2d 67, 77, 109 Ill.Dec. 772, 510 N.E.2d 840, 844 (Ill.1987); *Latimer v. Perry,* 410 Ill. 119, 128, 101 N.E.2d 531, 535 (Ill.1951)("[W]e have stated that the agent is a fiduciary only with respect to matters within the scope of the agency."); *Golden v. McDermott, Will & Emery,* 299 Ill.App.3d 982, 991, 234 Ill.Dec. 241, 702 N.E.2d 581 (1st Dist.1998); *Elliot by Elliot v. Chicago Motor Club Insurance,* 1986 WL 5646 at *3 (N.D.Ill.1986). Paragraph 7 of the parties' show agreement states: "Exhibitor contracts pertaining to Shows shall be executed by [Reed] as agent for itself and [AHMA]." Reed acknowledges that this imposes a fiduciary duty as to the execution of exhibitor contracts and in its reply brief concedes that plaintiff may have technically stated a claim for breach as to these contracts. Nonetheless, Reed argues that the focus of count IV is a variety of other allegations for which Reed owed no duty to AHMA.

*12 Plaintiff's pleadings do not support a claim for breach of fiduciary duty beyond Reed's execution of exhibitors' contracts. In addition to the show agreement's limited provision on agency, AHMA alleges that a fiduciary relationship arises from Reed's course of conduct. In Illinois, "[p]arties to a contract deal at arms' length and do not owe a fiduciary duty to one another, except when special circumstances exist."*Ward Enterprises, Inc. v. Bang & Olufsen,* 2003 WL 22859793 at *2 (N.D.Ill.2003)(citing *Bixby's Food Systems, Inc. v. McKay,* 985 F.Supp. 802, 808 (N.D.Ill.1997); *McGowan v. Pillsbury Co.,* 723 F.Supp. 530, 536 (W.D.Wash.1989)). Special circumstances may exist when "one party reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first."*Humana Health Plan, Inc. v. Heritage Indiana Medical Group, P.C.,* 2001 WL 8878 at *2 (N.D.Ill.2001)(quoting *Oil Express National, Inc. v. Latos,* 966 F.Supp. 650, 651

(N.D.Ill.1997)). When determining whether contracting businesses have a fiduciary relationship, courts consider their level of experience and the degree to which one business is subservient to the other. *Humana Health Plan, Inc.,* 2001 WL 8878 at *3. "Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship."*Oil Express National, Inc. v. Burgstone,* 958 F.Supp. 366, 370-71 (N.D.Ill.1997). Plaintiff has not alleged any facts indicating that Reed held such a dominant position. Thus, the pleadings do not support the claim that the parties had a fiduciary relationship due to special circumstances. Count IV survives dismissal to the extent it rests on Reed's fiduciary duty as AHMA's agent under the show agreement.

### Common Law Fraud

Plaintiff brings a claim for both common law fraud (count I) and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA)(count II). To state a common law fraud claim plaintiff must allege: "(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury."*Vazquez v. Sears, Roebuck & Co.,* 1999 WL 965556 at *5 (N.D.Ill.1999) (quoting *Cramer v. Insurance Exchange Agency,* 174 Ill.2d 513, 528, 221 Ill.Dec. 473, 675 N.E.2d 897, 905 (Ill.1996).

Plaintiff alleges that Reed committed fraud by making false statements regarding expenses paid for the hardware show and revenue received. Reed allegedly concealed payments received from Freeman for the 2001 hardware show by providing AHMA information that omitted reference to the kickbacks received. Plaintiff maintains that Reed omitted sim-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ilar information in 2000, 2002 and 2003. Reed allegedly intended for plaintiff to rely on this information, which it did, thus avoiding an investigation into the hardware show's financial records and ensuring plaintiff's continued involvement in the shows.

*13 Reed argues that plaintiff's fraud claim fails because it is based on the unsupported conclusion, dismissed above, that Reed had a contractual obligation to share all hardware show revenue with AHMA. Though the complaint does not sufficiently allege that contractual claim, it does not follow that the fraud claim must be dismissed.

A common law fraud claim "based on an omission or concealment of a material fact requires there to have been a duty to speak."*Abbell Credit Corp. v. Bank of America Corp.,* 2002 WL 335320 at *3 (N.D.Ill.2002)(Citing *Lidecker v. Kendall College,* 194 Ill.App.3d 309, 314, 141 Ill.Dec. 75, 550 N.E.2d 1121, 1124 (1st Dist.1990)). A duty to speak generally arises in two circumstances: "1) when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension, or 2) when the defendant owes some fiduciary duty to the plaintiff to make a full and fair disclosure and fails to correct a misapprehension of a material fact."*Coca-Cola Co. Foods Div. v. Olmarc Packaging Co.,* 620 F.Supp. 966, 973 (N.D.Ill.1985); *see Gioranno v. New-York-Insurance Co.,* 2000 WL 748142 at *9 (N.D.Ill.2000). Plaintiff alleges that Reed had an affirmative duty by virtue of their relationship to disclose all revenue. Plaintiff also alleges that the omissions were misrepresentations upon which Reed intended AHMA to rely.

As we explained above, plaintiff's allegations do not support the claim that Reed was under a contractual duty to share all revenue from the hardware show, nor to report all revenue. Moreover, plaintiff has not sufficiently plead a fiduciary duty beyond Reed's limited role as its agent, as specified in paragraph 7 of the show agreement. Nonetheless,

plaintiff's allegations contend that it was Reed's actions-its provision of financial data regarding the show-that created the misapprehension that there was no other revenue derived from the show. Allegedly, Reed intentionally failed to correct this misapprehension to ensure AHMA's continued commitment to the show. Even though plaintiff has not sufficiently plead a contractual right to a portion of the concealed payments, it has still plead damages as a result of the omission. Plaintiff claims that as a result of Reed's misrepresentation, it was unaware of defendant's arrangements with Freeman and show exhibitors continued to be overcharged for services, leading to the decline in the National Hardware Show's success.

Defendants argue that even if plaintiff alleges the elements of fraud, it fails to plead them with the level of particularity required by Rule 9(b). As explained above, under Rule 9(b), "allegations must be specific enough to provide the defendants with a general outline of how the alleged fraud scheme operated and of their purported role in the scheme."*Menard, Inc. v. U.S. Equities Development, Inc.,* 2002 WL 31050160 at *6 (N.D.Ill.2002)(quoting *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 347 (N.D.Ill.1997). AHMA alleges who sent the misleading financial information, when it was sent, and how it constitutes fraud. Nonetheless, Reed asserts that plaintiff has not sufficiently plead scienter. Rule 9(b) does not require a plaintiff to plead defendant's mental state with particularity, it only requires "a basis for believing that the plaintiff[ ] could prove scienter."*Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 650 n. 7 (7th Cir.1997)(quoting *DiLeo,* 901 F.2d at 629). As a plaintiff can aver "[m]alice, intent, knowledge, and other condition of mind" generally under Rule 9(b), sufficient factual support for scienter exists where plaintiff pleads the circumstances of fraud in detail. *See Sullivan v. Rilling,* 1999 WL 199602 at *2 (N.D.Ill.1999). Plaintiff has provided this detail and has therefore satisfied the rule's requirements.

*ICFA*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 13
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

\*14 In count II, AHMA alleges that both Reed and Freeman violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (ICFA). To state a claim under the ICFA, plaintiff must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception."*Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 149, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (Ill.2002). AHMA alleges that Reed and Freeman engaged in four different acts or practices that violated this statute: (1) Freeman's payment of kickbacks to Reed in return for the position as general contractor of the hardware show, (2) passing the costs for conducting the show on to association members and show exhibitors, (3) Freeman's payment of bribes to Reed in return for the position as general contractor of the hardware show, and (4) concealing material facts from AHMA with the intent of deceiving the association and allowing it to rely on false and incomplete information. Plaintiff also alleges that Reed used AHMA trademarks and goodwill to create the false impression that the association was involved with Reed's 2004 Las Vegas Event.

Reed contends that plaintiff's ICFA claim may only rest on its trademark allegations. The other four grounds, defendant argues, fail the consumer nexus test. To state a claim under the ICFA, a party must be a consumer, as defined by the state statute, or must demonstrate that the alleged conduct relates to consumer protection issues. *3Com Corp. v. Electronic Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 939 (N.D.Ill.2000)(citing *Athey Products Corp. v. Harris Bank Roselle,* 89 F.3d 430, 437 (7th Cir.1996)(other citations omitted)). Under the Illinois statute a consumer is "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."815 ILCS 505/1. Since plaintiff does

not allege that it meets this definition of consumer, there must be a nexus with consumer protection in order to bring the claim.

Citing *Ivanhoe Financial, Inc. v. Mortgage Essentials, Inc.,* 2004 WL 856591 at \*1 (N.D.Ill.2004), plaintiff argues that it does not need to allege a nexus between defendants' alleged activity and consumer protection concerns because it was directly harmed by defendants' conduct. While the ICFA is to be liberally construed, see*Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 534, 137 Ill.Dec. 409, 546 N.E.2d 33, 40 (2d Dist.1989), the act does not confer standing on any party affected by a defendant's harmful conduct. We did not address the consumer nexus test in *Ivanhoe Financial Inc.,* because the corporate plaintiff was a consumer of the defendant's services. *Id.* at \*2. But as plaintiff is not alleged to be a consumer of Reed's goods or services, we must determine "whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns."*Downers Grove Volkswagen, Inc.,* 190 Ill.App.3d at 534, 137 Ill.Dec. 409, 546 N.E.2d 33 (citing *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.,* 657 F.Supp. 1486, 1493 (N.D.Ill.1987)). If not, plaintiff's claims fail.

\*15 The consumer nexus test was not intended to allow parties to supplant common law fraud and contract claims with the ICFA, but rather to provide companies who are not consumers under the act to sue "to redress competitive injury they suffer when other businesses deceive customers."*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 857 F.Supp. 1241, 1248 (N.D.Ill.1994)(citing *Downers Grove Volkswagen, Inc.,* 190 Ill.App.3d at 533, 137 Ill.Dec. 409, 546 N.E.2d 33). Any mere effect on consumers as a result of defendant's actions does not suffice to "implicate consumer protection." See*Pressalite Corp. v. Matsushita Electric Corp. of America,* 2003 WL 1811530 at \*10 (N.D.Ill.2003)(citing *Williams Electronic Games Inc. v. Barry,* 2001 WL 1104619 at \*10

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

(N.D.Ill.2001); *Simon v. Oltmann,* 2001 WL 1035719 at *8 (N.D.Ill.2001)). While consumer protection concerns cannot be clearly delineated, they often involve "sharp practices" intended to mislead consumers. *Simon,* 2001 WL 1035719 at *8. Plaintiffs established a consumer protection nexus where a corporate defendant distributed brochures containing false information about the plaintiff to consumers, *seeDowners Grove Volkswagen, Inc.,* 190 Ill.App.3d at 534, 137 Ill.Dec. 409, 546 N.E.2d 33; and where a party's deceptions of its contracting partner were intended to facilitate the sale of contaminated corn feed into the European food chain, *seeStickle Enterprises, Ltd. v. CPS International, Inc.,* 1997 WL 767301 at *4 (N.D.Ill.1997). Plaintiffs failed to establish a nexus where a subcontractor breached its agreement with a contractor, *seeLake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.,* 275 Ill.App.3d 452, 460, 211 Ill.Dec. 299, 654 N.E.2d 1109, 1116 (2d Dist.1995); where the defendant schemed to attract business with no intention of performing promised services, *seeCentral Diversey M.R.I. Center, Inc. v. Medical Management Sciences, Inc.,* 952 F.Supp. 575, 577-78 (N.D.Ill.1996); and where the defendant made misrepresentations to its partners in a real estate joint venture so they would terminate the joint venture, allowing defendant to sell the property at a large profit, *seeVan Brock v. Chicagoland Service Corp.,* 1990 WL 84534 at *4 (N.D.Ill.1990);

In light of these decisions we find that only one of plaintiff's claims in count II alleges the necessary nexus with consumer protection-AHMA's allegations that Reed promoted its 2004 Las Vegas convention with AHMA's trademarks to capitalize on the association's good will and create the false impression that it was involved with the show. This alleged deception was directed at consumers in contrast to AHMA's other four claims involving bribes between Reed and Freeman (which account for two of the claims), shifting the cost of the show from Reed to exhibitors, and concealing information regarding the show's finances.

While the allegations of cost-shifting arguably implicate consumer protection concerns, plaintiff never alleges that the cost-shifting involved consumer deception. Exhibitors were not the victims of a bait-and-switch scheme or price-fixing, they were just charged rates that AHMA complains were too high, leading to a drop in attendance at the hardware show. Though AHMA may find the prices charged to exhibitors unreasonable, they were not based on a consumer deception and do not support an action under the ICFA. *SeeIn re Estate of Albergo,* 275 Ill.App.3d 439, 451, 211 Ill.Dec. 905, 656 N.E.2d 97, 107 (2d. Dist.1995)(finding that reasonableness of charges is a matter of opinion that does not support claims under the ICFA). This claim, like the other three claims concerning bribes and deception, are akin to the failed ICFA allegations in *Pressalite Corp.,* 2003 WL 1811530 at *1, and *Van Brock,* 1990 WL 84534 at *1. In *Pressalite Corp.,* plaintiff alleged that defendant failed to inform plaintiff that it continued to distribute defective batteries even as they negotiated a settlement agreement to address prior shipments of defective merchandise. 2003 WL 1811530 at *1. Though consumers were the eventual recipients of the defective batteries, the defendant's alleged fraud was directed at the corporate plaintiff. *Id.* The court dismissed the ICFA claim. *Id.* at *10.Likewise in *Van Brock,* no consumer protection nexus was found, despite defendant's alleged fraud, because it was directed at plaintiff, not at consumers. 1990 WL 84534 at *4. AHMA's four claims do not involve practices directed to the market generally nor do they implicate consumer protection concerns; rather, they involve one corporation's alleged breach of contract and deception of another corporation.

*16 Count II against Reed and Freeman is dismissed to the extent it relies on claims that (1) Freeman paid Reed kickbacks or bribes in exchange for its position as general contractor of the show, (2) Reed shifted costs for conducting the show from itself to the exhibitors, and (3) it concealed, suppressed and omitted material facts from AHMA. Count II is wholly dismissed as to Freeman.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 15
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Unjust Enrichment*

In count VI, plaintiff brings a claim for unjust enrichment against both Reed and Freeman. To state a claim for unjust enrichment under Illinois law, plaintiff must establish that defendant (1) received a benefit, (2) to plaintiff's detriment, and (3) defendant's retention of the benefit would be unjust. *TRW Title Insurance Co. v. Security Union Title Insurance Co.,* 153 F.3d 822, 828 (7th Cir.1998)(citing *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989)). Plaintiff alleges that both Reed and Freeman, through their wrongful actions, have received monetary and other benefits to the detriment of AHMA. Generally, when a specific contract governs parties' relationships, the doctrine of unjust enrichment, which is based on an implied contract, does not apply. *People ex rel. Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (Ill.1992)(citing *La Throp v. Bell Federal Savings & Loan Association,* 68 Ill.2d 375, 391, 12 Ill.Dec. 565, 370 N.E.2d 188 (Ill.1977)(other citations omitted)).

Both Reed and Freeman move to dismiss. First we address Reed's motion. Reed asserts that this claim must be dismissed because a contract governs its relationship with AHMA. Plaintiff responds that unjust enrichment is a valid claim despite its contract claims, because federal pleadings may contain claims offered in the alternative, *see Citicorp Leasing Inc. v. Meridian Leasing Corp.,* 1992 WL 211050 at *3 (N.D.Ill.1992), and because the unjust enrichment claim is based on defendant's tortious conduct, not quasi-contract. While plaintiff can plead unjust enrichment in the alternative to a breach of contract claim, for it to be offered in the alternative to the contract claim it may not allege the existence of a contract governing the parties' relationship. *Team Impressions, Inc. v. Chromas Technologies Canada, Inc.,* 2003 WL 355647 at *4 (N.D.Ill.2003). Plaintiff's claim incorporates allegations of such contracts. Nonetheless, plaintiff's

claim against Reed survives the motion to dismiss.

Under Illinois law, plaintiff may allege unjust enrichment as well as the existence of a governing contract when the claim is based on defendant's tortious conduct. *Liberty Mut. Ins. Co. v. Decking and Steel, Inc.,* 301 F.Supp.2d 830, 835 (N.D.Ill.2004)(citing *Peddinghaus v. Peddinghaus,* 295 Ill.App.3d 943, 949, 230 Ill.Dec. 55, 692 N.E.2d 1221, 1225 (1st Dist.1998)(denying summary judgment on unjust enrichment claim despite contract between parties because the unjust enrichment sounded in tort, rather than quasi-contract). In *Peddinghaus,* the court reversed the dismissal of the plaintiff's unjust enrichment claim because it could properly survive based on allegations that the defendants fraudulently induced plaintiff to sell shares in a trust. 295 Ill.App.3d at 949, 230 Ill.Dec. 55, 692 N.E.2d at 1225. Reed's claim that the *Peddinghaus* court allowed the unjust enrichment claim to stand "[b]ecause the plaintiff in *Peddinghaus* sought rescission of the sale contract," is nowhere supported by the language of the case. The *Peddinghaus* court clearly stated that "[s]ince plaintiff's unjust enrichment claim is based on tort, instead of quasi-contract, *the existence of a specific contract does not defeat his cause of action."Id.* (emphasis added). Rescission of the contract had no bearing on the decision. As plaintiff has sufficiently alleged fraud and other torts against Reed, its unjust enrichment claim is not dismissed.

*17 Freeman also moves to dismiss this claim, arguing that AHMA has failed to sufficiently allege the necessary elements of unjust enrichment. The complaint states: "Freeman has received and/or retained significant monetary and other benefits, including lucrative general contractor position for the Show from Reed, through its wrongful conduct at the expense of AHMA and its members."Freeman argues that plaintiff's claim fails because it has not alleged that any wrongfully-held benefit belonged to plaintiff. The alleged benefits that Freeman received flowed not from AHMA, but from Reed. Where the benefits come from a third party, defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 16

ant's retention of the benefits is unjust where "(1) the benefits should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant."*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 161-62, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989)(internal citations omitted). While plaintiff asserts that it was Freeman's (and Reed's) wrongful conduct that allowed Freeman to procure its benefits, it does not allege that it was entitled to the benefits Freeman received.

Citing *Comcast of Illinois X, LLC. v. Hightech Electronics, Inc.,* 2004 WL 1718522 at *1 (N.D.Ill.2004), plaintiff argues that it has sufficiently plead the elements of unjust enrichment. To the contrary, the case undermines its contention. In *Comcast,* the plaintiff cable company brought an unjust enrichment claim against internet companies that assisted in the distribution of illegal cable pirating devices. *Id.* at *7. Comcast alleged that the revenue that the defendants received from companies selling these devices belonged to Comcast, because it was gained by illegally benefitting from its cable services. *Id.* at *8. AHMA, on the other hand, has not alleged entitlement to the benefits received by Freeman, only that the benefits received led to the association's loss of revenues from hardware shows. Count VI against Freeman is dismissed.

*Tortious Interference*

Plaintiff labeled count XI a claim for "Tortious Interference with Prospective Economic Advantage and Contractual Relationships."*Reed argues that under Illinois law tortious interference with prospective economic advantage and tortious interference with contractual relationships are two different claims, *seeInternational Marketing, Ltd. v. Archer-Daniels-Midland Co., Inc.,* 192 F.3d 724, 731 (7th Cir.1999), and that plaintiff has failed to plead the

elements for the latter. In its response to Reed's motion to dismiss, AHMA concedes that it has not plead a claim for interference with contractual relationships. Defendant's motion to dismiss Count XI is therefore granted as to this claim, but denied as to the claim for interference with prospective economic advantage.

*Accounting*

**\*18** Count XII of plaintiff's complaint is for a full accounting as to the revenues received and expenses incurred relating to the hardware show. Defendant argues that plaintiff alleges insufficient grounds for this separate cause of action, while plaintiff maintains that the Lanham Act, common law, and equity all support this claim. As defendant points out, plaintiff's assertion that an accounting is a possible remedy for a violation of the Lanham Act is irrelevant to the inquiry whether plaintiff may pursue a common law or equitable cause of action for an accounting.

Under Illinois law, the elements of a claim for accounting are "the absence of adequate remedy at law and either a breach of fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts which are of a complex nature."*Williams Electronic Games, Inc. v. Barry,* 2001 WL 1104619 at *10 (N.D.Ill.2001)(citing *3Com Corp. v. Electronic Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 942 (N.D.Ill.2000)). Though plaintiff acknowledges the adequacy of a legal remedy for the majority of its claims, it does explicitly allege the lack of an adequate remedy at law for its unfair competition claims. The motion to dismiss this claim is denied. As this court has noted in prior actions, retaining this claim will most likely be of little consequence since discovery will likely reveal the information plaintiff seeks.

*Civil Conspiracy*

Both Reed and Freeman seek to dismiss Count III for civil conspiracy. "The elements of a civil con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

spiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act."*Fritz v. Johnston,* 209 Ill.2d 302, 317, 282 Ill.Dec. 837, 807 N.E.2d 461, 470 (Ill.2004)(citing *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62-63, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (Ill.1994). Plaintiff alleges that Reed and Freeman schemed to obtain various benefits by defrauding AHMA-a fraud which, as discussed above, plaintiff alleged in counts I and II.

Defendants argue that plaintiff fails to adequately plead the third requirement for a conspiracy claim-the commission of a tort in furtherance of the conspiracy. They acknowledge that AHMA indicates that defendants engaged in fraud to achieve their purpose, but re-assert that plaintiff has failed to state a claim for fraud. Had we agreed that defendant failed to state a claim for fraud, then this claim would fail. However, plaintiff has sufficiently plead claims for fraud against Reed. Thus, plaintiff's assertion that Reed engaged in fraud in furtherance of defendants' conspiracy satisfies the third element of the claim. Moreover, we find that the complaint provides a sufficient sketch of the who, what, when, where and how concerning the conspiracy to satisfy the heightened pleading standard.

*CONCLUSION*

**\*19** For the foregoing reasons, defendants' motions are granted in part and denied in part. The motion to dismiss all claims to the extent they are based on acts and omissions occurring before February 26, 2003, is denied. Count V for breach of contract is dismissed in part; plaintiff has failed to state a claim based on its right to a portion of all revenue from the hardware show or on Reed's obligation to report all revenue. Otherwise, the motion to dismiss count V is denied. Count IV for breach of fiduciary duty is also dismissed in part. Plaintiff has stated a claim only to the extent it rests on AHMA's agency

under the terms of the show agreement. The motion to dismiss count I for common law fraud is denied. Count II, for violation of the ICFA, is dismissed in part as to Reed, and is wholly dismissed as to Freeman. Count II states a claim against Reed based on its allegations that Reed misrepresented AHMA's involvement in defendant's 2004 Las Vegas event. Plaintiff's other claims under count II fail. Reed's motion to dismiss count VI for unjust enrichment is denied. Freeman's motion to dismiss count VI is granted. Count XI for tortious interference with prospective economic advantage and contractual relationships is dismissed to the extent it alleges a claim for interference with contractual relationships. The motion to dismiss count XII for a full accounting is denied. Finally, both motions to dismiss count III for civil conspiracy are denied.

N.D.Ill.,2004.
American Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.
Not Reported in F.Supp.2d, 2004 WL 3363844 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.