**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PLATINUMTEL COMMUNICATIONS, LLC, | ) ) | |
| | ) | Civil Action No. 08 CV 1062 |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Judge JOAN H. LEFKOW |
| ZEFCOM, LLC d/b/a TELISPIRE, TELISPIRE, INC, et al, | ) ) | |
| | ) | |
| Defendants. | ) | |

**SEPARATE APPENDIX OF UNPUBLISHED CASES CITED IN
DEFENDANT TELISPIRE'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS PLATINUMTEL'S AMENDED COMPLAINT**

Terri L. Mascherin
Jeffrey S. Eberhard
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 222-9350

*Counsel for Defendant Zefcom, LLC
d/b/a Telispire, Inc*

# TABLE OF CONTENTS

**TAB     CASE**

1.  *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, No. 91 C 2092, 2000 WL 310304 (N.D. Ill. Mar. 24, 2000).

2.  *Cardionet, Inc. v. Lifewatch Corp.*, No. 07 C 6625, 2008 WL 567031 (N.D. Ill., Feb. 27, 2008)

3.  *Hydra-Stop, Inc. v. Severn Trent Envtl. Servs., Inc.*, No. 03 C 4843, 2005 WL 2035584 (N.D. Ill. Aug. 19, 2005)

4.  *Midwest Canvas Corp. v. Commonwealth Canvas Inc.*, No. 07 C 0085, 2008 WL 162757 (N.D. Ill. Jan. 16, 2008)

5.  *Muzikowski v. Paramount Pictures Corp.*, No. 01 C 6721, 2003 WL 22872117 (N.D. Ill. Dec. 2, 2003)

6.  *Rosenthal Collins Group, LLC v. Trading Tech. Int'l*, No. 05 C 4088, 2005 WL 3557947 (N.D. Ill. Dec. 26, 2005)

7.  *West v. Miller*, No. 05 C 4977, 2006 WL 2349988 (N.D. Ill. Aug. 11, 2006)

# TAB 1

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

Alexander Binzel Corp. v. Nu-Tecsys Corp.
N.D.Ill.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
ALEXANDER BINZEL CORPORATION and Al-
exander Binzel GmbH & Co., KG, Plaintiffs/
Counter-Defendants,
v.
NU-TECSYS CORPORATION and Karl-Heinz
Binzel, D efendants/Counter-Plaintiffs.
**No. 91 C 2092.**

March 24, 2000.

### MEMORANDUM OPINION AND ORDER

PALLMEYER, J.
**\*1** The parties to this case are a well-known Ger-
man manufacturer of welding equipment and an
American corporation established by the son of the
German company's founder. On April 8, 1991, Al-
exander Binzel Corporation ("Binzel U.S.") and Al-
exander Binzel GmbH ("Binzel Germany") sued
Nu-Tecsys Corporation ("Nu-Tecsys") and its Pres-
ident, Karl-Heinz Binzel ("Karl-Heinz") alleging
Lanham Act violations, common law trademark in-
fringement, unfair competition and violations of the
Illinois Uniform Deceptive Trade Practices Act.
Binzel's claims related to Nu-Tecsys' production
and sale of high-tech welding guns. Nu-Tecsys
filed four counterclaims, alleging violations of the
Lanham Act, common law unfair competition, viol-
ations of the Illinois Uniform Deceptive Trade
Practices Act and Illinois Consumer Fraud and De-
ceptive Business Practices Act, and intentional in-
terference with prospective economic advantage.
Nu-Tecsys' claims arise from Binzel U.S.'s distribu-
tion of a disparaging letter at a trade show resulting
in business detriment to Nu-Tecsys. After the jury
rendered a verdict against Binzel U.S. on its claims
and in favor of Nu-Tecsys on its counterclaims,

Binzel U.S. moved to amend the judgment, for
judgment as a matter of law on Nu-Tecsys' counter-
claims, or in the alternative, for a new trial. Nu-
Tecsys simultaneously filed post-trial motions seek-
ing enhanced damages, punitive damages and attor-
neys' fees. For the reasons set forth below, Binzel
U.S.'s motions for judgment as a matter of law and
for a new trial are denied and its motion to amend
the judgment is granted; Nu-Tecsys' motions for en-
hanced and punitive damages and fees are denied.

### FACTUAL BACKGROUND

The protracted procedural history relating to this
dispute between Karl-Heinz and the company foun-
ded by his father has already been set forth by this
court in its earlier ruling on Plaintiffs' motion to
dismiss and Defendants' motion for summary judg-
ment. *See Binzel v. Nu-Tecsys Corp.,* No. 91 C
2092, 1999 WL 166972, at [*] 1 (N.D.Ill. Mar. 23,
1999). Furthermore, the parties are familiar with
the facts as they were presented at trial. For pur-
poses of this opinion, the court will now focus only
on the facts that relate to Nu-Tecsys' counterclaims.
Moreover, references in this opinion to
"Counter-Defendant" are references to Binzel U.S.
only; likewise, references to "Counter-Plaintiff" are
references to Nu-Tecsys only.[FN1]

> FN1. As discussed *infra,* the jury rendered
> a verdict in favor of Defendant Nu-Tecsys
> Corporation only. The jury concluded, fur-
> ther, that Binzel Germany was not liable
> for the wrongful conduct alleged by Nu-
> Tecsys. (Verdict Form.)

Binzel U.S. is the United States distributor and as-
sembler of genuine Binzel welding equipment man-
ufactured by Binzel Germany. Karl-Heinz is the
former president and part-owner of Binzel U.S.,
and is now the president and owner of Nu-Tecsys, a
corporation he established in 1986 to manufacture
and sell welding guns. (Tr. 522-24.) From 1986 un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

til early 1990, Binzel Germany, and Binzel affiliates in Scandinavia and Australia supplied Binzel parts and complete welding equipment to Nu-Tecsys, which Nu-Tecsys sold to the consumer market. (Tr. 526-27.) In September 1990, Nu-Tecsys began manufacturing and selling Metallic Inert Gas ("MIG") welding guns, a type of welding gun that Binzel U.S. also manufactured. (Tr. 586, 591.) In this lawsuit, filed April 8, 1991, Binzel U.S. claimed trade dress rights in the shape and color of Nu-Tecsys guns, and alleged that Nu-Tecsys infringed on its MIG design.

**\*2** Nu-Tecsys filed unfair competition counterclaims against Plaintiff. At trial, Nu-Tecsys presented three principal pieces of evidence to establish Binzel U.S.'s anti-competitive conduct. First, Binzel U.S. distributed a letter at a trade show in Detroit, Michigan, on April 16, 1991 (the "Detroit Letter"). (Def. Ex. 1001 .) The letter contained three phrases which Nu-Tecsys alleged were false and misleading: (1) "The MIG guns marketed by Nu-Tecsys [sic] Corporation are not produced or endorsed by Alexander Binzel Corporation of Frederick, Maryland[;]" (2) "This action was taken to protect users of original Binzel MIG guns from counterfeit product[;]" and, finally (3) a description of Binzel U.S.'s exclusive rights to distribute "copies and/or colorable imitations of the red-handled and blue-handled Binzel MIG welding tools and other Binzel trade dress, the Binzel model and part numbers, and products partially assembled from Binzel parts."(*Id.*) Nu-Tecsys also argued that testimony by William Bridges ("Bridges"), the former president of Binzel U.S., evidenced Counter-Defendant's anti-competitive conduct. Specifically, Nu-Tecsys points to Bridges' testimony that he "intimated" to customers that they would be "cut-off" if they purchased goods from Nu-Tecsys, and that throughout his tenure at Binzel U.S., he "never" stopped making such intimations. (Tr. 885-86.) Finally, when questioned about whether he was involved in the production of any letters containing such intimations, Bridges testified that he was not. (Tr. 887-88.) Nu-Tecsys impeached

Bridges on that testimony by producing a letter distributed by Binzel Canada (Def.Ex. 1122) (the "Canada Letter"), and drafted by Bridges in his own handwriting. (Def.Ex. 1123.) Nu-Tecsys argued that this letter, which read, "I wish to inform you of some recent developments that could seriously impact your business and your relationship with our joint customers," constituted unfair competition. (Tr. 1297.)

The jury entered judgment in favor of Nu-Tecsys on its counterclaims and awarded damages in the amount of $4 million. The $4 million judgment consisted of $1.81 million in Nu-Tecsys' lost profits and $3.03 million in Binzel U.S.'s wrongful profits, reduced by the jury to $4 million to account for any overlap. It is this judgment and damages award that Binzel U.S. now challenges.

## DISCUSSION

A number of post-trial motions are before the court. The court will address each in turn.

## I. Counter-Defendant's Motion for Judgment as a Matter of Law

Binzel U.S. urges this court to enter judgment in its favor on Nu-Tecsys' counterclaims, arguing that the factual bases for the jury's finding of liability are insufficient as a matter of law to support the jury's verdict. Specifically, Binzel U.S. argues that the Detroit Letter provides no basis for liability, first, because it was issued as publicity incidental to the lawsuit, and is therefore privileged by the *Noerr-Pennington* doctrine, and, second, because the statements in the letter were not false or misleading. Next, Binzel U.S. argues that Bridges' "intimation" testimony is insufficient to sustain a verdict of unfair competition or intentional interference with Nu-Tecsys' prospective economic advantage because a manufacturer has the freedom to exercise discretion in deciding with whom to deal.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

A. Standard of Review

**\*3** Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."FED. R. CIV. P. 50(a)(1); *see also Lane v. Hardee's Food Systems, Inc., 184 F.3d 705, 706 (7th Cir.1999).* When deciding a motion for judgment as a matter of law, the court may not resolve any conflict in the testimony nor weigh the evidence. *See id.*Instead, the court must view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party, and determine whether substantial evidence, and not a mere scintilla of evidence, could support a jury verdict. *See Willis v. Marion County Auditor's Office, 118 F.3d 542, 545 (7th Cir.1997).* Nevertheless, if "there is any basis upon which a reasonable jury could reach the conclusion that it did," the verdict must be upheld. *See Frazier v. Norfolk & W. Ry. Co., 996 F.2d 922, 924 (7th Cir.1993).*

B. The Detroit Letter and the *Noerr-Pennington* Doctrine

Binzel U.S. argues that Nu-Tecsys' counterclaims are barred by the *Noerr-Pennington* doctrine because the lawsuit itself and any incidental publicity, namely the Detroit Letter, are privileged activity. The *Noerr-Pennington* doctrine provides immunity from liability arising out of the filing and maintaining of a civil lawsuit, so long as the litigation is not a sham. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56-57 (1993).* The Supreme Court has defined "sham" litigation as involving a lawsuit that is both (1) objectively baseless, and (2) intended as an anti-competitive weapon. *See id.* at 60-61.

Most courts to consider the issue have extended *Noerr-Pennington* immunity to shield non-judicial acts that are "reasonably and normally attendant upon protected litigation."*See, e.g., Matsushita Elecs. Corp. v. Loral Corp., 974 F.Supp. 345, 359 (S.D.N.Y.1997)* (extending immunity to infringement warning letters sent to customers of defendants) (quoting *Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir.1983)* (citing cases)). Some cases have extended the immunity to attendant publicity and to letters threatening court action. *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n, 182 F.3d 1132, 1136 (10th Cir.1999)* (extending immunity to letters threatening suit for alleged infringement); *Thermos Co. v. Igloo Products Corp.,* No. 93 C 5826, 1995 WL 842002, at *4-5 (N.D.Ill. Sept. 27, 1995) (extending immunity to cease and desist letters sent to alleged infringers); *Aircapital Cablevision, Inc. v. Starlink Communications Group, 634 F.Supp. 316, 325-26 (D.Kan.1986)* (extending immunity to press releases publicizing the lawsuit and threatening further legal action).*But see Laitram Mach., Inc. v. Carnitech A/S, 901 F.Supp. 1155, 1161 (E.D.La.1995)* ("The *Noerr-Pennington* doctrine does not extend to sending letters to a competitor's customers alleging violation of trade secrets and infringement of patents."). In instances involving attendant publicity, a party who "has probable cause to threaten litigation and makes no assertions beyond the legal and factual bases [of the suit] may enjoy *Noerr-Pennington* immunity[.]"*See Cardtoons, 182 F.3d at 1139.*

**\*4** Binzel U.S. contends that the Detroit Letter was issued to Nu-Tecsys' customers incident to the lawsuit, and therefore is not actionable. To the extent that Nu-Tecsys suggests that the lawsuit was "sham" litigation, the court finds this argument untimely. At trial, Nu-Tecsys disavowed any such claim in open court, and conceded that a finding of liability on the counterclaims cannot be based merely on the filing and maintenance of the lawsuit.FN2(Tr. 968-71 ("[T]he bringing of the suit itself is not part of this case[.]").) The remaining question, then, is whether the statements in the Detroit Letter constitute assertions beyond the legal and factual bases of the lawsuit, and are therefore not privileged.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

Page 4

FN2. The court notes its discomfort in considering the possibility that a lawsuit that has clogged the federal court system and absorbed the attention of several lawyers and judges for nearly ten years could be a sham.

Nu-Tecsys contends that the Detroit Letter is not entitled to *Noerr-Pennington* immunity for three reasons: (1) Binzel U.S. falsely claimed exclusive rights in its trade dress; (2) the statement that Binzel U.S. did not produce or endorse the welding guns marketed by Nu-Tecsys is misleading; and (3) Binzel U.S.'s characterization of Nu-Tecsys' products as "counterfeit" is false. These arguments implicate the merits of Nu-Tecsys' counterclaims, and therefore, the court will consider the jury's finding of liability on these issues.

C. Evidence Supporting Jury's Lanham Act Finding

In order to prevail on its Lanham Act claim, Nu-Tecsys was required to show that the Detroit Letter was "literally false, or if literally true or ambiguous, that it [was] 'misleading in context, as demonstrated by actual consumer confusion.' " *See BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1089 (7th Cir.1994) (quoting *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 13 (7th Cir.1992)). The court instructed the jury on this standard, as well as on the *Noerr-Pennington* defense.FN3 (Tr. 1315, 1318, 1327.) The court also instructed the jury on the right of a trademark owner to defend against infringement as follows:

FN3. Both parties spend some time arguing whether erroneous jury instructions are sufficient to warrant judgment as a matter or law, or whether a party waives this post-trial argument when that party failed to object to the instructions at the time they were given. In fact, the jury was instructed only on the "sham" portion of the *Noerr-Pennington* defense, and not on the attendant publicity theory. Oddly, Binzel U.S.

never argues that the judge improperly instructed the jury on the *Noerr-Pennington* defense. Indeed, *Nu-Tecsys* corrected the court on the *Noerr-Pennington* defense, and the court reinstructed the jury, still omitting the attendant publicity theory, without objection from Binzel U.S. (Tr. 1325-27.)

the owner of a trademark or trade dress has a right to defend itself against infringement and to warn purchasers from an alleged infringer that they, too, might be held liable. That right, however, is limited. A trademark or trade dress owner may not send out infringement letters that contain false statements or that are issued in bad faith. Whether that portion of the letter was proper does not depend on the merits of [Binzel U.S.'s] claim, as long as [Binzel U.S.] believed at the time the letter was sent that its claims were meritorious.

(Tr. 1317.) In answer to specific interrogatories, the jury found that the Detroit Letter contained false or misleading statements, that it contained disparaging statements, and that the statements were made in bad faith. (Verdict Form, Questions B1-B3.) If there is a legally sufficient basis for a reasonable jury to find Lanham Act liability, and to reject both the *Noerr-Pennington* defense, and the right of a trademark owner to defend itself against infringement, the verdict will stand.

**\*5** The Detroit Letter stated: "This action was taken to protect users of original Binzel MIG guns from counterfeit product."Focusing on the term "counterfeit," Binzel U.S. argues that the statement is not false because the term denotes "not genuine or authentic" as defined by *Webster's Third New International Dictionary.*In other words, Binzel U.S. argues that Nu-Tecsys' product was counterfeit, or inauthentic, because it was made with Binzel parts. Nu-Tecsys counters, arguing that the term has a common sense meaning of "fake," a meaning the jury could have adopted in making its liability determination.

During the hearing on instructions for the jury, the

—

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

court rejected Binzel U.S.'s attempt to enter a "legal" definition of the word "counterfeit" in the jury charge. Instead, the court ruled that the meaning of counterfeit was a matter for argument. (Tr. 1172-75.) Binzel U.S. offered the dictionary definition into evidence, and the court took judicial notice of that definition. (Tr. 1001-02.) In making its closing arguments, Binzel U.S. argued that this definition that should apply to the statement in the Detroit Letter. (Tr. 1252 ("[T]his looks like a genuine Binzel gun, but it's not genuine or authentic. It's not the real thing. It fits within the definition of counterfeit.").) Nu-Tecsys argued what is characterizes as the "common sense" meaning; that the guns were genuine Nu-Tecsys guns with some Binzel parts, not fake Binzel guns. (Tr. 49-50, 1267 ("What do you think of when you hear counterfeit?... Fake....[Y]ou don't need a dictionary to know what counterfeit means.").) The court further instructed the jury to consider the evidence "in light of your own observations and experiences in life ."(Tr. 1306.)

The jury was free to adopt the common sense meaning, and find the statement in the letter to be actually false, and therefore actionable under the Lanham Act. A reasonable jury could have found that Binzel U.S.'s label of Nu-Tecsys' product as "counterfeit" was literally false. The counterfeit statement in the Detroit Letter supports a finding of liability. Notably, Binzel U.S. never alleged that Nu-Tecsys engaged in counterfeiting. (Def. Exs. 1067, 1068; Tr. 50-51, 868.) Therefore, because the court has determined that the jury could reasonably conclude that the counterfeit statement was literally false, and because Binzel U.S. never charged Nu-Tecsys with counterfeiting Binzel guns, Binzel U.S. made assertions in the Detroit Letter that go beyond the legal and factual bases of the suit. Therefore the Detroit Letter is not entitled to *Noerr-Pennington* immunity *See Cardtoons,* 182 F.3d at 1139.

With respect to the counterfeit statement, Binzel U.S. makes a last ditch effort after the trial to argue that the statement is not actionable under Illinois

law on unfair competition, product disparagement or intentional interference with prospective economic advantage. Binzel U.S. contends that the counterfeit statement is one of opinion, and cannot therefore form the basis of a fraud action. *See Soderlund Brothers, Inc. v. Carrier Corp.,* 278 Ill.App.3d 606, 620, 663 N.E.2d 1, 10-11 (1st Dist.1996).

**\*6** Relying on a number of distinguishable cases, Binzel U.S. suggests that the Detroit Letter employed the art of hyperbole in referring to the Nu-Tecsys product as counterfeit. In *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 729 (1st Cir.1992), the statements challenged by the plaintiff appeared in a "regularly run theater column, a type of article generally known to contain more opinionated writing than the typical news report."(referring to language describing a production of Phantom of the Opera as "a rip-off, a fraud, a scandal, a snake-oil job"); *accord McCabe v. Rattiner,* 814 F.2d 839, 842 (1st Cir.1987) (statements in a newspaper article used a style that "puts the reader on notice that the author is giving his views ... unlikely to convey the impression that an imprecise and unverifiable statement is meant to be a statement of fact."). In *Coastal Abstract Serv., Inc. v. First Amer. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir.1999), the court held that the statement that a competitor was "too small" to handle a large account was "vague and subjective." In the same case, the court held that the statement that the competitor was not "paying its bills" was actionable under the Lanham Act. *See id.* at 732.

All of these statements in the cited cases are distinguishable from the counterfeit statement made in this case. The Detroit Letter exhibited an entirely factual tone, and the counterfeit statement is embedded within that context. Indeed, Bridges specifically testified that it was written to "set the facts straight." (Tr. 953.) In cataloguing the events and actions of the pending litigation, the Detroit Letter explained to Nu-Tecsys customers that "[t]his action was taken to protect users ... from counterfeit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

product."Nothing in that statement, especially in the context of the Letter as a whole, hints at hyperbole or opinion.

Because the court has concluded that the counterfeit statement in the Detroit Letter supports a verdict finding that the letter contained false statements, and that the Letter is not entitled to *Noerr-Pennington* immunity, the court need not determine whether the other two statements at issue were false or misleading. Therefore, the court need not determine whether Nu-Tecsys made a showing of actual consumer confusion. *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971-72 (7th Cir.1999) (citations omitted).

D. Evidence Supporting Jury's Verdict on Illinois Unfair Competition and Tortious Interference Claims

Binzel U.S. next argues that the intimations made by Bridges to Nu-Tecsys distributors and customers constituted privileged acts of competition. Nu-Tecsys counters that the Detroit Letter alone supports a finding of liability on these claims, but that evidence of intimidation on the part of Binzel U.S. further supports that finding.

On Nu-Tecsys' claim for unfair competition and intentional interference with prospective economic advantage, Nu-Tecsys had the burden of proving that (1) Nu-Tecsys had a reasonable expectation of entering into a valid business relationship; (2) Binzel U.S. knew of the prospective business relationship; (3) Binzel U.S. purposefully interfered to defeat or diminish this legitimate expectation; and (4) the interference caused damages to Nu-Tecsys. *See Soderlund,* 278 Ill.App.3d at 615, 663 N.E.2d at 7-8. There is a privilege to engage in business and to compete, so long as when diverting business from a competitor, one is not solely motivated by ill will. *Id.* Acts of competition which are never privileged include fraud, deceit, intimidation or deliberate disparagement. *See id.* 278 Ill.App.3d at 618, 663 N.E.2d at 8.

*7 The parties do not appear to disagree that Nu-Tecsys met its burden with respect to the first two elements of the cause of action. Karl-Heinz testified at length about his expectations of making MIG gun sales to existing and new customers. (Tr. 729-40, 764-72.) Bridges knew that many of Nu-Tecsys' existing and prospective customers would be in attendance at the Detroit Show; indeed, the Detroit Letter was addressed to Exhibitors at the show. (Tr. 845; Def. Exs. 1001, 1066.) Where the parties disagree is whether the jury could have reasonably concluded that Binzel U.S.'s activity constituted purposeful interference or protected competitive activity.

Relying on *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.,* 956 F.2d 1399, 1405 (7th Cir.1992), Plaintiff, without referring at all to the Detroit Letter, argues that Bridges' intimations fall within the competitor's business exception. *A-Abart* involved a defendant retailer who told a manufacturer it would not carry its new product line if such products were also to be made available through its competitor, plaintiff retailer. *See id.* at 1401.The Seventh Circuit held that defendant's activity of advancing its interests at the expense of its competitor fell within the competitor's privilege exception to the tort of intentional interference with prospective economic advantage. *See id.* at 1405.The court is inclined to agree with Binzel U.S. that Bridges' intimations that distributors would be cut off if they dealt with Nu-Tecsys are similar to the activity found to be privileged in *A-Abart.*Nu-Tecsys did not establish that Binzel U.S. acted solely with ill will; the evidence shows that Binzel U.S. had an across-the-board policy barring distributors from promoting a competitor's product. (Tr. 922-925.)

Nevertheless, Nu-Tecsys argues that the jury could have concluded that the Detroit Letter alone met the third element of the intentional interference with prospective economic advantage and unfair competition causes of action. Binzel U.S. does not rebut this argument, and the court finds it persuasive. As discussed earlier, the evidence supports a finding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

that the Detroit Letter contained false information. Deceit or fraud is never a protected business activity. *See Soderlund,* 278 Ill.App.3d at 616, 663 N.E.2d at 8. Moreover, Karl-Heinz testified that Binzel U.S. employees "stormed" the Nu-Tecsys booth at the Detroit show, causing existing and prospective customers to leave. (Tr. 980-83.) A reasonable jury could have inferred that Binzel U.S. either intimidated these customers, or disparaged Nu-Tecsys, both unprivileged business activities. *See Soderlund,* 278 Ill.App.3d at 616, 663 N.E.2d at 8.

Finally, with respect to the damage element of the claims, Karl-Heinz testified regarding Nu-Tecsys' decline in sales and poor performance beginning with the Detroit show. (Tr. 728-44, 764-72.) Therefore, the court concludes that sufficient evidence, based solely on conduct surrounding the Detroit show, supports the jury's finding of liability on Nu-Tecsys' unfair competition and tortious interference counterclaims.

E. Evidence Supporting Finding on Consumer Fraud Act and Bad Faith

**\*8** The elements of a claim under the Illinois Consumer Fraud Act are the same as those under the Lanham Act with the added element that the tortfeasor intend that consumers rely on the deception. *See Thacker v. Menard, Inc.,* 105 F.3d 382, 386 (7th Cir.1997) (listing elements of cause of action under the Illinois Consumer Fraud Act). Binzel U.S. argues that because Nu-Tecsys failed to show that the Detroit Letter was false or misleading under the Lanham Act, this Illinois law claim is not supported by the evidence. Because the court has already determined that a reasonable jury could have found the counterfeit statement in the Detroit Letter false, the court will consider whether the evidence supports a finding that Binzel U.S. intended that customers rely on the statements. With regard to intent, the jury specifically found that the statements in the Detroit Letter were made in bad faith. (Verdict Form, Question B3.) This finding and the circumstances surrounding the distribution

of the Letter support the inference that Binzel U.S. intended that consumers rely on the Detroit Letter and not do business with Nu-Tecsys. The remaining question, then, is whether the jury's finding of bad faith is supported by the evidence.

The Detroit Letter referred to Nu-Tecsys' goods as "counterfeit product." As confirmed by answers to interrogatories, Binzel itself never alleged that Nu-Tecsys counterfeited its MIG guns. (Def.Exs.1067, 1068.) The jury could properly have inferred that Binzel U.S. never believed Nu-Tecsys' goods to be counterfeit, and made the counterfeit statement in the Detroit Letter knowing it was not true, e.g., in bad faith.

In so concluding, the court notes that it is unpersuaded by Binzel U.S.'s objections to the Verdict Form. Binzel U.S. argues that the jury was not asked to specify the basis for its finding of bad faith, and therefore, the jury may have improperly based its finding on Bridges' intimations and the Canada Letter, conduct Binzel U.S. argues is lawful. Question B3 of the Verdict Form, however, specifically asks the jury to consider, if they answered "yes" to Questions B1 and B2, whether the false or misleading statements were made in bad faith. Questions B1 and B2 both specifically ask the jury whether the statements in the Detroit letter were false or misleading. Therefore, the jury did specify its basis for its finding of bad faith-the jury determined that the false statements in the Detroit Letter were made in bad faith.

For the foregoing reasons, Binzel U.S.'s motion for judgment as a matter of law is denied. In accordance with Federal Rule of Civil Procedure 59(e), however, the court amends the judgment entered on July 9, 1999 so that judgment is entered against Binzel U.S. only, and not against Binzel Germany. The jury specifically found that Binzel Germany was not responsible for the content of the Detroit Letter, the basis for Binzel U.S.'s liability. (Verdict Form, Question B4.) Binzel U.S.'s motion to amend the judgment is granted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Case 1:08-cv-01062    Document 48    Filed 05/20/2008    Page 11 of 68    Page 8

Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

## II. Counter-Defendant's Motion For A New Trial

**\*9** Binzel U.S. sets forth two bases for ordering a new trial: it argues that a new trial is warranted because the Canada Letter was improperly admitted into evidence; and it urges this court to grant a new on trial on damages, arguing that the $4 million verdict was excessive and not supported by the evidence.

### A. Standard of Review

A motion for a new trial under Federal Rule of Civil Procedure 59 should be granted when "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party."*See Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1367 (7th Cir.1996) (quoting *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 516 (7th Cir.1993)).

### B. Introduction of Canada Letter

Binzel U.S. argues that the Canada Letter should have been excluded from evidence because Nu-Tecsys failed to produce the letter in discovery and failed to identify the letter in the pre-trial order. Binzel U.S. further contends that this erroneous evidentiary ruling resulted in an unfair trial and therefore constitutes grounds for the granting of a new trial on Nu-Tecsys' counterclaims. Nu-Tecsys responds that it was Binzel U.S. who should have produced the Canada Letter in discovery. According to Nu-Tecsys, counsel chose not to list the Canada Letter in the final pre-trial order because the letter's primary purpose was to impeach Bridges' testimony.

### 1. Discovery of the Canada Letter

Binzel U.S. requested from Nu-Tecsys production of "all documents tending to support the loss of customers by Nu-Tecsys due to the conduct of [Counter-Defendant] complained of in this action."( [Counter-Def.'s] Memo in Support of Mot. for J. as a Matter of Law and for a New Trial, at 14 n. 7, referring to Document Request No. 55.) Binzel U.S. argues that the Canada Letter fell within the scope of production requests made to Nu-Tecsys but was never produced, despite Nu-Tecsys' obligation to supplement discovery responses.

In response, Nu-Tecsys argues that the letter was drafted by Bridges, and subsequently signed by a representative of Binzel Canada, and therefore should have been produced in response to Nu-Tecsys' own discovery requests for documents in Binzel U.S.'s possession, but was instead withheld by Binzel U.S. Moreover, Nu-Tecsys contends it had no duty, once it came into possession of the letter, to supplement Document Request No. 55 because that request sought documents relating to sales figures and the like, not copies of Binzel U.S.'s own documents.

The court concludes that prompt production by Nu-Tecsys of the Canada Letter may well have been the safest course. Nevertheless, the court believes Nu-Tecsys' failure to produce a document generated by Binzel U.S.'s own key witness did not violate the discovery rules. The court recognizes that a party seeking discovery "is not limited to facts exclusively or peculiarly within the knowledge of the opponent. This is true even where the interrogator has at his disposal an adequate or even better source of information ."*See Onofrio v. American Beauty Macaroni Co.,* 11 F.R.D. 181, 183 (W.D.Mo.1951).*Accord United States v. 58.16 Acres of Land,* 66 F.R.D. 570, 573 (E.D.Ill.1975); *Rowe Spacarb, Inc. v. Cole Products Corp.,* 21 F.R.D. 311, 312 (N.D.Ill.1957); *Grand Opera Co. v. Twentieth Century-Fox Film Corp.,* 21 F.R.D. 39, 40 (E .D. Ill.1957). The cases cited by Binzel U.S. for this principle are distinguishable, however; each holds that even if the discovering party has a better source of the information sought already in its possession, the party responding to the discovery request is still obligated to comply. In this case, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

court concludes Binzel U.S. should have had in its possession not only a source of the information requested, but the original version of the Canada Letter. Nor does the court agree that the Canada Letter, a document that Binzel U.S.'s main witness himself drafted, falls within a request for documents reflecting Nu-Tecsys' sales.

2. Canada Letter Not Included In Pre-Trial Order

**\*10** Binzel U.S. urges the court to order a new trial because the jury considered improperly admitted evidence that was not included in the pre-trial order. Nu-Tecsys responds that the Canada Letter was properly offered to impeach Bridges' credibility as a witness, and was therefore properly excluded from the pre-trial order. In response, Binzel U.S. submits that the Canada Letter was not used solely for impeachment purposes, but was used as substantive evidence in Nu-Tecsys' affirmative case.

This court's Final Pretrial Order form requires parties to identify all exhibits in the pretrial order "except rebuttal exhibits," *see* LOCAL R. 16.1.1. The Federal Rules, likewise, require pretrial disclosure of all exhibits to be used "other than solely for impeachment," *see* FED. R. CIV. P. 26(a)(3). Under Federal Rule of Civil Procedure 37(c)(1), evidence not disclosed pursuant to Rule 26(a) must be excluded. The Seventh Circuit has held that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *See Salgado by Salgado v. General Motors Corp.,* 150 F.3d 735, 742 (7th Cir.1998).

It is true that Nu-Tecsys initially offered the Canada Letter to impeach Bridges' testimony that he never saw the letter, a letter which he actually later admitted to drafting. It is equally true that the statements in the letter had substantive value with respect to Nu-Tecsys' affirmative case on most of its claims. Relying on a First and a Fifth Circuit case, Binzel U.S. contends that evidence which is used both for impeachment and for substantive pur-

poses must be disclosed before trial. *See Klonoski v. Mahlab,* 156 F.3d 255, 270 (1st Cir.1998) (holding that evidence at issue was "at least in part substantive, ... [it] did not fall within the 'solely for impeachment' exception of Fed.R.Civ.P. 26(a)(3)"); *Chiasson v. Zapata Gulf Marine Corp.,* 988 F.2d 513, 537-38 (5th Cir.1993)(vacating denial of motion for new trial where impeachment evidence was used as substantive evidence but not disclosed prior to trial).

Although the Seventh Circuit has not explicitly ruled on this issue, two of its cases are at least instructive here. *DeBiasio v. Illinois Central Railroad,* 52 F.3d 678 (7th Cir.1995), *cert. denied,* 516 U.S. 1157 (1996) involved claims under the Federal Employers' Liability Act and the Federal Safety Appliance Act. During the trial, the defendant railroad called a witness who had not been named in the pre-trial disclosures, but who had been qualified as an expert during pre-trial deposition. On direct examination, the defendant railroad's counsel asked the witness to authenticate an exhibit which would have impeached the testimony of one of plaintiff's witnesses. The plaintiff objected on the grounds that the defendant had not disclosed this witness or the exhibit as required by Federal Rule of Civil Procedure 26(a)(2) and this court's local rule. The defendant countered by arguing that insofar as the witness was authenticating the exhibit, he was merely an impeachment witness. The trial judge sustained the plaintiff's objection to testimony about the exhibit, but allowed the defendant's witness to testify as an expert. On appeal, the Seventh Circuit found that the trial judge abused his discretion in excluding the impeachment testimony, but that the error was harmless. *See id.* at 686. In concluding that the district court should have overruled plaintiff's objection, the Court of Appeals suggested almost the opposite of what Binzel U.S. argues here; that it is an abuse of discretion to exclude evidence that is offered for impeachment purposes, even if that same evidence has substantive value as well. Like the Canada Letter in this case, the evidence at issue in *DeBiasio* was not offered to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

prove an essential element of the affirmative claims, but for impeachment purposes. *See id.*

**\*11** More recently, the Seventh Circuit considered this issue in a different context and reached a different result. In *Wilson v. AM General Corp.,* 167 F.3d 1114 (7th Cir.1999), an employment discrimination case, the defendant sought leave to call two witnesses not disclosed on its witness list, arguing that these two witnesses were to be called only for impeachment purposes. The district court denied the request, concluding that the two witnesses were not merely rebuttal witnesses because these two individuals were qualified to testify to the allegedly nondiscriminatory reasons for the defendant's decision to discharge the plaintiff. *See id.* at 1122.On appeal, the Seventh Circuit held that the trial judge did not abuse his discretion in so ruling. *Id.* Finding that the proposed testimony was part of the defendant's primary line of defense, the Court of Appeals concluded that the two witnesses should have been named in the Rule 26 pretrial disclosures. *Id.*

Neither of these cases is directly relevant here. In the absence of controlling authority, the court declines to affirmatively decide the issue here. Even if the evidentiary ruling admitting the Canada Letter was erroneous, the court has already determined that a reasonable jury could have found for Nu-Tecsys on its counterclaims based on evidence other than the Canada Letter, and therefore its introduction was harmless. *See DeBiasio,* 52 F.3d at 685 ("An erroneous evidentiary ruling is harmless ... 'unless there is a significant chance that it has affected the result of the trial.' ")(quoting *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 313 (7th Cir.1986); FED. R. CIV. P. 61; FED.R.EVID. 103(a)). Furthermore, the violation of a pretrial order does not warrant a new trial unless "the violation so surprised the party complaining of it that it denied that party a fair hearing." *Exxon Corp. v. Exxene Corp.,* 696 F.2d 544, 548 (7th Cir.1982). Binzel U.S. can not make such a showing with respect to a document that its own key witness authored.

Binzel U.S.'s motion for a new trial on the grounds that the court erroneously admitted the Canada Letter into evidence is denied.

**C. Counter-Defendant's Motion for New Trial on Monetary Relief**

Finally, Binzel U.S. urges the court to order a new trial on damages, arguing that the jury's award was based on insufficient evidence, and was unreasonably speculative and excessive. The jury awarded Nu-Tecsys $1.81 million dollars for lost profits and $3.03 million dollars in Binzel U.S.'s wrongful profits, totaling $4.84 million. The jury reduced this figure to $4 million to account for the overlap between Nu-Tecsys' lost profits and Binzel U.S.'s wrongful profits. Nu-Tecsys contends that this award is supported by the evidence. A jury's damages award should stand unless there is "no rational connection between the evidence on damages and the verdict."*See Mercado v. Ahmed,* 974 F.2d 863, 866 (7th Cir.1992) (quoting *Lippo v. Mobil Oil Corp.,* 776 F.2d 706, 716 (7th Cir.1985)).

**1. Evidence of Nu-Tecsys' Lost Profits**

**\*12** As Nu-Tecsys emphasizes, Karl-Heinz described sales lost to specific, identifiable customers and prospective customers during his testimony. (Tr. 728-44, 764-72.) Some of this testimony was stricken as hearsay and the credibility of some of this testimony was put challenged during cross-examination. Nevertheless, on the ultimate issue of lost sales damages, Karl-Heinz testified to an estimated lost sales of $150,000 per year from 1991 to 1998, totaling $1.2 million in lost sales during the relevant time period. (Tr. 796.) Karl-Heinz further testified that after expenses, Nu-Tecsys' profit margin is approximately fifteen percent of gross revenue. (Tr. 795-96.) Lost profits on the claimed $1.2 million in lost sales can therefore be estimated at $180,000 (fifteen percent of $1.2 million). Because the jury found that Nu-Tecsys suffered $1.81 million in damages for lost profits, it is clear that their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

verdict was not based on Karl-Heinz's testimony regarding lost sales to identifiable individual customers. Rather, it is apparent that the jury's verdict on Nu-Tecsys' lost damages was based on Karl-Heinz's projections of what Nu-Tecsys hoped to earn between 1991 and 1998. The court must determine, then, whether the evidence forming the basis of this award was sufficient to support the verdict. Even considering the evidence in a light favorable to the jury's verdict, the court concludes that the evidence was speculative.

The evidence at trial established that between the years 1991 and 1998, Nu-Tecsys earned revenue between $1.3 million and $1.8 million per year. (Tr. 1271.) Karl-Heinz testified that in 1990, he projected Nu-Tecsys' sales to increase to between $4 and $7 million annually. (Tr. 713.) Nu-Tecsys submitted no corroborating evidence that it ever made such a projection in 1990. Furthermore, Karl-Heinz claims to have based this projection only on his previous experience as President at Binzel U.S. and "the feedback we got from our distributors, the feedback we got back from our advertising, and simply from comments."(Tr. 711.)

First, Nu-Tecsys does not point to any evidence in the record showing that during Karl-Heinz's tenure as President of Binzel U.S., the company experienced a "very nice gradual increase" in sales. (Tr. 711.) This projection is highly speculative and not proven by "methodologies that ... [do] not insult the intelligence."*See Zazu Designs v. L'Oreal,* S.A., 979 F.2d 499, 505 (7th Cir.1992). Indeed, Nu-Tecsys points to no evidence showing how the estimates were generated, nor any evidence that adjustments were made in the estimates reflecting inflation or an increase in the price of materials. Nor does Nu-Tecsys provide evidentiary support for the suggestion that Nu-Tecsys' experience should have paralleled the success achieved while Karl-Heinz was at the helm of Binzel U.S.

Nor has Nu-Tecsys offered support for the notion that the sole factor that prevented Nu-Tecsys from achieving its goals was the conduct of Binzel U.S.

Instead, the jury must have made a "leap of faith" to believe that in determining Nu-Tecsys would have earned two to five times the amount of revenue during the relevant years, had Binzel U.S. not engaged in unlawful conduct. *See id.* at 506 (in calculating an award of compensatory damages, "[a]llowance for uncertainty is one thing ... and rank speculation is another."); *Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1368 (7th Cir.1996) (an award must be based on the record and cannot be based on "leaps of faith"); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738 (7th Cir.1985) ("The plaintiff failed to produce any evidence supporting its assumption that, 'it is reasonable to expect Otis Clapp to continue to grow at its historical rates.' "). Simply put, the evidence does not support this award.

*\*13* Second, the award is also speculative because Karl-Heinz could not reasonably project the growth of Nu-Tecsys based on the past performance of Binzel U.S. Under Illinois law, a new business, or an existing business with a new product, cannot recover lost profits because the future profits of a new business cannot be ascertained with any degree of certainty. *See Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust,* 51 F.3d 1319, 1328 (7th Cir.1995); *Drs. Selke & Conlon, Ltd. v. Twin Oaks Realty, Inc.,* 143 Ill.App.3d 168, 174, 491 N.E.2d 912, 917 (2nd Dist.1986). Nu-Tecsys falls under this "new business rule" because it had entered into the MIG market only seven months prior to the time of the filing of the lawsuit. (Tr. 715-16.) Past success in a similar enterprise does not alone provide a "self-evident basis for generalizations" about projected sales. *See Stuart Park,* 51 F.3d at 1328; *see also Drs. Selke & Conlon,* 143 Ill.App.3d at 174, 491 N.E.2d at 917 ("The long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative."(citations omitted)). Therefore, Karl-Heinz's fourteen years as President for Binzel U.S. do not provide the evidentiary basis

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

necessary to support the jury's verdict on lost profits to Nu-Tecsys in the amount of $1.8 million.

2. Evidence of Binzel U.S.'s Wrongful Profits

Under the Lanham Act, once the alleged wrongdoer has been found liable, the prevailing party may receive damages reflecting the wrongdoer's profits gained from the unlawful conduct. *See Web Printing Controls Co., Inc. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990). Disgorgement of the wrongdoer's profits may be awarded on three different bases: compensation, unjust enrichment or deterrence. *See Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1349 (7th Cir.1994) (quoting *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir.1989). Binzel U.S. argues that on any of the three rationales, the jury's verdict on wrongful profits cannot stand.

The court agrees with Binzel U.S.'s argument that unjust enrichment could not form the basis of the jury's verdict on wrongful profits. Under the Lanham Act, an award of the wrongdoer's profits must bear some relationship to the unlawful conduct-e.g., grounded in the benefit accruing to Binzel U.S. on account of its unlawful conduct. *See Sands, Taylor & Wood v. The Quaker Oats Co.,* 34 F.3d 1340, 1349 (7th Cir.1994). Here, the amount of wrongful profits awarded by the jury exactly parallels the amount of profits Binzel U.S. earned on *all* its MIG sales during the relevant time period. (Tr. 1070.) The record shows that Binzel U.S. had made MIG sales prior to the issuance of the Detroit Letter. The court concludes that no reasonable jury could have found that Binzel U.S. was unjustly enriched by every single MIG sale it made from 1991 through 1998; put another way, not every MIG sale made by Binzel U.S. during this time was a direct result of its unlawful conduct towards Nu-Tecsys.

**\*14** Having concluded that unjust enrichment does not furnish a basis for the jury's wrongful profits award, the court considers two other potential rationales for the verdict: compensation or de-

terrence. Binzel U.S. urges that compensation also does not furnish a basis for the award. According to Binzel U.S., disgorgement of wrongful profits is most appropriate when actual damages are otherwise minimal; a separate award for wrongful profits might over-compensate an injured party, "creating a windfall judgment at the [liable party's] expense."*See BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1096 (7th Cir.1994) (quoting *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2nd Cir.1992)). Nu-Tecsys' award of lost profits is not nominal here, and the court agrees that the additional wrongful profits may fairly be characterized as a windfall. As noted, the jury's wrongful profits award to Nu-Tecsys amounts to the equivalent of Binzel U.S.'s total MIG sales during the relevant time period. Although the jury ultimately subtracted nearly $1 million from the total amount of damages awarded, representing an overlap in Binzel U.S.'s wrongful profits and Nu-Tecsys' lost profits, the court concludes that the jury award exceeds mere compensation to Nu-Tecsys for its injuries.

Finally, an award of wrongful profits may be appropriate to deter the liable party from continuing its wrongful conduct. *See Sands,* 34 F.3d at 1349. Nevertheless, the Lanham Act forbids the court from allowing a recovery that is so excessive as to constitute a penalty. *See* 15 U.S.C. § 1117; *see also Otis Clapp,* 754 F.2d at 744. Based on its bad faith finding, the jury could have inferred that Binzel U.S. continued its wrongful conduct through the time of the trial and intended to continue such conduct in the future. In these circumstances, an imposition of an award for purposes of deterrence is appropriate.

The court concludes, nevertheless, that the award here-which results in disgorgement of all Binzel U.S.'s MIG profits during the relevant years-is so excessive as to constitute a penalty. It appears that in attempting to deter Binzel U.S., the jury ordered the disgorgement of all its MIG profits during the relevant years. Rather than order a new trial on damages, however, the court will exercise its dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Case 1:08-cv-01062    Document 48    Filed 05/20/2008    Page 16 of 68    Page 13

Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.))**

cretion to enter judgment for a sum that it finds just, according to the circumstances of the case. *See* 15 U.S.C. § 1117. First, the court concludes that Defendant adequately showed that it suffered an amount of lost profits equal to $180,000 from 1991 through 1998. The court also believes an award of wrongful profits is warranted in these circumstances. Rather than attempt to arrive at a wrongful profits figure on its own, the court will reduce the final award of damages by $1.63 million. This amount is calculated by subtracting $180,000 from the $1.81 million lost profits award. In conclusion, the court reduces the final $4 million total award by $1.63 million, thereby also reducing the award for the amount of wrongful profits that constituted a penalty. Accordingly, the court orders remittitur, reducing Defendants' award of damages from $4 million to $2.37 million.

III. Counter-Plaintiff's Motions for Attorneys' Fees and Enhanced and Punitive Damages

**\*15** Nu-Tecsys has moved the court for an award of enhanced damages under the Lanham Act, punitive damages under Illinois common law, and attorney's fees under the Lanham Act and under the Illinois Consumer Fraud and Deceptive Business Practices Act. Under the Lanham Act, a district court, in its discretion, may enhance the damage award when the violation indicates a need for deterrence, particularly when actual damages and profits are not easily ascertainable. *See Sands,* 34 F.3d at 1350-1352. Likewise, under Illinois law, punitive damages are justified in cases where a wrongdoer commits a tort with "actual malice." *See Martin v. Heinold Commodities,* 163 Ill.2d 33, 643 N.E.2d 734, 757. The standard for attorneys' fees is the same under both the federal and state statutory claims. *See Door Systems, Inc. v. Pro-Line Door Systems, Inc.,* 126 F.3d 1028, 1032 (7th Cir.1997). A court can exercise its discretion to award attorneys' fees when a case "so lacked merit and was so burdensome to defend against that it could fairly be described as oppressive." *See id.* at 1030.

Without ruling on the merits of each of these motions, the court denies all three. Given its ruling that the jury award is based, at least in part, on deterrence, the court declines to exercise its discretion to supplement that award with other damages and fees. To the extent any of Nu-Tecsys' damages and fees motions have merit, the court believes the award adequately reflects the need to deter wrongful conduct on the part of Binzel U.S.

*CONCLUSION*

For the foregoing reasons, Binzel U.S.'s motion to amend the judgment (Doc. No. 297-1) is granted; Binzel U.S.'s motions for judgment as a matter of law (Doc. No. 298-1) and a new trial (Doc. No. 298-2) are denied; and Nu-Tecsys' motions for attorneys' fees and enhanced and punitive damages (Doc. Nos.314-1, 2, 3) are denied. The court further orders that judgment against Binzel Germany be vacated, and that the award be reduced from $4 million to $2.34 million. Both parties' motions for directed verdict (Doc. No. 289-1) and (Doc. No. 290-1) are denied as moot. Finally, Nu-Tecsys' motion to lift the stay of judgment (Doc. No. 319-1) pursuant to FED. R. CIV. P. 62(b) is granted without prejudice.

N.D.Ill.,2000.
Alexander Binzel Corp. v. Nu-Tecsys Corp.
Not Reported in F.Supp.2d, 2000 WL 310304 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Slip Copy                                                                      Page 1
Slip Copy, 2008 WL 567031 (N.D.Ill.)
(Cite as: 2008 WL 567031 (N.D.Ill.))

CardioNet, Inc. v. LifeWatch Corp.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
CARDIONET, INC., Plaintiff,
v.
LIFEWATCH CORP., Hanna Konarzewska, M.D.,
Joel Lehman and Lisa Ament, Defendants.
Lifewatch Corp., Counter-plaintiff,
v.
Cardionet, Inc., Counter-defendant.
**Civil Action No. 07 C 6625.**

Feb. 27, 2008.

Thomas L. Duston, Alisa Colleen Simmons,
Gregory James Chinlund, Julianne Marie Hartzell,
Marshall, Gerstein & Borun, Chicago, IL, Amy L.
Kashiwabara, Julie L. Fieber, Richard Keenan, Fol-
ger Levin & Kahn LLP, San Francisco, CA, for
Plaintiff/Counter-defendant.
Sean W. Gallagher, Bartlit Beck Herman Palenchar
& Scott LLP, Chicago, IL, Alexander Kaplan, Julie
A. McCane, Kevin J. Perra, Proskauer Rose LLP,
New York, NY, Michael P. Kelleher, Folger Levin
& Kahn LLP, San Francisco, CA, for Defendants.

### MEMORANDUM OPINION AND ORDER

SUZANNE B. CONLON, District Judge.
**\*1** Counter-plaintiff Life Watch Corp. ("Life
Watch") sues counter-defendant CardioNet, Inc.
("CardioNet") for trade secret misappropriation un-
der the Illinois Trade Secrets Act, 765 ILCS 1065/1
et seq. (Count I), violation of the Lanham Act, 15
U.S.C. § 1125(a) (Count II), violation of the Illinois
Uniform Deceptive Trade Practices Act
("IUDTPA"), 815 ILCS 510/2 (Count III), violation
of the Illinois Consumer Fraud and Deceptive
Trade Practices Act ("ICFA"), 815 ILCS 505/2
(Count IV), interference with expectation of busi-
ness relationships (Count V), and unfair competi-

tion (Count VI). CardioNet moves to dismiss
Counts II, III, IV, V, and VI. For the reasons stated
below, CardioNet's motion is granted in part.

### I. MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) challenges
a counterclaim on the basis of a failure to state a
claim on which relief can be granted. In ruling on
the motion, the court accepts as true all well-
pleaded facts and draws all reasonable inferences
from those facts in Life Watch's favor. *Jackson v.
E.J. Brack Corp.,* 176 F.3d 971, 977 (7th Cir.1999).
The counterclaim must allege "enough facts to state
a claim to relief that is plausible on its face."*Bell
Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127
S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Life-
Watch need only provide enough detail to give Car-
dioNet fair notice of its claims, show that the
claims are plausible, rather than merely speculative,
and that relief is warranted. *EEOC v. Concentra
Health Care Servs., Inc.,* 496 F.3d 773, 776 (7th
Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1964
(further citations omitted)).

### II. BACKGROUND

CardioNet and LifeWatch are competitors that
make heart monitoring devices. In January 2007,
LifeWatch launched a heart monitoring device
called the LifeStar Ambulatory Cardiac Telemetry
(the "LifeStar ACT") in the United States. The
LifeStar ACT is comprised of wireless sensors
worn by patients and a cellular phone that monitors
a patient's heart rhythm. If irregular heart events oc-
cur, the LifeStar ACT transmits data to a LifeWatch
service center for analysis and response.

The LifeStar ACT is not sold to users; rather, it is
only prescribed to patients, LifeWatch and affili-
ated companies have expended significant time and
resources in developing and protecting the confid-
ential, proprietary, and trade secret software that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 567031 (N.D.Ill.)
**(Cite as: 2008 WL 567031 (N.D.Ill.))**

malces up the LifeStar ACT system.

In June 2007, a physician improperly arranged to have a LifeStar ACT system delivered to CardioNet's CEO in San Diego, California. Without Life Watch's knowledge, CardioNet's CEO, its head of research, and its head of product development, examined and tampered with the LifeStar ACT device. They took detailed photographs of it, copied written materials, removed the circuit board and shielding material from the sensor, and performed electrical tests,

CardioNet then allowed the device to be delivered to the patient for whom it was prescribed. The device was eventually returned to LifeWatch for circulation to other patients. CardioNet did not inform LifeWatch that it tampered with the device, and denied ever doing so. CardioNet used the information obtained from inspection of the LifeStar ACT to develop the next generation of its competing device.

**\*2** CardioNet also used information it learned from the device to further its marketing strategy. CardioNet misrepresented in advertisements and statements to physicians and governmental and private third party insurers that (1) its device was the only FDA approved and Medicare reimbursed arrhythmia detection and alarm system; (2) the LifeStar ACT device did not and could not meet the FDA's requirements for approval of an arrhythmia detection and alarm system; and (3) its device was superior and/or safer than the LifeStar ACT device. LifeWatch contends these statements were false and misleading because the LifeStar ACT had and has FDA approval, and the statements wrongfully suggest that the LifeStar ACT is less safe or reliable than CardioNet's device.

CardioNet moves to dismiss LifeWatch's counterclaims premised on false and misleading advertisements (Counts II-VI). CardioNet advances the following: (1) LifeWatch failed to plead required elements of its Lanham Act and intentional interference claims; (2) LifeWatch's statutory claims are a species of fraud and do not satisfy Rule 9(b)'s particularity requirements; (3) allegations that CardioNet's device is "superior," more "reliable" or "safer" than LifeWatch's are non-actionable puffery; and (4) allegations regarding FDA requirements for the parties' medical devices fail because they are not subject to consumer fraud statutes.[FN1]

> FN1. CardioNet improperly refers to materials beyond the pleadings, which are not considered on a Rule 12(b)(6) motion. *See Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 479 (7th Cir.2002). CardioNet also requests judicial notice of two documents indicating that the FDA approved the LifeStar ACT device as an arrhythmia detector and alarm on December 18, 2007. Because judicial notice is unnecessary in resolving CardioNet's motion, the questionable request is moot.

**III. DISCUSSION**

**A. Rule 9(b)**

CardioNet argues LifeWatch's Lanham Act, IUDTPA, and ICFA counterclaims (Counts II-IV) are insufficient to state a claim. However, the sufficiency of the allegations cannot be properly assessed because the claims fail to meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). Fed.R.Civ.P. 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Claims that allege false representation or false advertising under the Lanham Act are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). *Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 709 (N.D.Ill.2006) (Zagel, J.) (citations omitted). IUDTPA and ICFA claims sounding in fraud must also meet the pleading requirements of Rule 9(b). *Id.* (ICFA claim); *Am. Top English, Inc. v. Lexicon Mktg. .(USA), Inc.,* No. 03 C 7021, 2004

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WL 1403695, at *4-5 (N.D.Ill. June 21, 2004) (Conlon, J.) (ICFA claim); *Gold v. Golden G. T., LLC,* No. 05 C 288, 2005 WL 2465815, at *6 (N.D.Ill. Oct.4, 2005) (Filip, J.) (ICFA and IUDTPA claims); *Nakajima All Co., Ltd. v. SL Ventures Corp.,* No, 00 C 6594, 2001 WL 641415, *6-7 (N.D.Ill. June 4, 2001) (Gettleman, J.) (ICFA and IUDTPA claims).[FN2]

> FN2. Under Illinois law, ICFA claims must also be pleaded with the same specificity as common law fraud claims. *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 857, 658 N.E.2d 1325, 1335, 213 Ill.Dec. 304,314 (Ill.App.Ct.1995) (citations omitted).

LifeWatch's argument that Rule 9(b) does not apply to its IUDTPA and ICFA claims because they do not sound in fraud is belied by its allegations. LifeWatch alleges that after CardioNet inspected the LifeStar ACT device, CardioNet knowingly and deliberately made misrepresentations in its marketing strategy. Countercl. ¶ 28. LifeWatch contends that CardioNet falsely misled physicians and third party insurers into believing that: (1) its device was the only FDA approved and Medicare reimbursed arrhythmia detection and alarm system; (2) the LifeStar ACT device did not and could not meet the FDA's requirements for approval of an arrhythmia detection and alarm system; and (3) its device was superior and/or safer than the LifeStar ACT device. Because these allegations sound in fraud, Rule 9(b)'s specificity requirements apply to LifeWatch's IUDTPA and ICFA counterclaims. *See, e.g., Nakajima,* 2001 WL 641415, at *6-7 (Rule 9(b) applies to allegations of false or misleading advertisements/statements that sound in fraud).

**\*3** Under Rule 9(b), LifeWatch's Lanham Act, IUDTPA, and ICFA counterclaims must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated."*Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)

(quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)). In other words, LifeWatch must plead the "who, what, when, and where of the alleged fraud."*Uni*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). The absence of essential details renders these counterclaims deficient.

LifeWatch does not identify *who* made false and misleading statements, *when* they were made, *where* they were made, or the medium in which they were made. The particulars of the false and misleading statements are also absent. For example, LifeWatch's bare-bones allegation that CardioNet "advertised and made other statements ... to the effect that its device is superior to and/or safer that then LifeStar ACT device" merely alleges that unspecified advertisements *had the effect* of implying that CardioNet's device was superior and safer. Countercl. ¶ 31. These nebulous allegations fall short of Rule 9(b)'s requirements. *See, e.g., Nakajima,* 2001 WL 641415, at *6-7. CardioNet and the court are left to speculate what specific advertisements and statements underlie LifeWatch's claims. Accordingly, counterclaims II-IV are dismissed.

**B. State Common Law Claims**

*1. Intentional Interference With Expectation of Business Relationships*

CardioNet argues LifeWatch's intentional interference with expectation of business relationships counterclaim should be dismissed because LifeWatch did not identify any specific relationships subjected to interference. To state a claim for tortious interference with a prospective economic advantage, LifeWatch must allege: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional and malicious interference inducing or causing a breach of termination of the relationship or expectancy; (4) resultant damage to the party whose relationship has been disrupted. *Small v. Sussman,* 306

Ill.App.3d 639, 648, 239 Ill.Dec. 366, 713 N.E.2d 1216 (Ill.App.Ct.1999). The acts that form the basis of tortious interference must be directed at parties other than CardioNet. *Cont'l Mobile Tel. Co. ., Inc. v. Chicago SMSA Ltd. P'ship,* 225 Ill.App.3d 317, 325, 167 Ill.Dec. 554, 587 N.E.2d 1169 (Ill.App.Ct.1992). Although LifeWatch contends that CardioNet must *specifically* identify a third party with which it had a potential business relationship, LifeWatch may alternatively allege a prospective class of third parties against whom the conduct was directed. *See Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 529, 137 Ill.Dec. 409, 546 N.E.2d 33 (Ill.App.Ct.1989).

**\*4** Construing allegations in its favor, LifeWatch alleges CardioNet's false and misleading advertisements were directed toward physicians, private insurers, and Medicare reimbursement providers-the targeted consumers of their LifeStar ACT product. This constitutes a prospective class of third parties adequate to give CardioNet notice of its claim. *See, e.g., Russian Media Group, LLC v. Cable Am., Inc.,* No. 06 C 3578, 2008 WL 360692, \*5 (N.D.Ill. Feb.7, 2008)* (Darrah, J.) (allegations that defendants' conduct was directed against third party consumers was sufficient to withstand dismissal).

LifeWatch also adequately pleads independent wrongful conduct to withstand dismissal of its intentional interference counterclaim. LifeWatch alleges CardioNet intentionally interfered with its prospective relationships by knowingly issuing false and misleading statements to limited consumers of the LifeStar ACT device. This allegation of wrongdoing is sufficient to give CardioNet notice of its intentional interference claim. *See, e.g., Conditioned Ocular Enhancement,* 458 F.Supp.2d at 712 (intentional interference claim adequately pleaded under Rule 8(a)).

**2. Unfair Competition**

Illinois courts have not specifically enumerated the elements of the common law tort of unfair competition. *See Gorgonz Group, Inc. v. Mormon Holdings, Inc.,* No. 00 G 2992, 2001 WL 103406, \*3-4 (N.D.Ill. Jan.30, 2001) (Kennelly, J.) (citing *Custom Bus. Sys., Inc. v. Boise Cascade Corp.,* 68 Ill.App.3d 50, 52, 24 Ill.Dec. 801, 385 N.E.2d 942, 944 (Ill.App.Ct.1979)). However, the allegations underlying a claim of tortious interference with prospective economic advantage also suffice to state a claim for unfair competition.*Id,; see also Zenith Elec. Corp. v. Exzec, Inc.,* No. 93 C 5041, 1997 WL 223067, at \*5 (N.D.Ill. Mar.27, 1997) (Manning, J.). Because LifeWatch adequately alleges intentional interference, LifeWatch's unfair competition claim is sufficient as well.

**IV. CONCLUSION**

For the foregoing reasons, CardioNet's motion to dismiss is granted in part. Counts II, III, and IV of LifeWatch's counterclaims are dismissed.

N.D.Ill.,2008.
CardioNet, Inc. v. LifeWatch Corp.
Slip Copy, 2008 WL 567031 (N.D.Ill.)

END OF DOCUMENT

# TAB 3

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

Hydra-Stop, Inc. v. Severn Trent Environmental
Services, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
HYDRA-STOP, INC., et al., Plaintiffs,
v.
SEVERN TRENT ENVIRONMENTAL SER-
VICES, INC., et al., Defendants.
**No. 03 C 4843.**

Aug. 19, 2005.

Ralph C. Hardesty, Hardesty & Associates, Patricia
A. Wrona, Wrona Law Offices, Chicago, IL, for
Plaintiffs.
Christopher P. Tompkins, David Edward Walters,
Donald R. Cassling, Jenner & Block, Chicago, IL,
for Defendants.

*MEMORANDUM OPINION*

KOCORAS, Chief J.
**\*1** This matter comes before the court on five mo-
tions of the parties. Three are motions for partial
summary judgment, which as a whole address all of
the counts of the complaint and counterclaim filed
in this case. The remaining two motions seek to
strike expert testimony. For the following reasons,
one motion for summary judgment is granted. The
other two are granted in part and denied in part.
The motions to strike are denied without prejudice.

BACKGROUND

Plaintiff Kevin Murphy is the president and princip-
al shareholder of Plaintiffs Hydra-Stop, Inc., and
HSI Services, Inc. He is the manager of Plaintiff
Asylum Partners, LLC. For the sake of conveni-
ence, we will refer to Plaintiffs collectively as
"Murphy." Defendant Severn Trent PLC is the par-
ent corporation of Defendants Severn Trent Envir-

onmental Services ("Environmental") and Capital
Controls, Ltd.

The dispute in this case arises out of an Asset Pur-
chase Agreement ("APA") executed on May 31,
2000, between Hydra-Stop and Defendants Pito-
meter Associates, Inc., and Capital Controls Lim-
ited ("Capital"). Because Environmental is the suc-
cessor in interest to Defendant Pitometer Asso-
ciates, Inc., with respect to the APA, we will refer
to them both as "Environmental." Pursuant to the
agreement, Capital purchased the assets of Hydra
Stop, Ltd., and Environmental purchased the assets
of Hydra-Stop, Inc.; HSI Services, Inc.; HSI Truck-
ing, Inc.; and HSI Network Sciences, Inc. for
$11,750,000.

The purchase price included inventory owned by
Hydra-Stop, Inc., estimated to be worth $310,000 at
the time the agreement was executed. The agree-
ment acknowledged that the actual value of the in-
ventory was not known as of the date of execution.
Section 2.9 of the APA provided that, within five
days of the execution of the agreement, the parties
would physically count all of the inventory in-
cluded in the asset purchase. It further stated that if
the count revealed that the inventory was worth
more than $310,000, the purchase price would be
increased to include the difference between the es-
timated and actual inventory values. If, on the other
hand, the inventory proved to be worth less than
$310,000, Murphy would refund the difference to
Environmental. If the count revealed that the estim-
ate was more than the actual value, Murphy could
challenge the calculated value through a specified
process.

Environmental hired Les Detterbeck, Murphy's ac-
countant, to perform the postclosing inventory
count and valuation. Detterbeck's efforts yielded a
value of $1,524,315.55, and Murphy subsequently
demanded that Environmental pay him the $1.2
million difference between that figure and the
$310,000 identified in § 2.9. Environmental dis-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

puted the accuracy of Detterbeck's conclusions and performed several inventory counts and valuations of its own. To date, Environmental has not paid any money for the inventory above the $310,000.

Another provision of the APA stated that Murphy would stay on at Hydra-Stop as a consultant for three years after the sale was executed. He was paid an annual salary of $250,000 and was given the possibility of receiving earnout payments if the company's gross profits (calculated using a formula enumerated within the agreement) exceeded certain levels over the first three years after closing. The payouts were capped at $5,000,000 in the aggregate.

**\*2** Section 2.3(d)(vi) of the APA specified that, while Murphy served as a consultant, he would have the same control and authority of a chief executive officer. He reported to the president of Environmental, a position occupied at that time by a Bill Hall. In the fall of 2000, Environmental hired John Marafino as vice-president of operations to oversee the day-to-day functioning of the company. Marafino reported to both Murphy and Hall. Environmental made several other changes in areas from employees to branding to advertising.

During Murphy's three years as a consultant, the company's profits declined, though it still operated at a profit. The relationship between the parties steadily deteriorated, and several disputes erupted over particular payments by customers or other actions taken. Shortly after his consultancy expired, Murphy filed the instant suit. His complaint alleged that Environmental owed him approximately $1,214,315.55 for the inventory payment, that they had deliberately suppressed profits to prevent him from receiving any earnout payments, and that they had defrauded him in connection with the value of the inventory and their plans for the company both individually and in concert with Capital. The complaint also implicated PLC in each of these counts, as well as alleging in the final count that PLC was the true moving force behind Environmental's actions and therefore that it had tortiously induced

Environmental to shirk its contractual obligations to Murphy. PLC moved to dismiss the complaint as to it on grounds that personal jurisdiction was lacking. We granted the motion with respect to the first three counts but denied it as to the tortious interference claim. *Hydra-Stop, Inc. v. Severn Trent Environmental Servs., Inc.,* 2003 WL 22872137 (N.D.Ill.Dec.3, 2003).

In conjunction with the filing of their answer, Environmental filed a four-part counterclaim. It alleged that Murphy breached the APA and defrauded Environmental by supplying financial statements, particularly for the year 1999, that were not prepared according to generally accepted accounting principles ("GAAP"). It also contended that Murphy had converted two specific customer payments that belonged to Environmental: one from a customer called CPI and another from Logan Utara. Finally, the counterclaim alleged that Murphy owed Environmental certain amounts that he was to pay them under the APA. The parties proceeded to discovery on the remaining counts of the complaint and counterclaim, a process which included retention of experts Terry Korn, Garry Bartecki, Sally Hoffman, and Alan Funk on issues tied to the inventory valuation and the potential for earnout payments.

PLC now moves for summary judgment in its favor with respect to the sole remaining count against it. Murphy and Environmental each move to strike the expert testimony proffered by its opponent and for summary judgment with respect to certain portions of the complaint or counterclaim, some of which overlap into cross motions.

## LEGAL STANDARDS

### A. Cross Motions for Summary Judgment

**\*3** Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(c); *Anderson v. Liberty*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

*Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. Proc. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case."*Celotex,* 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial."Fed. R. Civ. Proc. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts,"*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant,"*Buscaglia v. United States,* 25 F.3d 530, 534 (7th Cir.1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record-only those inferences that are reasonable."*Bank Leumi Le-Israel. B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. *M. Snower & Co. v. United States,* 140 F.2d 367, 369 (7th Cir.1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment.*Miller v. LeSea Broadcasting, Inc.,* 87 F.3d 224, 230 (7th Cir.1996).

B. Motions to Strike Expert Testimony

Federal Rule of Evidence 702 only permits expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue."An expert may so testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."*Id.* Pursuant to these requirements, "a district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability."*Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir.2001).

**\*4** With these principles in mind, we turn to the parties' motions.

DISCUSSION

A. Motions to Strike Expert Testimony

Both Environmental and Murphy move to strike the testimony of experts proffered by their opponents. Each contends that the evidence advanced does not satisfy the standards required under Fed.R.Evid. 702 as explained in *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

Each expert submitted a report as well as giving deposition testimony. With respect to the opinions offered within the reports, the parties ignore a threshold infirmity that obviates any consideration of the soundness of the methodology these experts employed: none is accompanied by a sworn affidavit attesting to the authenticity of the document. Without this foundational support, the reports cannot be offered as evidence in connection with a motion for summary judgment. *See,e.g.,Scott v. Edinburg,* 346 F.3d 752, 759 (7th Cir.2003). Consequently, we consider only the deposition testimony of the four experts.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

Case 1:08-cv-01062    Document 48    Filed 05/20/2008    Page 26 of 68    Page 4

Murphy's experts, Alan Funk and Garry Bartecki, opine on both the correctness of the $1.5 million inventory value as well as the potential Murphy had for gaining earnout payments. The deposition excerpts that the parties have offered, while acknowledging certain general aspects of the processes employed by Bartecki and Funk, do not provide sufficient explanation or detail to allow us to definitively exclude them for all purposes. Without more, we cannot determine whether Environmental's position that their testimony should be stricken is meritorious or not. As a result, the motion to strike the testimony of these expert witnesses is presently denied.

Environmental's expert, Sally Hoffman, restricts her analysis to whether Environmental was damaged by receiving inventory valued in excess of the $310,000 indicated in Hydra-Stop's financial statements. Their other expert, Terry Korn, offers opinions on Murphy's potential for gaining earnout payments. In their depositions, each sets forth descriptions of and insight into the methodologies they employed in forming their opinions to allow us to conclude that the *Daubert* standard is satisfied. Some of the challenges to these experts require greater elucidation and development, as well as an opportunity to supply additional matters of justification. As a consequence, the motions to strike are presently denied without prejudice.

**B. Severn Trent PLC's Motion for Summary Judgment**

After our ruling on PLC's motion to dismiss for lack of personal jurisdiction, only one count of Murphy's complaint remained with respect to PLC. That count alleges that PLC tortiously interfered with the contractual relations between Murphy and Environmental by inducing Environmental 1) to withhold the inventory payment from Murphy and 2) to prevent the company from reaching the profit thresholds necessary for him to receive earnout payments. PLC moves for summary judgment in its favor on this count, arguing that Murphy can show

no evidence that they were actively involved in charting the course that Environmental took under the APA.[FN1]

> FN1. In his response, Murphy asks that we reinstate the dismissed claims, but he has not presented this request in a procedurally correct manner. Furthermore, even if he had properly moved for reconsideration of our ruling, he has offered no persuasive reason why our earlier conclusions were in error. We therefore confine our analysis to the only claim for which we have the power to pass judgment: the tortious interference claim advanced in Count IV.

**\*5** To prevail on his claim of tortious interference, Murphy must show that he had a valid contract with Environmental, that PLC was aware of the contract, that it intentionally and unjustifiably induced Environmental to breach its contractual obligations, that PLC's actions caused the breach to occur, and that Murphy suffered damages from the breach. See *Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98, 101 (Ill.App.Ct.1980). There is no dispute that the APA was a valid contract or that PLC was aware of its existence. With respect to the respect to the third and fourth elements, PLC contends and advances evidence to support that it was neither informed of nor involved in Environmental's decision making process with respect to the APA and Environmental's performance under the agreement. There is undisputed testimony that Len Graziano, an executive at Environmental, decided that Murphy would not be paid any additional money for the inventory received without input from anyone at PLC. The evidence shows only passing mention of issues between Murphy and Environmental at PLC meetings, and there is no evidence that PLC had any input into the operations of Hydra-Stop that would affect its profitability during Murphy's consultancy.

The evidence Murphy has presented to defeat the motion is not to the contrary. At best, these facts upon which he relies establish passive, generalized

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

knowledge of events that transpired, but nothing that rises to the level of intentional and unjustified action by PLC designed to effect unlawful behavior by its subsidiary. As a result, Murphy has shown nothing to support his theory that PLC engaged in purposeful acts that could be said to have caused any unlawful acts by Environmental. Because Murphy has failed to demonstrate any evidence of an issue needing trial, PLC's motion for summary judgment in its favor on Count IV of Murphy's complaint is granted.

C. Murphy's Motion for Summary Judgment

With respect to his complaint, Murphy moves for summary judgment on a single, discrete aspect: his claim that Environmental is contractually obligated under § 2.9 to pay him an adjustment (and the interest that has accrued on that amount since the dispute first arose) for the additional inventory. With respect to Environmental's counterclaim, he requests a judgment in his favor as to all four counts. We address each argument in turn.

*1. Count 1A/Counterclaim I: Inventory Adjustment*

Murphy's argument that he is entitled to an inventory adjustment is rooted in the plain language of § 2.9 of the APA, which states in pertinent part:

Within five days after the Closing Date, Buyer and Sellers shall jointly conduct a physical count of all of Sellers' inventories counting for such purposes only those items of Sellers' inventory that are in usable and saleable condition at retail ... If and to the extent that the aggregate value of all of the inventory of the U.S. Sellers as so determined is more than $310,000 ... the Base Purchase Price payable by Buyer to Sellers hereunder shall be adjusted and increased by the amount of such overages.

**\*6** The parties' arguments with respect to this issue focus on whether Environmental can challenge Detterbeck's conclusions, not whether they are obligated to pay an adjustment to Murphy if the invent-

ory is valued above $310,000. It is not disputed that the inventory Hydra-Stop had at the time of closing was worth more than that amount. Neither is it disputed that Environmental has not paid Murphy anything beyond the $310,000 for the inventory. Based on the plain language quoted above, we conclude that Environmental's failure to pay more than $310,000 is a breach of their obligations under the APA.

Having established that Environmental has breached the APA, we turn to the parties' true fight: the amount of damages. Murphy urges that he is owed the $1,214,315.55 difference between Detterbeck's final valuation and the $310,000 figure in the APA. Environmental challenges the correctness of this figure in two ways: first, by contending that Detterbeck's valuation contained several errors, as described by their expert Sally Hoffman,[FN2] and second, by contending that Murphy's failure to supply them with GAAP-compliant financial statements before the closing as required by § 3.1 of the APA releases them from their contractual obligation to pay any overage.

> FN2. Hoffman's challenges to Detterbeck's results are primarily contained in her report and rebuttal report, which as described above cannot be considered as evidence for purposes of this motion. However, Hoffman also described the deficiencies she found during her deposition, the contents of which are fair game. Nevertheless, her testimony, even if given full evidentiary weight, does not and cannot create a material issue of fact either as to Environmental's liability for the unpaid inventory evaluation or the amount of same.

With respect to the first argument, the undisputed fact is that Environmental retained Detterbeck to perform the count provided for under the APA. Detterbeck had the power to act on their behalf in performing the count and valuation of the inventory; their relationship was that of agent and principal. *See Letsos v. Century 21,* 285 Ill.App.3d 1056,

Case 1:08-cv-01062    Document 48    Filed 05/20/2008    Page 28 of 68    Page 6

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

221 Ill.Dec. 310, 675 N.E.2d 217, 224 (Ill.App.Ct.1996). If Environmental was displeased with Detterbeck's work as their agent, it was incumbent upon them to raise the issue within that relationship at that time. Because they did not, their agreement now with his final product is irrelevant. The end result of his retention was a document memorializing his conclusion that the existing Hydra-Stop inventory was worth $1,524,315.88 as of May 31, 2000. While we do not subscribe to the idea that Environmental was never without recourse if they disagreed with the outcome of the joint count, their time to do so has long since come and gone and the arena in which that dispute should have played out is not this suit. Environmental is bound by the figure reached by its agent Detterbeck, regardless of any alleged deficiencies its expert identified in the context of this case.

With respect to Environmental's second argument (which also forms the basis of the second point in Murphy's motion), we disagree that the financial statements, GAAP-compliant or not, have the potential to release Environmental from its obligation to pay an increased purchase price for the additional inventory. Murphy argues that the resolution of this issue turns on whether §§ 2.9 and 3.1 conflict and that, in any event, Environmental cannot show that the statements did not comply with GAAP. Environmental insists that there is no conflict between the two provisions and goes on to argue that Murphy has in essence admitted that he did not fulfill his obligations under § 3.1.

**\*7** These battles overlook a fundamental fact. The APA is a fully integrated contract, executed by two sophisticated parties represented by experienced counsel. There is nothing in the language of § 2.9 that indicates the $310,000 figure is in any way tied to the financial statements or their accuracy. The section specifies that figure as what was included in the base purchase price and then establishes a corrective process once the value of the inventory can be determined. If Environmental wished to link that number to the accuracy of the financial statements,

they should have done so. As the contract stands, there is no connection between the obligations set forth in the two sections, so a breach of one does not affect what must be done under the other.

In sum, the APA provided that Environmental would pay the difference between the $310,000 and the valuation produced by the joint count if the latter was in excess of the former. Because that situation has come to pass, Environmental is liable to Murphy for the $1,214,315.55 difference as well as interest that has accrued while this amount has gone unpaid, pursuant to § 2.9.

*2. Counterclaim II: Fraud*

Next, Murphy moves for summary judgment of nonliability for the second cause of action contained in the counterclaim. This claim alleges that Murphy made material misrepresentations to Environmental in the form of the financial statements provided before the closing. Environmental contends that they reasonably relied on these statements and suffered damages in the amount of the difference between the estimated value of the inventory and the actual value. If Environmental could show each of these elements, they could proceed under a fraud theory. *SeeChatham Surgicore, Ltd. v. Health Care Serv. Corp.,* 356 Ill.App.3d 795, 292 Ill.Dec. 534, 826 N.E.2d 970, 977 (Ill.App.Ct.2005).

However, Environmental cannot establish that they reasonably relied on the representations of the financial statements to come to the conclusion that they would pay no more than $310,000 for Hydra-Stop's inventory. The undisputed evidence shows that Environmental had been told that the figures given were estimates and that the inventory had not been counted for 18 months, and they knew that the statements were not audited. Furthermore, their pre-closing due diligence report was replete with warnings about the unreliability of these documents and recommendations for actions to obtain more accurate information.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

Case 1:08-cv-01062    Document 48    Filed 05/20/2008    Page 29 of 68    Page 7

The law requires that we consider all of what Environmental knew about the transaction to determine whether their professed reliance was reasonable. *See* *Luciano v. Bestor,* 106 Ill.App.3d 878, 62 Ill.Dec. 501, 436 N.E.2d 251, 256-57 (Ill.App.Ct.1982). When all of the information known or available to Environmental is considered as a whole, we do not agree that they were justified in believing the representations made within the unaudited statements to the exclusion of everything else they knew about, even in the face of the warranty given in § 3.1(e)(ii).

**\*8** The case Environmental cites in support of their argument that the warranty cancels out all else is not to the contrary. In fact, the text upon which they rely addresses only the impact of an express warranty on a breach of contract claim. *Vigortone AG Products, Inc. v. PM AG Products, Inc.,* 316 F.3d 641, 648-49 (7th Cir.2002). Environmental fails to acknowledge that *Vigortone* also involved a fraud claim. The appellate court reversed the jury's verdict in favor of the allegedly defrauded party and awarded judgment as a matter of law in favor of the alleged defrauder because of the lack of justifiable reliance upon a particular representation in light of several contrary pieces of information known to the party at the time of the alleged fraud despite the existence of a warranty in the agreement. *Id.* at 645-47.

Because Environmental has not shown any evidence that would allow a finder of fact to conclude that they reasonably relied on the information contained in Hydra-Stop's financial statements, Murphy is entitled to summary judgment on the fraud count of Environmental's counterclaim.

*3. Counterclaim III: Conversion*

Next, Murphy moves for summary judgment on Environmental's claim that he converted two payments from two customers, CPI and Logan Utara, for work that was performed around the time that the company changed hands. The APA specifies that Murphy would be paid for work completed before the sale, and Environmental would be paid for work completed after the sale.

To prevail on its claim for conversion, Environmental must show four things: first, that Murphy exercised unauthorized or wrongful control, dominion, or ownership of the payments from Logan Utara and CPI; second, that Environmental had a right to the payments at all relevant times; third, that Environmental had a right to immediate possession of the payments; and fourth, that Environmental demanded that Murphy turn over the payments to them. *See* *Cirrincione v. Johnson,* 184 Ill.2d 109, 234 Ill.Dec. 455, 703 N.E.2d 67, 70 (Ill.1998).

Murphy contends that Environmental comes up short with respect to all but the fourth element. His challenge is both factual and legal in nature. First, he contends that there is no dispute that the work was completed before the sale. Second, he argues that Environmental's claim does not properly sound in conversion. In support of the latter argument, Murphy cites *In re Thebus,* 108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260-62 (Ill.1985) and *Horbach v. Kaczmarek,* 288 F.3d 969, 975 (7th Cir.2002).

We disagree with Murphy on both points. First, there is a legitimate dispute whether the CPI and Logan Utara work was completed before the sale, as Detterbeck listed them as "works in progress" in the postclosing inventory count and valuation. If the jobs were not completed as of the closing date, the eventual payments would belong to Environmental, not Murphy. Second, though an unspecified amount of money cannot be the "property" underlying a claim of conversion, a specific and identifiable amount, particularly when it is identifiable because it originates from an outside source, can be tortiously converted. *See* *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.,* 346 Ill.App.3d 996, 282 Ill.Dec. 305, 806 N.E.2d 280, 286, 288 (Ill.App.Ct.2004). Environmental has produced sufficient evidence with regard to both of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

these issues to defeat Murphy's motion for summary judgment on this count.

### 4. Counterclaim IV: Breach of Contract for Failure to Pay "Due from Seller" Sums

**\*9** The last target of Murphy's motion is Counterclaim IV, in which Environmental contends that Murphy breached the APA by failing to pay certain amounts due to Environmental after the closing. Murphy urges that there is no dispute that he has paid all amounts due. In part, this argument is based on his contention that the parties reached an accord and satisfaction, which impliedly admits that he has not paid everything that Environmental informed him he owed.

Our ability to fully assess the parties' respective positions is hampered by citations within the statements of fact to exhibits that do not correspond to the documents referenced within the statements. However, from the evidence that is properly presented, it is apparent that the facts surrounding this cause of action are very much in dispute, so no summary disposition is appropriate at this time. Thus, Murphy's motion is denied with respect to Counterclaim IV.

### D. Environmental's Motion for Summary Judgment

Environmental's motion for summary judgment addresses the three counts of Murphy's complaint directed to them as well as two counts of their counterclaim. Because we have addressed the merits of the arguments with respect to Count IA of the complaint and Counterclaims I and II in the context of Murphy's motion, we will not revisit them.

### 1. Count 1B: The Earnout Provision

The first portion of Environmental's motion that remains pertains to Murphy's allegation that Environmental breached § 2.3 of the APA, the so-called earnout provision, which states that Murphy will be paid a specified percentage of Hydra-Stop's profits

if the company's overall profit levels exceed certain thresholds during the three years of his consultancy.

It is undisputed that the company did not surpass the necessary profit levels. Neither is it disputed that Murphy did not receive any earnout payments. Murphy's theory of liability is that the company would have reached the levels specified if he had been allowed to run the company as he saw fit. He contends that Environmental made certain decisions regarding the chain of command within the company (particularly hiring Marafino as vice president of operations), branding, and use of Hydra-Stop employees that hamstrung the company into earning profits below the thresholds required for him to garner additional payments under the earnout provisions of § 2.3 of the APA.

In response, Environmental points out that the contract provided that Murphy was not the ultimate decision maker but instead was subject to the supervision of Environmental and its board of directors. Environmental was entitled to make decisions about the company's operations as it saw fit, regardless of whether Murphy ultimately agreed with them, so it breached no contractual duty in making decisions contrary to what Murphy would have done. Moreover, both of Murphy's experts acknowledged that there is no way to quantify the impact of the various decisions Environmental made. Funk Tr., pp. 69-70, Bartecki Tr., pp. 214-16. As a result, any argument that Murphy would have received earnouts if Environmental had not pursued the paths with which Murphy disagreed would be pure speculation. Such musings cannot be the basis of a claim for legal damages.

**\*10** Because Murphy cannot show that Environmental took any action not allowed under § 2.3 and because it is not possible to show Hydra-Stop would have achieved the profit thresholds but for Environmental's decisions, Environmental is entitled to summary judgment on Count IB of Murphy's complaint.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

*2. Count II: Fraud*

The penultimate issue for our consideration is Environmental's motion for summary judgment on Murphy's fraud claims. As explained in the context of Environmental's fraud claim, to defeat the motion for summary judgment, Murphy must show that Environmental made a representation of material fact about the value of the inventory, knowing or believing that it was untrue, to induce Murphy to act or refrain from acting. *SeeChatham Surgicore, 292 Ill.Dec. 534, 826 N.E.2d at 977.* Murphy must demonstrate that he reasonably relied upon the truth of the misrepresentation, which in turn caused him injury. *Id.*

As is apparent from even the limited recital of the parties' interactions in this opinion, Murphy cannot show that he ever relied on the information Environmental offered with respect to the value of the inventory. The undisputed evidence is that he never budged from his position that he was owed the $1,214,315.55.

Moreover, the actions Murphy claims were taken to his detriment in reliance are not of the kind that would lead to recoverable damages. He contends that Environmental's alleged fraud caused him to continue his consultancy under "difficult circumstances," incurring unidentified expenses, and then pursuing resolution of the disputes in his favor both privately and before this court. These contentions undermine Murphy's claim rather than supporting it. First of all, the "difficult circumstances" to which he points were the direct result of his constant belief that he should be receiving more money from Environmental. Second, an offhand reference to unspecified expenses is nowhere near sufficient to stave off summary judgment on an issue of damages incurred. Lastly, to support his claim for fraud, Murphy must show that he took action because he believed Environmental was telling him the truth, not that his disagreement with their position led him to take steps to prove that his contrary position was in fact correct. In short, Murphy cannot show any reliance on Environmental's statements about

the value of the inventory or that he suffered any damage from the same.

With regard to the allegations of fraud ultimately leading to Murphy being unable to receive earnout payments, the same unavoidable speculative nature of Environmental's actions on Hydra-Stop's ultimate profit achievements that impeded Murphy's contract claim dooms his fraud claim. Furthermore, the idea that Murphy would have received earnout payments but for statements that Environmental made during the contract negotiations is entirely too attenuated a theory of causation to allow a factfinder to reach a conclusion in Murphy's favor. Environmental is entitled to summary judgment on Count II of Murphy's complaint.

*3. Count III: Conspiracy to Commit Fraud*

**\*11** Finally, we examine Environmental's challenge to Count III of the complaint, which alleges that Environmental, Capital Controls, and PLC all conspired to defraud Murphy in the manner described in Count II. However, as stated above, Murphy cannot show that he relied to his detriment on any of the alleged misrepresentations or that he suffered any cognizable damages even if he had relied. Without an underlying fraud, there cannot be a conspiracy to commit the same. Accordingly, Count III cannot stand as to any of the alleged conspirators.

CONCLUSION

Based on the foregoing, PLC's motion for summary judgment is granted. Murphy's motion for summary judgment is granted with respect to Count IA of the complaint and Counterclaims I and II. It is denied with respect to Counterclaims III and IV. Environmental's motion is granted with respect to Counts IB, II, and III of Murphy's complaint. It is denied with respect to Count IA of Murphy's complaint and Counterclaims I and II. The motions to strike the testimony of Garry Bartecki, Alan Funk, Sally Hoffman, and Terry Korn are denied as described.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2035584 (N.D.Ill.))**

N.D.Ill.,2005.
Hydra-Stop, Inc. v. Severn Trent Environmental
Services, Inc.
Not Reported in F.Supp.2d, 2005 WL 2035584
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Slip Copy                                                                          Page 1
Slip Copy, 2008 WL 162757 (N.D.Ill.)
(Cite as: 2008 WL 162757 (N.D.Ill.))

Midwest Canvas Corp. v. Commonwealth Canvas, Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
MIDWEST CANVAS CORP., an Illinois Corporation, Plaintiff,
v.
COMMONWEALTH CANVAS, INC., a Massachusetts Corp., et al., Defendants.
No. 07 C 0085.

Jan. 16, 2008.

Jennifer Ann Esposito, Kantor & Apter, Ltd., David G. Rosenbaum, John Peter Paredes, Rosenbaum And Associates, P.C., Northbrook, IL, for Plaintiff.
Jan M. Michaels, John A. Lee, Steven Schulwolf, Michaels & May, P.C., Robert A. Habib, Attorney at Law, Peter Carl Nabhani, Law Office of Peter Nabhani, Stephen Andrew Skardon, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOAN B. GOTTSCHALL, District Judge.

**\*1** Plaintiff Midwest Canvas Corp. ("Midwest") has filed suit against defendants Commonwealth Canvas, Inc. ("Commonwealth"), Raw Equipment Corporation ("Raw"), and Constructioncomplete.com ("CC.com") alleging, *inter alia,* violations by Commonwealth and Raw of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); the Uniform Trade Practices Act, 815 ILCS 510/1 (Count VI); and state common law unfair competition (Count VII); and violation by Commonwealth and CC.com of the Lanham Act (Count VIII); the Uniform Trade Deceptive Practices Act (Count IX); and state common law unfair competition (Count X). Before the court is Commonwealth's motion to dismiss Counts V-X and Raw's motion to dismiss Counts V-VII. For the reasons set forth below, Commonwealth's

and Raw's motions to dismiss are granted.

### I. BACKGROUND

Midwest and Commonwealth are competing corporations engaged in the manufacture of, among other items, concrete curing blankets. Pl .'s First Amended Compl. ¶¶ 1-2. Concrete curing blankets are employed to cover freshly poured concrete. The blanket protects the surface of the concrete and its insulating qualities trap the heat released as the concrete cures and thus accelerates the hardening process; this is particularly important during construction in cold weather. Raw is a corporation engaged in the marketing and distribution of Commonwealth's products, including its curing blankets. Pl.'s First Amended Compl. ¶¶ 3-4.

One of Commonwealth's curing blankets, with the trade name "Cure-All," is listed on the website of the New York Department of Transportation ("NYDOT") on the page presenting the "Technical Services-Materials-Approved List" of form insulation materials for winter concreting (Form 711-07). Pl.'s First Amended Compl. ¶¶ 40-41; *see also* https://www.nysdot.gov/portal/page/portal/divisions/engineering/technicalservices/technical-services-repository/alme/pages/310-1.html (last visited Jan. 8, 2008). Commonwealth's blanket is one of seventeen curing blankets manufactured by eleven different corporations (including two of Midwest's "Insul-Tarp" products) that are listed as approved for use in NYDOT construction projects. *Id.;* Pl.'s First Amended Comp. Exh. C. The NYDOT website lists the Commonwealth "Cure-All" blanket as having a thickness of 25 mm (1 ). Pl.'s First Amended Compl. ¶ 42. No pricing or direct ordering information are listed on the website. Pl.'s First Amended Comp. Exh. C.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In April 2007, after the initial complaint in this suit was filed [FN1], Tim Dunphy ("Dunphy"), who was employed as a sales manager by Midwest, placed an order with Raw for a 25 mm "Cure-All" curing blanket, the same as listed on the NYDOT website. Pl.'s First Amended Compl. ¶ ¶ 43-44. Raw duly delivered a curing blanket, together with an invoice describing it as a "CLOSED CELL 1 NYSDOT CURING BLANKETS (sic) 6'x 25'.'"Pl.'s First Amended Compl. ¶¶ 45-46, Exh. D. Midwest claims that Dunphy, upon inspecting the curing blanket received from Raw, discovered that it was not 25 mm in thickness. Pl.'s First Amended Compl. ¶¶ 47-48.

> FN1. The initial complaint in this suit was filed on January 8, 2007. Midwest filed its amended complaint on June 28, 2007.

**\*2** Previously, in February 2007, Dunphy had likewise ordered a 1/2 (CC2) and 1 ("CC4") curing blankets from CC.com, which advertises and sells Commonwealth curing blankets. Pl.'s First Amended Compl. ¶¶ 62-65, Exh. E. The order was confirmed via email and, later, two curing blankets, together with a work order describing the blankets as being "CC2 6x25 2 LAYER FOAM CONCRETE CURING BLANKET" and "MISC CC-2 4 LAYER FOAM CONCRETE CURING BLANKET," were received by Midwest. Pl.'s First Amended Compl. ¶¶ 66-68, Exhs. F-G. Midwest claims that the received blankets were not 1/2 and 1 respectively in thickness. Pl.'s First Amended Compl. ¶ 69.

Count V of Midwest's first amended complaint claims that the invoice accompanying the curing blanket received from Raw constitutes commercial advertising as defined by the Lanham Act, 15 U.S.C. § 1125(a), and that Raw's provision of a curing blanket that was not 25 mm in thickness thereby constituted materially false and misleading representations about the nature and quality of the curing blanket. Counts VI and VII are pendant state and common law claims that Raw's actions respectively constituted a violation of the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq. and "New York and other state common law unfair competition."

Similarly, Count VIII of Midwest's amended complaint claims that the work order received with the blankets from CC.com constitutes false advertising in violation of the Lanham Act and that Commonwealth and CC.com's actions in selling the blankets are misleading and false. Counts IX and X claim respectively violations of the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq., and unfair competition under Illinois common law. Commonwealth has filed a motion to dismiss Counts V-X under Federal Rule of Civil Procedure 12(b)(6) and Raw has filed a motion to dismiss Counts V-VII on the same theory. Raw has also moved to dismiss the amended complaint under Federal Rule of Civil Procedure 9(b), alleging that Midwest has failed to plead fraud with the required particularity. Because the issues in both motions are essentially identical, the court considers both of these motions together.

## II. ANALYSIS

To survive a motion to dismiss under 12(b)(6), "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Equal Opportunity Comm'n v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting Fed.R.Civ.P. 8(a)(2)). The complaint "must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests' ... [and] its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Concentra,* 496 F.3d at 776 (quoting *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964, 1973 n. 14, 167 L.Ed.2d 929 (2007)).

### A. Midwest's Counts V-VII

**\*3** Count V claims specifically that the invoice ac-

companying Raw's shipment of the blanket to Midwest constituted advertising under the Lanham Act, and that Commonwealth and Raw's collective actions of selling blankets that are purported to be 1 thick but are not constitute material false and misleading misrepresentations about the nature of Commonwealth's products.

The Lanham Act (§ 43(a)) provides in relevant part that any person who: "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." 15 U .S.C. § 1125(a)(1)(B). To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999); *The Monotype Corp. v. Simon & Schuster, Inc.,* No. 99 C 4128, 2000 WL 1852907, at *6 (N.D.Ill. Sept.8, 2000).

Midwest specifically claims that the invoice accompanying the allegedly misrepresented curing blanket constitutes false commercial advertising under the Lanham Act. For a statement to amount to "commercial advertising or promotion" the statements must be (1) commercial speech (2) by a defendant who is in commercial competition with the plaintiff (3) for the purpose of inducing consumers to buy defendant's goods or services (4) disseminated sufficiently to the relevant purchasing public.

*Health Care Compare Corp. v. United Payors and United Providers, Inc.,* No. 96 C 2518, 1998 WL 122900 at *3 (N.D.Ill. Mar.13, 1998).

The court finds that Midwest's argument that the invoice accompanying Raw's delivered curing blanket constitutes advertising fails to meet these criteria. An invoice sent to an individual customer and accompanying an order can hardly be construed to have been "disseminated sufficiently to the relevant purchasing public" because it lacks the element of publicity required by the Lanham Act. *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1078 (N.D.Ill.1993) (Lanham Act's use of the terms "advertising" or "promotion" have requisite element of publicity); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). An invoice accompanying an order shipped to an individual customer lacks the requisite element of publicity. It is true, as Midwest points out correctly, that the required level of circulation establishing publicity will vary according to the specifics of each industry and can be so small as to comprise a single party. *Seven-up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1385 (5th Cir.1996). Nevertheless, even if a presentation to a single individual could possibly be considered public enough to satisfy publicity requirement of the statute, an invoice cannot be advertising because it is not an inducement to buy, but rather reflects an agreed-upon transaction.

**\*4** Specifically, an invoice accompanying an order shipped to a client is not sent for the "purpose of inducing consumers to buy defendant's goods or services"; the goods accompanying a shipment have already been ordered by the consumer who needs no further inducement to buy them. In sum, a single private communication from one party to another that is not an inducement to buy does not constitute

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commercial advertising sufficient to establish liability under the Lanham Act. *See American Needle, 820 F.Supp. at 1078.*

In its response to Commonwealth's and Raw's motions to dismiss, Midwest argues that the fourth prong is also satisfied because Commonwealth caused its products to become listed by NYDOT on NYDOT's website, and also because Commonwealth allegedly employed distributors who disseminated the "defendant's" (presumably Commonwealth's) statements over the internet in connection with promoting the sale of 1 NYDOT approved concrete curing blankets. The specifics of this claim are not clearly alleged in Midwest's complaint, but the court will assume, *arguendo,* that this argument falls under the rubric of Midwest's allegations, stated in its complaint, that Commonwealth's and Raw's "misrepresentations constituting false advertising" resulted from their "actions of selling concrete curing blankets that are purported to be 1 blankets when they are not ...." Pl.'s First Amended Compl. ¶¶ 50-52

To begin with, Midwest's claims on this point fall far short of the particularity required by Federal Rule of Civil Procedure 9(b) for pleadings alleging fraud. When alleging claims of fraud or mistake, the plaintiff is required to plead with specificity the who, the what, the where, and the when of the alleged fraud. FED R. CIV. P. 9(b); *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins.,* 412 F.3d 745, 749 (7th Cir.2005). In Count V, Midwest vaguely alleges that the listing of the Commonwealth blanket on the NYDOT site, and Commonwealth's and Raw's alleged misrepresentations, are somehow connected in such a way as to create a fraudulent advertisement in violation of the Lanham Act. But Midwest fails to allege with particularity just what, if any, the connection between the NYDOT website and Raw is. Not does it aver with any particularity what allegedly false statements have been made by Commonwealth or Raw other than the invoice; and the court has already determined that the invoice is not a commercial advertisement. Moreover, it does not allege with sufficient particularity a causal connection between Commonwealth's listing of its product on the NYDOT website and any direct or indirect misrepresentation whatever by Commonwealth to Midwest.

Even placing the issue of particularity aside, the listing of Commonwealth's (and Midwest's) curing blankets on the NYDOT website cannot be construed as a commercial advertisement by Commonwealth because the actual maker of the statement, NYDOT, a state government entity, is not in direct commercial competition with any of the companies whose curing blankets are listed on its Website, including Commonwealth and Midwest. Therefore, the listing cannot be a commercial advertisement or promotion by which liability can be established under § 43(a) of the Lanham Act. *Health Care Compare,* 1998 WL 122900 at *3.

**\*5** Furthermore, the NYDOT website listing of approved construction materials, including curing blankets, is not an inducement to the public to buy Commonwealth's (or any of the other manufacturer's) products. The listing of approved materials on the NYDOT website is presented as part of a "quality assurance program for materials incorporated into [NYDOT] projects ...."*See* https://www.nysdot.gov/porta l/page/ portal/divi- sions/engineer- ing/technicalser- vices/materials-bureau/materials-and-equipment (last visited Jan. 8, 2008). In short, the website lists materials approved for use by NYDOT and its contractors in carrying out NYDOT projects. It is just possible, arguably, that such a listing could have mixed commercial and non-commercial components-identifying blankets suitable for NYDOT purposes as well as supporting preferred vendors. The key to determining whether such a listing might qualify as commercial advertising for Lanham Act purposes is an analysis of whether the language is

motivated primarily by commercial concerns, or whether there are sufficient non-commercial motivations. *Monotype,* 2000 WL 1852907, at *7:*Oxycal Lab., Inc. v. Jeffers,* 909 F.Supp. 719, 725 (S.D.Cal.1995). Under this analysis, the listing of approved materials cannot be construed as commercial advertising: its principal purpose is to ensure that approved materials of sufficient quality are employed by NYDOT and its contractors in its construction projects. Such a purpose is most reasonably interpreted as being motivated by both quality assurance and public safety concerns. Because the principal purpose of the listing is informational, rather than commercial, it is not commercial advertising, and Midwest's claim fails. *Monotype,* 2000 WL 1852907, at *7.

Finally, Counts VI and VII allege the same factual elements as Count V. The same analysis employed in determining whether a claim for false or deceptive advertising exists under the Lanham Act is employed for Illinois false advertising claims. *Muzikowski v. Paramount Pictures Corp.,* 477 F.3d 899, 907 (7th Cir.2007); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 994 (7th Cir.2004). Therefore, for the same reasons presented above, Counts VI and VII also fail to state a claim upon which relief can be granted under the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq., and state common law unfair competition.[FN2] Midwest's Counts V through VII against Commonwealth and Raw are consequently dismissed.

> FN2. Count VII alleges violations by Raw of "New York and other state common law unfair competition," whereas Count X alleges "unfair competition, deceptive advertising and unfair trade practices under Illinois common law. (Confusingly, Counts VI and IX allege violation of the Illinois Uniform Trade Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.). Federal courts sitting in Illinois employ Illinois state choice of law rules. *Gramercy Mills, Inc. v. Wolens,* 63 F.3d 569, 572 (7th

Cir.1995). However, the choice of law issue confronting the court is moot in this instance, because the elements of both New York and Illinois unfair competition common law are very similar or identical to the Lanham Act and the legal analysis is substantially the same. *See, e.g., Paco Sport, Ltd. v. Paco Rabanne Perfumes,* 234 F.3d 1262, 1262 (2d Cir.2000); *Muzikowski v. Paramount Pictures Corp.,* 477 F.3d 899, 907 (7th Cir.2007). Under either Illinois or New York unfair competition common law, Midwest's Count VIII must be dismissed.

*B. Midwest's Counts VIII-X*

Midwest's Counts VIII through X against Commonwealth and CC.com have the same weaknesses as do Counts V through VII of their amended complaint against Commonwealth and Raw. Midwest's argument that the "work order" accompanying its order of two curing blankets from CC .com fails because a work order cannot be construed as commercial advertising is rejected by the court for the same reason that an invoice cannot be: it fails to meet the required elements of inducement of the public to buy and publicity. *See American Needle,* 820 F.Supp. at 1078. Midwest's implied claim that Commonwealth is somehow responsible for the representations on CC.com's website (which are presented as exhibits but not alleged as constituting false advertising in Counts VIII-X complaint) is not made with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b).[FN3] Moreover, for the same reasons as listed above, because Count VIII fails to state a claim upon which relief can be granted under the Lanham Act, the Illinois statutory and common law claims of Counts IX and X also fail and Commonwealth's motion to dismiss these Counts is also granted.

> FN3. Defendant CC.com has not yet filed an answer to Midwest's complaint and so this order will not consider CC.com's role in this suit.

### III. CONCLUSION

**\*6** For the reasons listed above, Commonwealth's motion to dismiss Counts V-X and Raw's motion to dismiss Counts V-VII of Midwest's first amended complaint are granted.

N.D.Ill.,2008.
Midwest Canvas Corp. v. Commonwealth Canvas, Inc.
Slip Copy, 2008 WL 162757 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

Muzikowski v. Parmount Pictures Corp.
N.D.Ill.,2003.

United States District Court,N.D. Illinois, Eastern
Division.
Robert E. MUZIKOWSKI, an individual, Plaintiff,
v.
PARAMOUNT PICTURES CORPORATION; SFX
Tollin/Robbins, Inc.; and Fireworks Pictures, Defendants.
**No. 01 C 6721.**

Dec. 3, 2003.

Marian Conroy Haney, Donald William Rupert,
Mayer, Brown, Rowe & Maw LLP, Michael B.
Roche, Lawrence Andrew Brehm, Michael T.
Roche, Schuyler, Roche & Zwirner, Chicago, IL,
for Plaintiffs.
David Mark Greenwald, Debbie L. Berman, Michael Allen Doornweerd, Jenner & Block, LLC,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION*

KOCORAS, Chief J.
**\*1** This matter comes before the court on the motion of Defendants Paramount Pictures Corporation;
SFX Tollin/Robbins, Inc. and Fireworks Pictures
(collectively referred to herein as "Paramount") to
dismiss Counts II, III, and V through XI of the
Second Amended Complaint filed by Plaintiff
Robert Muzikowski ("Muzikowski") pursuant to
Fed. R. Civ. Proc. 12(b)(6). For the reasons set
forth below, the motion is granted in part and
denied in part.

BACKGROUND

Muzikowski is a securities broker and insurance
agent. For the last ten years, he has been active in
organizing and running baseball leagues for young
boys in Chicago and New York. Muzikowski has

founded several leagues, among them the Near
North Little League ("NNLL") and Near West
Little League ("NWLL"). He has also been involved with a not-for-profit charitable organization
called the Chicago Hope Academy. Because of his
efforts, Muzikowski has been recognized by Little
League, Inc., the governing body of all Little
League programs, and he has been featured in several publications and broadcasts around the United
States.

In 1994, an assistant coach in the NNLL named
Daniel Coyle authored a nonfiction account of his
coaching experience entitled *Hardball: A Season in
the Projects.*The book mentions Muzikowski several times and discusses his life, background, and his
work with the NNLL teams. Paramount purchased
the film rights to the book, and in September 2001
released the film *Hardball.*The film recounts the
story of Conor O'Neill ("O'Neill"), a hard-drinking
gambling addict who coaches an inner-city baseball
team of young boys to pay off a debt owed to a
bookie. O'Neill is portrayed as violent and self-centered, as well as engaging in illegal activities
such as ticket scalping.

Based on preliminary reviews of the film,
Muzikowski filed suit first in the Central District of
California. He voluntarily dismissed that action and
refiled it in this Court. He sought an injunction of
the film's release and $11,000,000 in damages for
defamation and false light invasion of privacy. The
motion for a preliminary injunction was denied and
the film hit theaters on September 14, 2001.

On November 28, 2001, this Court dismissed
Muzikowski's defamation per se claims on the basis
that the film could be innocently construed.
*Muzikowski v. Paramount Pictures Corp.,* 2001 WL
1519419 (N.D.Ill.2001). The false light claims were
dismissed on similar grounds. *Id.* The per quod
claims were dismissed for failure to plead special
damages with sufficient specificity.*Id.* The dismissal was expressly without prejudice, and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

Muzikowski appealed, and the Seventh Circuit reversed our decision on the per se and false light claims, holding that, because of the different standards of pleading in the Illinois state and federal courts, the innocent construction rule cannot be applied on a motion to dismiss. *Muzikowski v. Paramount Pictures Corp.,* 322 F.3d 918 (7th Cir.2003). Muzikowski has since amended his complaint to include nine new claims. Paramount now launches a 12(b)(6) challenge to Counts II, III, and V through XI.

## LEGAL STANDARD

**\*2** Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Natl. Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). The allegations of a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.,* 144 F.3d 448, 454-55 (7th Cir.1998). The plaintiff need not allege all of facts involved in the claim and can plead conclusions. *Higgs v. Carter,* 286 F.3d 437, 439 (7th Cir.2002); *Kyle,* 144 F.3d at 455. However, any conclusions pled must "provide the defendant with at least minimal notice of the claim." *Id.* Further, the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the basis" of the claim. *Perkins,* 939 F.2d at 466-67. With these principles in mind, we turn to the motion at hand.

## DISCUSSION

After the parties filed their initial submissions on this motion, we requested further briefing on the application of Fed. R. Civ. Proc. 41(a)(1) and the Illinois single-filing rule, 735 ILCS § 5/13-217. The parties have briefed the additional question, and we have carefully considered their arguments.

In essence, Muzikowski contends that neither of these rules apply to his case. In his view, the case has been voluntarily dismissed only once, when he dismissed the action filed in the Central District of California. In his view, the only other dismissal that occurred was our order granting Paramount's motion to dismiss. While it is true that our order was an involuntary dismissal, Muzikowski ignores a crucial chapter in the procedural history of this case. As stated earlier, our dismissal was expressly without prejudice. While the decision with regard to the per se claims did not hinge on a defect that could be cured with an amended pleading, the defamation per quod claims certainly did. Thus, at the time that Muzikowski elected to stand on his complaint and pursue appeal, the judgment was not final with respect to all claims, precluding appellate jurisdiction under 28 U.S.C. § 1291. Perhaps because Muzikowski was no longer represented by counsel, the appellate court did not decline to hear the case on the grounds that it had no jurisdiction until all claims were dismissed with prejudice. *See West v. Macht,* 197 F.3d 1185, 1189-90 (7th Cir.1999). Rather than holding Muzikowski to strict compliance with this requirement, the appellate court interpreted his actions in pursuing an immediate appeal as "akin to a voluntary dismissal," thus providing the finality necessary for an appeal to proceed.[FN1] *Muzikowski,* 322 F.3d at 923-24. Muzikowski places great emphasis on the phrase "akin to" and contends that he never asked for any voluntary dismissal, so he cannot be held responsible for the fallout of the procedural vehicle chosen by the appellate court to allow his case to be heard and decided there. This argument singularly misses the point. Muzikowski voluntarily pursued his ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

peal of a decision that was not a final judgment. The only way for him to receive the relief he sought was to voluntarily dismiss the claims that he could have continued to pursue in the district court with an amended complaint. The appellate court overlooked the procedural improprieties in Muzikowski's presentation, and he accordingly received the benefit of an expedited appeal. It is difficult to grasp how he can now argue that he should be exempt from the consequences of the Seventh Circuit's magnanimous treatment of his unfamiliarity with rules of procedure.

> FN1. The appellate court also concluded that finality was present because the one-year statute of limitations had expired by the time the appeal was argued, thus precluding any refiling of a new complaint. It is unclear why the court used this as a jurisdictional basis. In each of the cases cited by the court in support of its reasoning, the statute of limitations expired during the pendency of proceedings in the district court. See *Larkin v. Galloway,* 266 F.3d 718, 721 (7th Cir.2001); *Elmore v. Henderson,* 227 F.3d 1009, 1011 (7th Cir.2000). In this case, by contrast, less than three months of the one year had elapsed at the time of the dismissal; Muzikowski had almost thrice that amount of time left in which to refile in a timely manner. In addition, as is clear from the new claims in the amended complaint, Muzikowski could have included claims that were not couched in terms of defamation, obviating any application of the innocent construction rule.

**\*3** Paramount acknowledges that the particular situation presented in this case has never been directly addressed in case law discussing Rule 41(a)(1) or the Illinois single-filing rule. Our research has likewise revealed no authority directly on point. Paramount advances compelling arguments rooted in the policies behind the two rules. In short, the reasoning goes like this: After our dismissal order, Muzikowski was faced with a choice to amend his complaint with claims that did not suffer from the deficiencies enumerated in the order or to pursue immediate appeal of the decision on his defamation per se and false light claims. He freely chose the latter, and the price of that choice is permanent forfeiture of the former. This argument as well as fundamental fairness strongly support a conclusion that Muzikowski should be limited to pursuing the claims that were considered and upheld by the appellate court. However, as noted earlier, the case law is not clear on whether the claims advanced in the amended complaint should be considered a third filing, and we are mindful of the Seventh Circuit's admonition that the scope of the narrow exception embodied in the "two-dismissal" rule should not be expanded when the underlying purpose of the exception would not be served. *Sutton Place Development Co. v. Abacus Mortgage Inv. Co.,* 826 F.2d 637, 640 (7th Cir.1987). The facts of this case present a very close call as to whether the purpose of the exception would or would not be served; as Paramount points out, Muzikowski's actions in this case border on prejudice to the defendants. However, as Muzikowski points out, Paramount has not expressly raised this issue at any point in the litigation, even on appeal. If we were starting from a clean slate, we are not convinced that Muzikowski's argument would carry the day, but given that Muzikowski has been allowed to amend the complaint twice since the case was remanded, it would not be appropriate to create new law at this point that would have drastic consequences for a case already in progress. We therefore conclude that the new complaint is not barred by either the Illinois single-filing rule or Fed. R. Civ. Proc. 41.

Paramount also argues that the new defamation claims are barred by the law of the case doctrine. They base this contention on the combination of two things: first, the new claims were not included in the initial complaint; and second, the Seventh Circuit expressly stated that "any new [defamation] claim would be barred by the statute of limita-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

tions."*Muzikowski,* 322 F.3d at 923. While this accurately quotes the appellate court, it clearly applies only to defamation per quod claims; any defamation per se claims would have been barred by our decision regarding the application of the innocent construction rule. Thus, we cannot agree that the law of the case bars the specific claims embodied in Counts II and III. Both of these claims are claims for defamation per se, not defamation per quod. Any amendment of the complaint to allege a different defamation per se claims (as opposed to per quod claims) would have been futile, regardless of whether the statutory limitation period had expired. It follows that the statement of the appellate court does not apply to these new claims.

**\*4** Along the same vein, Paramount contends that Counts II and III are time-barred. Muzikowski responds that because his original complaint included a claim of defamation against Paramount based on the same facts that underlie the new allegations of defamation per se, the relation back doctrine allows him to take advantage of his original filing date. If Muzikowski is correct, his new claims would not be time-barred.

Under Federal Rule of Civil Procedure 15(c)(2), an amended complaint is not barred by the statute of limitations when it relates back to the date of the original pleading. *Bularz v. Prudential Ins. Co. of Am.,* 93 F.3d 372, 379 (7th Cir.1996). In order to relate back to the date of the original pleading, the new claim brought in the amended complaint must "[arise] out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," even if the new claim involves a different substantive legal theory. *Id.* Here, Counts II and III stem from the same conduct, transaction, or occurrence that was at issue in the original complaint. Accordingly, the relation back doctrine applies to the newly alleged defamation claims, and they are not time-barred. We now turn to the substantive challenges to the new claims.

A. Count II

Count II of the Second Amended Complaint alleges that the film is defamatory per se toward Muzikowski in that it prejudices him in his profession as a Little League coach and fundraiser for the NWLL and the Chicago Hope Academy. A statement is defamatory per se if it wrongfully prejudices a party in her trade, profession, or business or falsely indicates that the party has committed a criminal offense, is infected with a venereal disease, is unable to perform or lacks integrity in the discharge of duties of public office, or has committed fornication or adultery. *Bryson v. News Am. Publications,* 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214-15 (Ill.1996).

Paramount's sole challenge to this count is that because Muzikowski is a volunteer in the NWLL and the Chicago Hope Academy, his work with them cannot be considered his profession. Rather, they insist, his only profession is that of securities and insurance broker. While this argument presents some initial appeal, it is insufficient to warrant dismissal of this count. Paramount has presented no authority that would indicate that, for the purposes of a defamation per se claim, a person can have only one business, trade, or profession. *Cf.Campbell v. Morris,* 224 Ill.App. 569 (Ill.App.Ct.1922) (allowing defamation plaintiff to allege injury to plaintiff's simultaneous occupations of surgeon and banker). Moreover, nothing in the case law indicates that payment for one's services is necessary for an activity to be considered a party's business or profession for the purpose of stating a legally cognizable defamation per se claim.

The parties' arguments on this point, while interesting, do little to illuminate the issue. Muzikowski's assertion that the Illinois courts have adopted the portions of § 573(b) of the Restatement (Second) of Torts, which states that holders of honorary or private offices in organizations such as fraternities and clubs can bring defamation per se claims for statements pertaining to their offices, is shaky at best. The two cases to which he refers do not support such a broad statement. In the first case, the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

Seventh Circuit addressed only §§ 559 and 566 of the Restatement (Second).*Pope v. Chronicle Publishing Co., 95 F.3d 607 (7th Cir.1996).* The second case cites § 573(b) for the proposition that defamation in Illinois includes statements regarding the integrity of one who holds a public office, not an honorary or private one.*Cooper v. Rockford Newspapers, Inc.,* 50 Ill.App.3d 247, 8 Ill.Dec. 506, 365 N.E.2d 744 (Ill.App.Ct.1977). While these two cases may indicate that Illinois courts may eventually adopt § 573(b) in its entirety, the affirmative representation that they already have overstates the case.

**\*5** With regard to Paramount's position, *King v. Armstrong* does not stand for the proposition that volunteer work cannot be a person's profession. 623 F.Supp. 487, 492 (N.D.Ill.1985). Rather, the court in *King* specifically based its decision on the conclusion that the plaintiff's activities were not her profession or employment. The contents of the instant complaint, by contrast, could support the inference that Muzikowski's volunteer efforts comprise a second profession. The other case cited by Paramount does not address the question of whether unpaid activities can ever constitute a person's profession; that case concluded that only public officeholders could bring suit under the category of defamation per se discussed in *Cooper.Spelson v. CBS, Inc.,* 582 F. Supp 1195 (N.D.Ill.1984).

Accordingly, we cannot say as a matter of law that Muzikowski's volunteer activities cannot be his profession for the purposes of a defamation per se claim, and Paramount's motion to dismiss Count II must be denied.

**B. Count III**

Count III also involves a defamation per se claim, but this time it is premised on Muzikowski's occupation in the securities field. The gist of this claim is that the film depicts O'Neill engaging in activities that would prompt reporting responsibilities and possible disciplinary action by regulatory agencies.

In other words, if the entities responsible for policing the securities industries believed that the real-life Muzikowski engaged in the same activities as the character O'Neill, he could face discipline either for not reporting these activities, for engaging in them at all, or both. Paramount argues that these statements cannot form the basis of a defamation per se claim in that they require extrinsic facts to explain their defamatory meaning. We disagree. As the Illinois Supreme Court noted in *Owen v. Carr,* statements imputing a violation of the regulations of one's profession can be defamatory per se. 113 Ill.2d 273, 100 Ill.Dec. 783, 497 N.E.2d 1145, 1149 (Ill.1986).[FN2] As that allegation is the basis of Count III, and Paramount advances no other deficiencies, Count III withstands the motion to dismiss. Paramount's challenge to the complaint's false light claims premised on the defamatory statements alleged in Counts II and III correspondingly survive.

> FN2. Despite this statement, the Court in *Owen* affirmed the trial court's grant of the defendant's motion to dismiss by applying the innocent construction rule. *Owen,* 100 Ill.Dec. 783, 497 N.E.2d at 1149. However, in light of the Seventh Circuit's earlier decision in the case at bar, that rule cannot affect the outcome of the instant motion.

**C. Counts V, VI, and IX**

These counts allege false advertising and endorsement in violation of the Lanham Act, the Illinois Uniform Deceptive Trade Practices Act, and the Illinois Consumer Fraud and Deceptive Business Practice Act. As Paramount notes, for claims of deceptive trade practices such as these, the legal inquiry is the same under the Lanham Act as it is under the two state statutes. *See,e.g .,Spex. Inc. v. Joy of Spex. Inc.,* 847 F.Supp. 567, 578 (N.D.Ill.1994), citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983). Accordingly, the following analysis applies to all three counts.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

*1. False Endorsement*

**\*6** The gist of Muzikowski's false endorsement claims is that the use of a character similar to him in the movie gives the false impression that he sponsored or endorsed the film. In support of his argument, he looks to case law that stands for the proposition that endorsements can be implied through use of identifiers other than name or likeness. *See, e.g., White v. Samsung Electronics America,* 971 F.2d 1395, 1400 (9th Cir.1992). The cases give this quality the necessarily amorphous moniker "persona." Although neither the parties' briefs nor our own research has revealed any Illinois cases involving this issue, the recently passed Illinois Right of Publicity Act defines a person's "identity" broadly, as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener" and includes a nonexhaustive list of examples. 765 ILCS § 1075/5. While the term "persona" is not contained in the list of examples, the breadth of this new statute supports the conclusion that Illinois courts would use an expansive approach in determining what kinds of attributes are protected under the statute.[FN3] In essence, Muzikowski alleges that the character O'Neill reflects his persona, thereby falsely implying that the real-life Muzikowski has endorsed the story Paramount's film tells.

> FN3. However, several cases support the conclusion that the amalgamation of events transpiring during a person's life is not a protectible interest (even when a person's actual name and likeness are used and particularly when fictionalized elements are included) and therefore does not amount to a "persona." *See, e.g., Matthews v. Wozencraft,* 15 F.3d 432, 437 (5th Cir.1994); *Ruffin-Steinback v. dePasse,* 82 F.Supp.2d 723, 731 (E.D.Mich.2000); *Seale v. Gramercy Pictures,* 949 F.Supp. 331, 337 (E.D.Pa.1996); *Hicks v. Casablanca Records,* 464 F.Supp. 426, 433 (S.D.N.Y.1978). *See also White v. Samsung*

*Electronics America, Inc.,* 989 F.2d 1512 (9th Cir.1993) (dissent from denial of petition for rehearing) (expressing grave First Amendment implications of overprotection of celebrities' right of publicity and related rights).

In response, Paramount raises the fact that, because this case involves speech (and artistic expression at that), it has a significant First Amendment component. While that is certainly the case, the protections of the Amendment are not so absolute that they automatically bar Muzikowski from bringing his claims under the Lanham Act and similar state statutes. To properly assess Paramount's contention, we would be required to balance public interest in the free flow of ideas and creativity against Muzikowski's ability to control marketing of his claimed celebrity value. The time for such an inquiry has not yet come in this case. For purposes of the present motion, we look only to the legal sufficiency of Muzikowski's allegations in isolation. So viewed, they are sufficient to withstand the motion to dismiss.

*2. False Advertising*

Paramount avers that Muzikowski cannot bring a false advertisement claim because he has not alleged that he is a competitor of Paramount, because he has not alleged a misrepresentation within the advertisements or promotional material, and because he has not alleged actual consumer reliance, a necessary predicate of a claim for damages. *L.S. Heath & Son v. At & T Info. Sys., Inc.,* 9 F.3d 561, 575 (7th Cir.1993).

On the first and second points, we cannot agree with Paramount's contention that the Second Amended Complaint does not contain sufficient allegations that the two parties are competitors. Rather, it is apparent from the face of the complaint that Muzikowski claims that he and Paramount are competitors in marketing the goodwill he has accumulated with his philanthropic efforts. Furthermore,

Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

read with all reasonable inferences in favor of the plaintiff, the complaint alleges that the representation of the film as "based on" a true story, though not outright false, was misleading. See *Hot Wax, Inc. v. Turtle Wax. Inc.,* 191 F.3d 813, 820 (7th Cir.1999) (stating that claims that are literally true but that implicitly convey a false impression can form the basis of a false advertising claim). Whether Muzikowski will ultimately be able to prove these two propositions is another question, but not one that need be resolved for the purposes of this motion.

**\*7** As for the final contention, Muzikowski does not contest and therefore concedes Paramount's point that he has not alleged actual consumer reliance. Def.'s Resp. at 8. Instead, he points out that he seeks relief other than money damages, which do not necessarily require allegations of actual reliance to be adequately pled. Accordingly, the portions of his complaint seeking money damages for false advertising are dismissed. The remainder of the relief he has requested survives the instant motion.

### D. Counts VII and VIII

These two counts are in essence claims for commercial disparagement. Here, Paramount's quarrel centers on the premise that the alleged characterizations (i.e., that Muzikowski is a thief, a liar, a felon, and a person incapable or unworthy of trust and responsibility) disparage Muzikowski only as an individual. It is true that commercial disparagement cannot be used as a vehicle to compensate a victim of unwarranted attacks that do not involve that person's goods, services, or business. *Allcare, Inc. v. Bork,* 176 Ill.App.3d 993, 126 Ill.Dec. 406, 531 N.E.2d 1033, 1037-38 (Ill.App.Ct.1988); *Am. Pet Motels, Inc. v. Chicago Veterinary Med. Ass'n,* 106 Ill.App.3d 626, 62 Ill.Dec. 325, 435 N.E.2d 1297, 1303 (Ill.App.Ct.1982). However, the complaint in this case alleges that honesty and trustworthiness are part and parcel of the services that Muzikowski offers as a securities broker and insurance sales-

man. As such, his pleading of these causes of action cannot be said to be fatally deficient.

### E. Count X

Count X purports to state a claim for intentional infliction of emotional distress. Paramount's sole argument in support of its dismissal for this count is that it cannot stand because of the First Amendment implications of this case. As stated earlier, this may very well be the case, but this defense does not address the issue of whether this count states a legally cognizable claim. The First Amendment, while powerful, does not provide an absolute bar to prohibitions of speech such that any request for injunctive relief in a case involving speech must be thrown out at the pleading stage.[FN4] Because Paramount does not argue any other inadequacies, the motion to dismiss this count is denied.

> **FN4.** Paramount's motion to strike all requests for injunctive relief follows a similar line of argument. Simply put, it is too early in this litigation to weigh all of the considerations that would be involved in resolving the propriety of injunctive relief.

### F. Count XI

Count XI is a claim premised on unjust enrichment. Muzikowski alleges that he and Coyle had an implied contract that Muzikowski would cooperate with the author's efforts, including giving him special access to the details of Muzikowski's life and the inner workings of the NNLL. In return, Coyle would use the information only in a nonfiction book that accurately reflected (in Muzikowski's opinion), the stories he related to Coyle. Muzikowski argues that by not complying with the terms of this implied agreement in making the film, Paramount was unjustly enriched at his expense. The fact that Paramount was not a party to the alleged agreement is not dispositive; Illinois courts recognize unjust enrichment claims in which the benefit plaintiff seeks has been transferred to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

defendant by a third party. *HPI Health Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 161, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill.1989). However, *HPI* limits the recovery of an unjust enrichment derived from third parties to three situations: "(1) where the benefit should have been given to the plaintiff but the third party mistakenly gave it to the defendant instead, (2) where the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) where the plaintiff for some other reason had a better claim to the benefit than the defendant."*Id.* at 162, 137 Ill.Dec. 19, 545 N.E.2d 672 (citations omitted); *see also**Wolff v. Ampacet Corp.* 284 Ill.App.3d 824, 830-31, 220 Ill.Dec. 601, 673 N.E.2d 745 (Ill.App.1996) (overruled on other grounds by*Morris B. Chapman & Assocs. v. Kitzman,* 193 Ill.2d 560, 575, 251 Ill.Dec. 141, 739 N.E.2d 1263 (Ill.2000)).

**\*8** It is clear that Muzikowski's claim does not fall into the first two categories. However, the third situation arguably applies. Paramount argues that the claim is insufficient, characterizing the benefit in question as the ability to tell a story incorporating aspects of Muzikowski's life. Because a person does not own his or her life story, they argue, there can be no implied contract involving the right to tell that story. This argument is correct as far as it goes, but Muzikowski's allegations of benefit to Coyle and correspondingly to Paramount go beyond just the telling of his story. Muzikowski also alleges that he provided Coyle with access to details that only he could provide. While this may not prove ultimately to be the case, for the purposes of a motion to dismiss, Muzikowski states a cognizable claim under Illinois law.

CONCLUSION

Based on the foregoing analysis, Paramount's motion to dismiss portions of the Second Amended Complaint is granted in part and denied in part.

N.D.Ill.,2003.

Muzikowski v. Parmount Pictures Corp.
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

Rosenthal Collins Group, LLC v. Trading Technologies Intern., Inc.
N.D.Ill.,2005.

United States District Court,N.D. Illinois, Eastern Division.
ROSENTHAL COLLINS GROUP, LLC, an Illinois Limited Liability Co., Plaintiff,
v.
TRADING TECHNOLOGIES INTERNATIONAL, INC., a Delaware corporation, Defendant.
**No. 05 C 4088.**

Dec. 26, 2005.

Stephen Lesavich, Lesavich High-Tech Law Group, P.C., Jeffrey A. Schulman, Wolin and Rosen, Chicago, IL, Anthony E. Dowell, Dowell Baker, Lafayette, IN, Geoffrey Andrew Baker, Dowell Baker, Oak Park, IL, for Plaintiff.

Michael M. Conway, Foley & Lardner, Dennis David Crouch, George I. Lee, Jennifer M. Kurcz, Leif R. Sigmond, Jr., Matthew J. Sampson, Paul H. Berghoff, Stephen Richard Carden, McDonnell, Boehnen, Hulbert & Berghoff, Ltd., Chicago, IL, Steven F. Borsand, Trading Technologies International, Inc., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.

**\*1** Plaintiff Rosenthal Collins Group, LLC (RCG), brought an action against Trading Technologies International, Inc. (TT), requesting a declaratory judgment of patent invalidity, and non-infringement and patent misuse by defendant. In the same action plaintiff alleged attempt to monopolize and illegal contract, combination or conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125, and deceptive business practices and unfair competition in violation of state laws and common law. Defendant moves to dismiss all claims (except for the declaratory judgment action for non-infringement) for failure to state a claim upon which relief can be granted. For the reasons set forth below, we grant in part and deny in part defendant's motion to dismiss.

*BACKGROUND*

In reviewing a motion to dismiss under FED. R. CIV. P. 12(b)(6), we must accept the complaint's well-pleaded factual allegations as true, including the inferences reasonably drawn from them. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). Under Rule12(b)(6) analysis, we will not look beyond the four corners of the complaint in determining whether plaintiff has stated a claim. *Palda v. General Dynamics Corp.,* 47 F.3d 872, 875 (7th Cir.1995). Documents attached to a defendant's pleadings cannot be considered without converting the motion to dismiss into a motion for summary judgment, except for documents referred to in plaintiff's complaint and central to his claim.*Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994). Therefore, we take the following facts from the plaintiff's complaint and accompanying exhibits.

Defendant currently holds two U.S. patents, nos. 6,766,304 ('304) and 6,772,132 ('132), both of which relate to computer software used for electronic trading in the futures market. Plaintiff alleges that "[s]ince obtaining these patents, TT has embarked on an anticompetitive campaign to monopolize the electronic futures trading market and control order flow and market internalization of these markets" (cplt., ¶ 9). Plaintiff brings this suit as its response to defendant's actions and proposed actions regarding these patents.

Plaintiff claims that defendant currently controls 50 to 70 per cent of the electronic volume share in the largest four futures trading exchanges. Through aggressive and allegedly illegal techniques of enforcing its current patents and the filing of more than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

eighty additional patent applications to interface with the current technology, plaintiff alleges that defendant "intends to control 100% of the market order flow" (cplt., ¶ 17). Plaintiff has identified several specific instances, which taken together, allegedly show illegal conduct in defendant's use of its patents.

First, in a press release entitled, "TT's Open Letter to the Futures Industry" (open letter) defendant proposed a royalty payment system for the use of defendant's patented technology in electronic futures trading. In exchange for unlimited access to defendant's technology for any participating trading exchange and defendant's forfeiture of its right to bring patent infringement suits, defendant proposed a 2.5 cents per side charge for every future and future option transaction that occurs in the participating exchange permanently (cplt., ex.1, p.) (2.5 cent proposal). Plaintiff asserts that this proposal is evidence of an intent to monopolize, in violation of the Sherman Act, § 2 (cplt., ¶ 11) ("TT's demand of a 2.5-cent royalty for every electronic trade would have increased the costs of futures trading for all exchange members. The flat rate royalty for all trades would also preclude competition and discourage innovation because exchange members would be paying a fee regardless of whether they used TT's patented software, thus discouraging the use of alternative software which would require an additional fee"). Additionally, in the same press release defendant stated, "By making a premier order-entry system commercially available, TT has truly leveled the playing field among market participants through our innovative technology" (cplt., ex.1, p. 1). Plaintiff contends that this statement, viewed in light of the allegation that defendant has not introduced its technology or proposal to level the playing field, but rather to slant the playing field to its advantage, violates the false advertising section of the Lanham Act.

**\*2** Second, plaintiff points to the various patent infringement lawsuits defendant has brought to protect its patented technology. Plaintiff claims that al-

though the targeted futures exchanges rejected defendant's 2.5 cent proposal, "TT sought another avenue to pressure the major exchanges to pay the flat rate fee on every trade and prevent customers from having a choice regarding electronic futures trading software," namely, patent infringement suits, threatened suits, and unfair settlement proposals (cplt., ¶¶ 12-14). According to plaintiff's complaint, defendant is also leveraging its existing license agreements to pressure firms into supporting the 2.5 cent proposal (cplt., ¶¶ 20-18). Plaintiff states that, upon approaching plaintiff claiming that plaintiff was infringing defendant's patented software, defendant proposed an unfair settlement agreement and threatened suit (cplt., ¶¶ 29-42). Thus, plaintiff brings its declaratory judgment action for noninfringement and patent misuse.

Finally, plaintiff claims that defendant entered into an illegal contract with Patsystems, a business partner of plaintiff's who provides essential services to plaintiff, requiring Patsystems to "terminate any customers that TT claims is using software that infringes TT patents" (cplt., ¶¶ 68-69). Plaintiff alleges, relying on "information and belief," that defendant intends to direct Patsystems to terminate customers, including plaintiff, regardless of whether that party uses infringing software. Plaintiff further alleges that "[o]n information and belief, TT intends to and will attempt to coerce customers of Patsystems such as RCG into accepting unfavorable settlement terms out of the fear of being terminated by Patsystems" (cplt., ¶ 71). Therefore, plaintiff asserts that defendant's contract with Patsystems is illegal and in restraint of trade, in violation of the Sherman Act, § 1.

### DISCUSSION

As noted above, under Rule 12(b)(6) we must accept the complaint's well-pleaded factual allegations as true, including the inferences reasonably drawn from them. Because FED. R. CIV. P. 8(a)(2) requires only that a complaint must contain a "short and plain statement of the claim showing that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

pleader is entitled to relief," the complaint should be dismissed only if the plaintiff "failed to allege any set of facts upon which relief may be granted."*Gibson,* 910 F.2d at 1521. *See also*Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Plaintiff expends a significant amount of energy and time arguing that federal notice pleading requires only that plaintiff set forth facts to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (plf's response at 3) (citing*Conley,* 355 U.S. at 47). Throughout its response to defendant's motion to dismiss, plaintiff reasserts the notice pleading standard and suggests that its complaint sufficiently put defendant on notice of its claims (plf's response at 5, 13, 16). We recognize that the notice pleading requirements set forth in the Federal Rules of Civil Procedure are quite liberal, and we do not require specific fact pleading in the federal district court. Neither complex antitrust nor patent claims are an exception to this rule. Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 782 (7th Cir.1994).*See also*Leatherman v. Tarrant County, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (holding that the Federal Rules of Civil Procedure do not require heightened pleading requirements for § 1983 claims, or any other claims, with the exception of those set forth in FED. R. CIV. P. 9(b)).[FN1] Plaintiff's claim cannot proceed, however, unless it contains allegations upon which a legal theory can succeed. Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984) ("In practice, 'a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory' ") (citing*Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 654 (7th Cir.1984)). The *Car Carriers* court went on to note, "[t]he pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing them up in the language of antitrust.'"*Id.*

FN1. Plaintiff's federal claims do not fall within the ambit of the heightened pleading requirements contained in Rule 9(b). Plaintiff's state law fraud claims, however, do fall within Rule 9(b), and must be pled with particularity.

*Antitrust Claims*

**\*3** In Count III, plaintiff alleges that defendant has violated the Sherman Act, § 2, which makes it a penalty to monopolize, or attempt to monopolize, any part of interstate trade or commerce. Relying chiefly on defendant's open letter, but also on defendant's aggressive patent infringement litigation and actions around settlement and licensing, plaintiff alleges that defendant's various actions and proposals comprise an attempted monopolization in violation of the Sherman Act. First, plaintiff alleges, "TT has attempted and is attempting to restrain competition in the relevant market by requiring the major futures exchanges to pay 2.5 cents per trade on all trades, regardless of whether the trades are or could be covered by a TT patent" (cplt., ¶ 62). Plaintiff also states, "TT has attempted and is attempting to restrain competition in the relevant market by requiring that RCG pay, as a condition of settlement, fees on products that are not covered by a TT patent" (cplt., ¶ 63). In response, defendant contends that Count III must be dismissed because, as plaintiff has not suffered nor is significantly threatened by an antitrust injury, plaintiff lacks standing to bring an antitrust action. Alternatively, defendant argues that plaintiff's claims must fail because it has failed to allege the basic elements of a Sherman Act, § 2 claim.

In Count IV, plaintiff contends that defendant has also violated the Sherman Act, § 1, which prohibits a contract, combination, or conspiracy in restraint of trade. Specifically, plaintiff alleges that defendant entered into an agreement with Patsystems, an essential partner of plaintiff's, requiring Patsystems to terminate any customers defendant claims is using software infringing upon defendant's patents. Plaintiff suggests that defendant will direct Patsys-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

tems to terminate its contract with plaintiff, regardless of whether plaintiff is actually infringing upon defendant's patents, and will use such an agreement to pressure plaintiff into accepting unfavorable settlement terms or supporting the 2.5 cent proposal. As in its response to allegations of § 2 violations, defendant contends that Count IV must be dismissed because plaintiff has failed to plead any antitrust injury or threat of future injury. Specifically, defendant argues, "RCG's mere assertion of its 'belief' that TT 'intends' to get a third party to terminate RCG at some unspecified point is far too attenuated for standing" (def's mem., pp. 12-13). As in its response to Count III, defendant argues, alternatively, that plaintiff has failed to adequately plead the essential elements of a Sherman Act, § 1 claim.

In order to bring a civil suit for violation of antitrust laws, plaintiff must first satisfy the standing requirements of the Clayton Act. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989) (stating that "the mere presence of a substantive Sherman Act ... violation ... does not by itself bestow on any plaintiff a private right of action for damages. That is the gift of section 4 of the Clayton Act, which 'defines the class of persons who may maintain private damage actions under the antitrust laws' "). Section 4 of the Clayton Act, 15 U.S.C.A. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained."Alternatively, section 16 of the Clayton Act, 15 U.S.C.A. § 26, provides injunctive relief "against threatened loss or damage by a violation of the antitrust laws...." Therefore, in order to recover damages for an antitrust violation, in addition to showing that plaintiff violated an antitrust law, plaintiff must plead and prove (1) that he is a person within the meaning of the Clayton Act; (2) that he suffered an injury to his business or property by those conditions within the market affected by defendant's conduct; and (3) that the injury is of the type the antitrust laws were meant to

recompense. *Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Warner Mgmt. Consultants, Inc. v. Data Gen. Corp.,* 545 F.Supp. 956, 962-963 (N.D.Ill.1982). For injunctive relief, instead of pleading and proving an injury to business or property, plaintiff must only plead and prove a significant threat of injury. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.,* 246 F.3d 752, 755 (5th Cir.2001). The injury, however, must also be of the kind the antitrust laws were designed to guard against. *Cargill, Inc.,* 479 U.S. at 122. Defendant argues that because plaintiff does not satisfy the injury or threat of injury requirement necessary for achieving standing under the Clayton Act, plaintiff's Sherman Act claims cannot proceed.

*Attempt to Monopolize*

**\*4** With regard to its Sherman Act, § 2 claim, plaintiff alleges that it has suffered and will continue to suffer damages if defendant's attempted monopolization is not curbed, specifically pointing to the proposed 2.5 cent royalty on futures trading and unfair proposed settlement conditions (cplt., ¶¶ 60-66). Defendant argues that plaintiff has sufficiently pled neither (1) an actual or significant threat of injury, nor (2) the requisite kind of antitrust injury, and therefore, its Sherman Act, § 2 claim must be dismissed.

We begin by inquiring as to whether plaintiff has alleged an injury in its business or property. *Warner Mgmt. Consultants, Inc.,* 545 F.Supp. at 961, n4. First, we ask whether plaintiff has pled an actual injury sufficient to satisfy the requirement of Clayton Act, § 4. Plaintiff's alleged injuries stem from two proposals that have not been effectuated-the 2.5 cent proposal and the proposed settlement. Therefore, we agree with defendant that plaintiff has not pled an actual injury and thus cannot maintain a claim for damages for violation of the Sherman Act, § 2.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

Next, we ask whether plaintiff has alleged a significant threat of injury to maintain an action for injunctive relief under the Clayton Act, § 16. Regarding the attempt-to-monopolize claim, the threat of injury will come to fruition if (1) the futures trading exchanges accept defendant's 2.5 cent proposal, or (2) plaintiff is coerced into accepting the terms of an unfair settlement. Plaintiff argues that "[i]t is precisely because competitors should not be forced to wait until they are forced out of the market illegally that Congress enacted § 16 of the Clayton Act" for injunctive relief (plf's response at 11). The language of the statute, however, nevertheless requires "threatened loss or damage," and has been interpreted to require plaintiff to "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). *See also Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 844 (7th Cir.1978); *South Austin Coalition Cmty. Council v. SBC Communications Inc.,* 2001 WL 1250101, *13 (N.D.Ill.2001).* Defendant argues, and we agree, that plaintiff's threatened injuries are speculative and remote, and thus do not sufficiently allege a significant threat from an impending violation.

Regarding the 2.5 cent proposal, the major futures exchanges have rejected defendant's proposal (cplt., ¶ 12) and plaintiff does not allege that they are considering changing their minds in the future. Plaintiff contends that this court "sum[med] up the essence of RCG's injury," in its statement, "if a trader has to pay an override regardless, he has every incentive to use plaintiff's software rather than pay plaintiff and also someone else to use that person's software." *Trading Tech. v. eSpeed,* 2005 WL 2139404 (N.D.Ill.2005). Plaintiff takes such dicta out of context. That order denied a motion to reassign defendant's many cases to this court and simply made a passing comment on REFCO's (a defendant in one of defendant's many patent infringement suits) counterclaims involving the 2.5 cent proposal. The

court did not make a determination on whether REFCO, or the current plaintiff, suffered the significant threat of injury necessary to proceed with an antitrust claim. Although plaintiff is correct that "competitors may be able to prove antitrust injury before they actually are driven out of the market and competition is thereby lessened" (plf's response at 11) (*citing Blue Shield of Va. v. McCready,* 465 U.S. 477, 482 (1982)), that statement does not suggest that courts should entertain antitrust actions where injury has neither occurred nor has a probable likelihood of occurring in the future. Acceptance or probable acceptance of the 2.5 cent proposal must occur before plaintiff has standing to pursue an antitrust violation based on the proposal. Therefore, defendant's 2.5 cent proposal cannot be the basis either for damages under the Clayton Act, § 4, or for injunctive relief under the Clayton Act, § 16.

**\*5** Similarly, the proposed settlement agreement cannot be the basis of plaintiff's antitrust allegation, as the plaintiff has not alleged that it has accepted the terms of the settlement, intends to accept the terms of the settlement, or currently is in a position that leaves it no choice but to accept the settlement or suffer serious financial harm. Plaintiff does claim that "[o]n information and belief, based on TT's public statements and course of conduct with REFCO, TT intends to terminate and will terminate RCG's Software License Agreement if RCG does not capitulate to TT's settlement terms" (cplt., ¶ 40). While defendant does not suggest that it intends to terminate its licenses with plaintiff, it does argue that harm to plaintiff from termination would not be an antitrust injury. Defendant is correct that, generally, licenses and contracts are not subject to antitrust liability because we recognize a private party's ability to determine with whom it will deal. As a matter of law, " '[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " *Intergraph Corp. v. Intel Corp.,* 195

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

F.3d 1346, 1358 (Fed.Cir.1999). Plaintiff has, however, pled that defendant's purpose is to create a monopoly. Although plaintiff's claim does not fail due to a right to license, it does fail because plaintiff does not sufficiently plead that such a harm is imminent or likely in the foreseeable future, as plaintiff has not pled that defendant threatened, or even proposed, such an action. *Lake Hill Motors,* 246 F.3d 752 (affirming dismissal of plaintiff's antitrust claims where a threat of injury made two years prior was never acted upon because such remote and speculative injury "can not be said to be a genuine threat sufficient to justify injunctive relief under § 16"). Plaintiff has not sufficiently alleged either an actual injury or a significant threat of an impending violation, and therefore cannot sustain a Sherman Act, § 2 claim.

*Illegal Contract, Combination or Conspiracy in Restraint of Trade*

With regard to its Sherman Act, § 1 claim, plaintiff alleges that as a condition of its contract with Patsystems, defendant will direct Patsystems to terminate its relationship with "customers such as RCG" and "will attempt to coerce customers of Patsystems such as RCG into accepting unfavorable settlement terms out of the fear of being terminated by Patsystems."(*Id.* at 68-72). Such an allegation fails for the same reason plaintiff's Sherman Act, § 2 claim failed-plaintiff's complaint lacks an allegation of actual injury necessary for standing under the Clayton Act, § 4, or a significant threat of injury necessary for standing under the Clayton Act, § 16.

The injury alleged is a prospective injury that will come to fruition only if Patsystems terminates its relationship with plaintiff. There is no actual injury and therefore there is no successful claim for damages. Additionally, while plaintiff's allegations, liberally construed, state a potential injury, we do not read the allegations to state an impending violation. Plaintiff makes no allegation that Patsystems has terminated its contract with plaintiff, that Patsystems threatened to terminate the contract, or even

that Patsystems intends to terminate the contract. It is unclear whether or when defendant's agreement with Patsystems will actually affect or injure plaintiff. Therefore, we hold that plaintiff's claim for injunctive relief cannot continue where the threat of injury is merely speculative. *SeeUnited States v. W.T. Grant,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (injunction can issue without a showing of past wrongs, but the moving party must satisfy the court that relief is needed by showing that some cognizable danger of a violation exists).*See also*Mahaffey v. Detroit Newspaper Agency, 1998 WL 739902, *3 (6th Cir.1998) (Clayton Act, § 16 claim cannot proceed because a threat of antitrust injury "is not satisfied by suggesting that the defendants might injure the plaintiffs at some indefinite time in the future ..."). Unless and until defendant requires Patsystems to terminate its relationship with plaintiff, or Patsystems makes a move to do so, we do not think there is a significant threat of antitrust injury as required under *Zenith Radio.*Thus, we find that plaintiff does not have standing under either Clayton Act, § 4 or § 16, to proceed with its Sherman Act, § 1 claim.

**\*6** Because we find that plaintiff lacks standing to progress with its Sherman Act claims at this stage, we will not address the merits of the claims under the Sherman Act.

*Patent Misuse*

In Count II, plaintiff seeks a declaratory judgment of patent misuse on the part of defendant. Specifically, plaintiff asserts that defendant has impermissibly broadened the physical scope of its patent grant with anticompetitive effect by (1) demanding that plaintiff make fee payments on products defendant knows are not covered by patents, and (2) demanding that futures exchanges pay royalties to defendant on trades not covered by defendant's patents, after the patents' expirations, and on activities and conduct not covered by defendant's patents. The first allegation of misuse stems from defendant's licensing and settlement proposals to plaintiff. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

second allegation of misuse stems from defendant's 2.5 cent proposal to the futures exchanges that would require royalty fees on all trades into perpetuity.

At the outset, we note that patent misuse is generally an affirmative defense which "requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001 (Fed.Cir.1986). The doctrine of patent misuse originates from the equitable doctrine of unclean hands (*B.Braun Medical, Inc. v. Abbott Lab.,* 124 F.3d 1419, 1427 (Fed.Cir.1997)), and "arose to restrain practices that [do] not in themselves violate any law, but that [draw] anticompetitive strength from the patent right, and thus [are] deemed to be contrary to public policy." *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 704 (Fed.Cir.1992).

Defendant asserts that "the patent misuse counterclaim should be dismissed to the extent it is seeking an affirmative claim for relief" (def's mem. at 19). Defendant is correct to the extent that the patent-misuse doctrine cannot be asserted for monetary relief. *See B. Braun,* 124 F.3d at 1427 (holding that a successful patent misuse argument will result in "rendering the patent unenforceable until the misuse is purged ... [but will not] result in an award of damages to the accused infringer"). Although other courts have read *B. Braun* to require dismissal of a patent misuse counterclaim (*see PSN Illinois, Inc. v. Ivoclar Vjvadent, Inc.,* 2005 WL 2347209, *3 (N.D.Ill.2005); *Bernhardt L.L.C. v. Collezione Europa USA, Inc.,* 2002 WL 1602447, *2 (M.D.N.C.2002)), we read *B. Braun* to allow a patent misuse declaratory judgment claim, but allow it solely to enjoin defendant from asserting a patent infringement claim against plaintiff. *See Inamed Corp.,* 275 F.Supp.2d at 1124 (allowing plaintiff to raise patent misuse defense by way of an action for declaratory relief). We also note, however, that any injunction issued must limit its effect to rendering the patent unenforceable only until the misuse is

purged. *See B. Braun,* 124 F.3d at 1427.

**\*7** As in this case, patent misuse allegations often arise alongside allegations of antitrust violations. Although a finding of an antitrust violation requires a finding of patent misuse, the same is not true in the reverse. Patent misuse is considered a broader wrong than antitrust violation and a patent misuse claim is easier to prove than an antitrust violation. *See Inamed Corp. v. Kuzmak,* 275 F.Supp.2d 1100, 1125 (C.D.Cal.2002); *Motorola, Inc. v. Kimball Intern., Inc.,* 601 F.Supp. 62, 65 (N.D.Ill.1984); 6 Donald S. Chisum, CHISUM ON PATENTS, § 19.04 (2001). This is because the party asserting patent misuse need not prove anticompetitive effects or individual harm. *Transitron Elec. Corp. v. Hughes Aircraft Co.,* 487 F.Supp. 885, 892 (DMUS.1980).

In order to show patent misuse, plaintiff must plead and prove that defendant impermissibly broadened the "physical or temporal scope" of the patent grant with anticompetitive effect. If defendant's restrictions do not exceed the scope of its patents, then there can be no patent misuse. *See B. Braun,* 124 F.3d at 1426. If, however, defendant's restrictions do exceed the scope of the patent, a court can find patent misuse either where (1) the Supreme Court has deemed the action per se anticompetitive; or (2) a factual determination reveals that the "overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market." *Windsurfing Int'l,* 782 F.2d at 1001-02.

Unlike the earlier antitrust analysis, plaintiff need not plead specific injury due to defendant's misuse of its patents. The Supreme Court explained: "It is a principle of general application that courts ... may appropriately withhold their aid where the [patentee] is using the right asserted contrary to the public interest....'It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent.'"*Morton*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

*Salt Co. v. GS Sappier Co.,* 315 U.S. 488, 493-94 (1942). Therefore, "[patent misuse may be shown from the totality of a licensor's conduct and business practices."*Transitron Elec. Corp.,* 487 F.Supp. at 892.

In this case, plaintiff has adequately pled patent misuse. In *Brailed v. This Company,* 379 U.S. 29, 32, 85 S.Ct. 176, 13 L.Ed.2d 99 (1965), the Supreme Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se."[FN2] *See also U.S. Philips Corp. v. Int'l Trade Com'n,* 424 F.3d 1179, 1184 (Fed.Cir.2005) ("the doctrine of patent misuse bars a patentee from using the 'patent's leverage' to 'extend the monopoly of his patent to derive a benefit not attributable to the use of the patent's teachings,' such as requiring a licensee to pay a royalty on products that do not use the teaching of the patent"). This is arguably what defendant proposed to the futures exchanges. And because plaintiff does not have to plead injury from that proposal, the patent misuse claim cannot be dismissed on the same grounds on which we dismiss the antitrust claims. Even if the 2.5 cent proposal is not considered per se anticompetitive, we find that the plaintiff has sufficiently alleged actions by defendant that could be deemed anticompetitive under the rule of reason balancing test employed where the conduct is not per se anticompetitive.

> FN2. The Seventh Circuit, in *Scheiber v. Dolby Lab., Inc.,* 293 F.3d 1014 (7th Cir.2002), questioned the wisdom of the holding in *Brulotte* that any contract extending royalties beyond the temporal limit of the patent was per se misuse. The court also noted, however, that *Brulotte* is still good law, and maintains its precedential import.

**\*8** Additionally, plaintiff alleges that defendant has committed patent misuse by proposing a settlement agreement that would force plaintiff to make fee payments on products not covered by defendant's patent. Defendant argues that patent misuse cannot

stand where patentee simply seeks to enforce his patent rights against infringement or contributory infringement (def's mem. at 19). Although defendant is correct that "[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringer"(*Mallinckdrodt,* 967 F.2d at 709), plaintiff alleges that defendant was aware that its demands on plaintiff and futures exchanges are for payments on actions not covered by its patents (cplt., ¶¶ 50-51). Because we view all facts and draw reasonable inferences in favor of the plaintiff in a motion for dismissal on the pleadings, we find that plaintiff sufficiently alleged bad faith on the part of defendant.

We note, however, that plaintiff's claim that the proposed settlement agreement is "unfair" is meaningless if the agreement solely protects actually patented technology. Patent misuse will arise only if the proposed settlement agreement requires royalties, fees or protection beyond the physical or temporal scope of defendant's patented technology. Because it is unclear from the draft settlement agreement whether defendant is attempting to broaden the scope of its patent, we will not venture any opinion as to the alleged overreaching at this stage in the litigation. Because we leave it for another day, we deny's defendant's motion to dismiss the patent misuse claim.

*Lanham Act Claim*

In Count V, plaintiff alleges that defendant violated the Lanham Act, § 42(a)(1)(B),[FN3] which states:

> FN3. In its complaint, plaintiff incorrectly stated an alleged violation of § 43(a)(1)(A). Defendant recognized the mistake and responded to allegations as if they arose under § 43(a)(1)(B). Therefore, we will treat the complaint as alleging violation of § 43(a)(1)(B).

Any person who, on or in connection with any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (B) in commercial advertising or promotion, misrepresents the nature characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125. Specifically, plaintiff asserts that defendant's claim that "TT has truly leveled the playing field among market participants through" its "innovative technology" contained in its open letter violates the Lanham Act (cplt., ¶ 80). Plaintiff contends that because defendant controls a large part of the order-flow of the market and information embedded in that order-flow, defendant has "unfairly taken advantage of market information to the disadvantage of public market participants, including RCG" (cplt., ¶ 76). Plaintiff states that due to the control of order-flow, market information, and current and future patented technology, defendant will be able to create a "super exchange," thereby eliminating the need for other electronic exchanges, which is ultimately not in the best interest of the public (cplt., ¶¶ 78-80). Thus, plaintiff asks this court to enjoin defendant's unfair business practices under the auspices of the Lanham Act.

**\*9** In order to maintain a successful claim under the Lanham Act, a plaintiff must show that defendant (1) made a false factual statement in a commercial advertisement about its own or another's product; (2) the statement actually deceived or is likely to deceive a substantial segment of its audience; (3) the deception is material to a purchasing decision; (4) the statement is about goods entering interstate commerce; and (5) the plaintiff has been injured or injury is probable as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of good will associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191

F.3d 813, 819 (7th Cir.1999) (*citing B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971 (7th Cir.1999)). As plaintiff only makes a claim for injunctive relief, we do not require plaintiff to allege the additional actual injury and causation elements necessary to make out a claim for monetary damages. *Id.,* at 819-20. Defendant asserts that plaintiff's claim for relief under the Lanham Act should be dismissed because (1) it does not adequately plead a false statement of fact, (2) plaintiff has not been and is not likely to be injured by defendant's statement, and (3) defendant's press release is not a commercial advertisement or promotion.

The false statement element of a Lanham Act claim includes either (1) commercial claims that are literally false, or (2) literally true or ambiguous claims that convey a false impression or are misleading and likely to deceive consumers. *Id.,* at 820. Plaintiff argues that "[a]t this stage in the litigation, RCG need only show that under some set of circumstances, TT's comments can be seen as false" (plf's response at 14). Although this is true, plaintiff also needs to show that under some set of circumstances, defendant's comments can be construed as factual. We do not believe that plaintiff has made any such allegation.

It is somewhat unclear what plaintiff suggests is the false statement of fact upon which its Lanham Act claim is based. Plaintiff points to a statement in defendant's press release that reads: "By making a premier order-entry system commercially available, TT has truly leveled the playing field among market participation through our innovative technologies." We read plaintiff's complaint to essentially argue that defendant made a false claim of its intention or rationale for making its technology available to the public through the 2.5 cent proposal. Plaintiff seemingly contends that defendant's press release was a deceptive tactic by which it attempted to trick the futures trading exchanges into accepting its proposal or purchasing its software by stating that its intent was to level the playing field and its software

was innovative, when, in fact, its intent was to un-fairly compete with its competitors (plf's response at 14-15). Defendant apparently understands plaintiff's allegations differently, that plaintiff claims that defendant made false statements of fact in stating both that its technology is "innovative" and that the technology will "level[ ] the playing field." As we are unsure which contention plaintiff relies upon, we will address each in turn.

**\*10** If we correctly read plaintiff's claim to be that defendant's false claim of intent and purpose as to its reasoning behind the 2.5 cent proposal violates the Lanham Act, we must disagree. Such a claim cannot be maintained in this action because the al-legedly false statement is a subjective statement not actionable under the Lanham Act. See*Lutheran Ass'n of Missionaries and Pilots, Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.,* 2005 WL 629605 (D.Minn.2005) (dismissing Lanham Act claim where statements reflected opinion of cir-cumstances surrounding the parties' disaffiliation and intentions to operate in the future). Defendant's intention in proposing the 2.5 cent solution is neither specific nor measurable. See*Coastal Ab-stract Service, Inc. v. First American Title Ins. Co.,* 173 F.3d 725 (9th Cir.1999) (dismissing Lanham Act action where defendants' assertion that plaintiff was too small to handle a certain amount of busi-ness was vague and subjective, and, therefore, not actionable); *Groden v. Random House, Inc.,* 32 U.S.P.Q.2d 1266, 1271 (S.D.N.Y.1994) ("Subjective claims about products, which cannot be proven either true or false, are not actionable un-der the Lanham Act"). Defendant's intention in pro-posing the 2.5 cent proposal was the defendant's opinion, directed at a sophisticated trade audience, and was part of a larger persuasive argument to ac-cept the proposal. Therefore, it is not actionable un-der the Lanham Act. See*Glenn v. Advertising Pub-lications, Inc.,* 251 F.Supp. 889, 904 (S.D.N.Y.1966) (finding no Lanham Act violation where the "whole subject is essentially a matter of argument ... [t]he advertiser to whom the argument was addressed was free to make up his own mind as

to its validity").

If defendant correctly reads plaintiff's allegation to be that defendant's statements of "innovative" and "leveling the playing field" are false factual state-ments, we also disagree. This claim cannot be maintained because the allegedly false statements are mere puffery and, therefore, not actionable un-der the Lanham Act. Puffery is "exaggerated ad-vertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)"*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir.1997) (*citing* 3 J. Thomas McCarthy, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION § 27.04[4][d] at 27-52 (3d ed.1994)). Actionable false statements are generally differentiated from unac-tionable puffing by determining whether the claims are specific or absolute characteristics of a product capable of testing-such objective claims are not puffery and may be actionable under the Lanham Act. *Id.* In this case, "innovative" and "leveling the playing field" are not specific, not concrete, not measurable, and therefore puffery. See*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24 (1st Cir.2000) (the statement, "Whiter is not possible," is non-actionable puffing); *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616 (7th Cir.1995) (finding that "comparison" to a mystery rival is only puffery and therefore not actionable); *Malaco Leaf, AB v. Promotion In Motion, Inc.,* 287 F.Supp.2d 355 (S.D.N.Y.2003) (using the words "original" and "famous" on packaging constituted mere puffery); *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304 (2d Cir.1972) (defendant's claim of "countless hours of research" leading to superior quality is puffing); *Data Cash Systems, Inc. v. Js & a Group, Inc.,* 223 U.S.P.Q. 865, 867 (N.D.Ill.1984) ("Frequently, newness claims are only puffing, especially when they are made in the context of promotional literature"). Additionally, as the press release at issue was directed at a specific sophisticated trade audience, no reasonable con-sumer would rely on such statement to determine whether to accept defendant's proposal. In fact,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Case 1:08-cv-01062    Document 48    Filed 05/20/2008    Page 60 of 68    Page 11
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

since the four major futures exchanges targeted by the press release declined the proposal (cplt., ¶ 12), we can say with certainty that they were not "duped" by the defendant's statements. Therefore, plaintiff's Lanham Act claims cannot proceed.

*State Law Claims*

**\*11** Finally, plaintiff alleges various violations of state unfair competition claims. In Count VI, plaintiff alleges violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 et seq., Count VII alleges violation of the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 et seq., and Count VIII alleges violation of common law unfair competition. Defendant argues that such state law unfair competition claims fail for the same reason the Lanham Act claim fails. Alternatively, defendant claims that Count VI must be dismissed for plaintiff's failure to allege its deception and Count VII must be dismissed because plaintiff has failed to allege that it is "likely to be damaged" by defendant's allegedly deceptive trade practices. Plaintiff responds by reasserting its Lanham Act arguments, and restating that "TT controls order flow, led RCG and others to use its software that allows for embedded market information to be used by TT and used that embedded market information to the detriment of RCG and others similarly situated" (plf's response at 19). Neither party devotes much time or effort to arguments regarding these claims, and each relies primarily on its arguments regarding the Lanham Act claims.

Defendant suggests that claims under both ICFA FN4 and UDTPA should be resolved by analyzing them under the principles of the Lanham Act (def's mem. at 25) (citing*AT & T Corp. v. Synet, Inc.,* 45 U.S.P.Q.2d 1656, 1660 (N.D.Ill.1997)). Plaintiff does not dispute such a contention. We agree that in this case the fatal flaw in plaintiff's Lanham Act claim also bars plaintiff's state law unfair competition claims.

FN4. We also note that, with certain exceptions, Illinois courts have held that Rule 9(b), requiring a claimant to plead the circumstances constituting fraud or mistake with particularity, applies to claims under ICFA. *SeeJacobson v. Ford Motor Co.,* 1999 WL 966432, \*4 (N.D.Ill.1999) (citing*Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.,* 940 F.Supp. 176, 180 (N.D.Ill.1996)); *Swift v. First USA Bank,* 1999 WL 350847, \*5 (N.D.Ill.1999). In *Eromon v. Gran Auto Sales, Inc.,* 351 F.Supp.2d 825, 827 (N.D.Ill.2004), we also required a claimant to plead claims under the ICFA with particularity. In this case plaintiff has not pled its fraud claims with particularity; it has not pled the circumstances, "the who, what, when, where, and how," in detail, as required under the Seventh Circuit's interpretation of Rule 9(b).*SeeDiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including ... the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission or such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Practices Act' ... in the conduct of any trade or commerce...."815 ILCS 505/2. Although the ICFA was originally designed to protect consumers, it also protects competitors from fraud and unfair competition. *SeeGold v. Golden G.T., LLC,* 2005 WL 2465815, \*4 (N.D.Ill.2005). Here, plaintiff is both a consumer and competitor of plaintiff's product.

To state a claim under the ICFA, plaintiff must plead that (1) defendant perpetrated a deceptive act; (2) the defendant intended for consumers to rely on that deception; and (3) deception took place in trade

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

or commerce. *See id.;Jacobson v. Ford Motor Co.,* 1999 WL 966432, *4 (N.D.Ill.1999). Plaintiff's ICFA claim fails for the same reasons that its Lanham Act claim failed. Opinions and puffery are not actionable under the ICFA. *Thacker v. Menard, Inc.,* 105 F.3d 382, 386 (7th Cir.1997).*See also Tylka v. Gerber Products Co.,* 1999 WL 495126 (N.D.Ill.1999) (finding that defendant's statements that its baby food products have "optimum nutrition," and "[are the] most wholesome nutritious safe foods you can buy anywhere in the world," among other statements, were non-actionable sales pitches).

**\*12** The UDTPA was "designed to address conduct involving either misleading trade identification or false and deceptive advertising."*Menasha Corp. v. News America Marketing In-Store, Inc.,* 238 F.Supp.2d 1024, 1035 (N.D.Ill.2003). The statute prohibits deceptive trade practices and sets forth twelve specific practices declared illegal under the Act, including "(5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation or connection that he or she does not have; (6) represent[ing] that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand; (11) mak [ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2.

In Count VII, plaintiff claims "TT's conduct, as well as that of its officers and/or principals creates a likelihood of misunderstanding and therefore violates the Illinois Uniform Deceptive Trade Practices Act" (cplt., ¶ 87). As plaintiff's brief points to its Lanham Act arguments to support its UDTPA claim, we can only assume that plaintiff intends to reassert its false advertising claim based on the statement that "TT has truly leveled the playing field among market participation through our in-novative technologies."Although at first glance it appears that plaintiff might have a viable claim for violation of the UDTPA, the claim fails because the allegedly false statement contained in defendant's press release does not appear to be material to plaintiff's claimed injury. Plaintiff does not allege or present facts that it would have acted differently had it known that plaintiff was proposing its 2.5 cent proposal in order to slant the playing field to plaintiff's advantage, rather than to level the playing field. *SeeKellerman v. Mar-Rue Realty and Builders, Inc.,* 132 Ill.App.3d 300, 87 Ill.Dec. 267, 476 N.E.2d 1259, 1264 (Ill.App.Ct.1985) (finding no violation of ICFA or UDTPA, where plaintiff did not allege that it would have done anything differently had it known of a fact omitted from defendant's advertisement). Additionally, plaintiff does not allege that it acted in reliance on such a statement-there is no allegation that plaintiff purchased more of defendant's software or encouraged the trading exchanges to adopt defendant's proposal in reliance on defendant's statement that it was proposing the 2.5 cent proposal in order to level the playing field. Therefore, plaintiff's UTDPA cannot proceed.

*CONCLUSION*

For the reasons set forth above, we grant defendant's motion to dismiss with respect to Counts III through VIII: the Sherman Act, §§ 1 and 2 claims, the Lanham Act claim, and the state and common law claims. We deny defendant's motion to dismiss with respect to Count II, the declaratory judgment patent misuse claim.

N.D.Ill.,2005.
Rosenthal Collins Group, LLC v. Trading Technologies Intern., Inc.
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.))**

West v. Miller
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Kanye WEST, Plaintiff/Counter-Defendant,
v.
Eric "E-Smoove" MILLER and Focus Music
Group, Inc. Defendants/Counter-Plaintiffs.
**No. 05C4977.**

Aug. 11, 2006.

Leslie Anne Morse, Ronald Hanley Balson, Carrie
A. Hall, Hill, Gilstrap & Balson, Chicago, IL,
Philip R. Hoffman, Pryor, Cashman, Sherman &
Flynn, New York, NY, for Plaintiff/
Counter-Defendant.
Lois T. Collins, Randolph D. Phifer, Victor L.
Bowman, Phifer & White, P.C., Detroit, MI, for
Defendants/Counter-Plaintiffs.

*MEMORANDUM OPINION AND ORDER*

VALDEZ, Magistrate J.
**\*1** The claims and counter-claims arising out of this
dispute are a mix of federal and state causes of ac-
tion regarding the parties' respective rights to ex-
ploit for commercial purposes eleven unreleased
master recordings of performance artist Kanye
West that were made in or around 1995 or 1996.
Now before this Court is a pair of motions filed by
Defendants/Counter-Plaintiffs, Eric "E-Smoove"
Miller and Focus Music Groups, Inc.
("Defendants"), including Defendants' motion to
compel production of documents [Doc. No. 33] and
motion to extend the discovery deadline [Doc. No.
35]. Plaintiff/Counter-Defendant, Mr. West
("Plaintiff" or "West"), responds by opposing both
motions.

*I. Background*

The District Court, on December 5, 2005, referred
all discovery matters to this Court for resolution.
*See* [Doc. No. 23]. This Court held its first status
hearing with the parties on January 18, 2006, and
allowed the parties to set a discovery cutoff of July
10, 2006. *See* [Doc. No. 28]. At a subsequent status
hearing on April 20, 2006, the parties appeared and
represented to this Court that discovery was pro-
gressing without incident. *See* [Doc. No. 32].

Yet more than two months later and with less than a
dozen days left in discovery, Defendants filed their
(1) motion to compel production, and (2) motion to
extend discovery.[FN1] Defendants through their mo-
tion to compel indicated that as early as April 10th
the discovery process broke down with regard to
Defendants' document requests nos. 1 and 6.[FN2]
(Defs.' Mot. Compel ¶¶ 2, 3, Ex. B.) As to Defend-
ants' motion to extend discovery, they represented
that a new discovery cutoff was needed as a result
of parties agreeing to suspend discovery to pursue
informal settlement talks between April 21st and
June 8th. (Defs.' Mot. Extend ¶¶ 5, 6.)

> FN1. Courtesy copies of these motions
> were delivered to this Court on July 6,
> 2006.

> FN2. Plaintiff objected to request nos. 1
> and 6 by arguing that Defendants sought
> propriety and confidential information and
> were overbroad and unduly burdensome.
> (Defs.' Mot. Compel Ex. B.)

At the July 12th argument on the motions, counsel
for Defendants raised an additional concern regard-
ing an outstanding deposition. This Court granted
leave for the parties to brief their respective posi-
tions if they could not resolve the deposition dis-
pute on their own. Five days later, Defendants filed
a third motion [Doc. No. 40] and eventually noticed
it up before this Court for August 3, 2006.

Awaiting the August 3rd hearing on Defendants'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

third motion, this Court delayed ruling on the others. At the August hearing, however, the parties resolved the matter raised in the third motion which lead this Court to deem the motion moot. *See* [Doc. No. 45.] Accordingly, this Court now turns to address Defendants' remaining motions.

### II. Motion to Compel Production of Documents

Through their first motion, Defendants seek an order to compel the production of various recording and/or music production contracts ("recording contracts") executed between Plaintiff and third parties. (Defs.' Mot. Compel ¶ 3.) Through their pleadings, Defendants narrowed their discovery request to those recording contracts "generated in the last five years."(Defs.' Mem. Supp. Mot. Compel 9.) At argument, however, Defendants further narrowed the request to Plaintiff's current contract with the successor-in-interest to a contract originally entered into between Plaintiff and Roc-A-Fella Records ("Roc-A-Fella contract"). Plaintiff asserted that this contract contains a valid confidentiality clause and they offered to produce this contract to the Defendants in redacted form, which was declined. As such, this Court now addresses Defendants' motion to compel production of the Roc-A-Fella contract, which is the only issue remaining to support extending the discovery deadline.

### A. Meet & Confer Requirements

**\*2** This Court begins by noting that Defendants failed to include in their motion to compel a detailed explanation of their past in-person or telephonic communications with their opponent to resolve this discovery dispute without court intervention. Both Rule 37 of the Federal Rules of Civil Procedure and Local Rule 37.2 prescribe a firm meet and confer requirement for motions to compel. Fed.R.Civ.P. 37(a)(1)(A) ("The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the

disclosure without court action."); N.D. Ill. L.R. 37.2 (requiring "consultation in person or by telephone" and "good faith attempts to resolve differences").

"Failure to comply with the local rules," which seek to further the aims of the federal rules, "is not merely a harmless technicality, but can be a fatal mistake." *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.,* No. 03 C 760, 2004 WL 3021842, at *4 (N.D.Ill.Dec.20, 2004) (citations and internal quotations omitted). Nevertheless, this Court will forego a harsh application of either the federal or local requirement as there are independent grounds to deny Defendants' production request.

### B. Relevance

Relevancy for discovery purposes is a broader concept than relevancy at the time of trial. Fed.R.Civ.P. 26(b)(1) ("Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). Specifically, Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...."

Despite the liberal breath of discovery allowed under the federal rules, "the proponent of a motion to compel discovery [still] bears the initial burden of proving that the information sought is relevant." *U.S. v. Lake County Bd. of Com'rs,* No. 2:04 CV 415, 2006 WL 978882, at *1 (N.D.Ind. Apr.7, 2006) (quoting *Alexander v. Federal Bureau of Investigation,* 186 F.R.D. 154, 159 (D.D.C.1999) and citing *United States v. Farley,* 11 F.3d 1385, 1390 (7th Cir.1993)). However, failure to make even a colorable initial showing as to relevance can doom a motion to compel. *See, e.g., Rennie v. Dalton,* 3 F.3d 1100, 1110 (7th Cir.1993) (finding court did not abuse its discretion in denying motion to compel discovery for lack of a persuasive show-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.))**

ing on relevance).“If the discovery appears relevant, the party objecting to the discovery request bears the burden of showing why that request is improper.”*Trading Technologies Intern., Inc. v. eSpeed, Inc.,* No. 04 C 5312, 2005 WL 1300778, at *1 (N.D.Ill. Apr.28, 2005) (citing *Rubin v. Islamic Republic of Iran,* 349 F.Supp.2d 1108, 1111 (N.D.Ill.2004)). Defendants here do not make a sufficient showing to shift the burden to their opponent.

### 1. Parties' Arguments on Relevance

**\*3** Defendants' relevance arguments are based on the contention that the Roc-A-Fella contract is at issue in this litigation. In support of their burden, Defendants' offered that this contract is relevant to address the current market value of Plaintiff's recording works. (Defs.' Mem. Supp. Mot. Compel 6-7.) At argument on this motion, Defendants expanded the justification to add that this contract is needed to calculate the market value of Plaintiff's studio recording time, it is needed to further Defendants' fraud counter-claim, and it has a direct bearing on Plaintiff's motivation for filing this suit.

Through his response, Plaintiff countered that the only contract at issue in this instant matter is the absence of one between the parties-not any contract West may have or had with third parties years later. (Pl.'s Resp. Mot. Compel ¶ 3.) Plaintiff further speculated that Defendants seek such contracts for motives unconnected to the underlying litigation-namely for purposes of harassment and to obtain confidential information about a celebrity, the Plaintiff. (*Id.*) At argument, Plaintiff added that Defendants had slept on their rights through an untimely filing of their motion to compel, contested that Plaintiff's worth as an artist today has any bearing on his worth in 1995 when he was a minor and a relatively unknown figure in the music industry, and asserted that there is not even partial relevance at play here.

### 2. Waiver through Undeveloped Arguments

By and large, what Defendants have argued and placed before this Court is simply not enough to reach the conclusions on relevance that they demand. Traditionally, where a movant “failed to discuss the facts relevant to their claim,” such “[p]erfunctory or undeveloped arguments are waived.”*Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir.2005) (citing *Colburn v. Trs. of Ind. Univ.,* 973 F.2d 581, 593 (7th Cir.1992); *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417 (7th Cir.1986)).

Defendants make two market value arguments. They assert that the Roc-A-Fella contract is relevant to calculating “the market value of Plaintiff's work as a record artist” (Defs.' Mem. Supp. Mot. Compel 7), and relevant to calculate the market value of his studio time. Defendants, however, are not specific as to whether the artistic work and studio time market values they envision are ones from 1995, 2005, or at the time of the alleged breach of the parties' purported contract. Generally, market value is a concept tied to a specific time reference and factors relevant to its calculation must be close in time to said reference point. *See, e.g., Vill. of Lake Villa v. Stokovich,* 284 Ill. 360, 376 (Ill.2004) (holding a comparison too remote in time to be “little evidence of market value”). Nor are Defendants specific as to which claim or defense such market values relate. Without specificity as to time reference or which claim or defense is contemplated, this Court cannot properly weigh Defendants' market value arguments on relevance. For lack of development and support, this Court deems the market value arguments waived. *See Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 173 n. 1 (7th Cir.1996) (upholding trial court finding that argument was waived for lack of both specificity as to evidence and cited authority in support).

**\*4** Next, Defendants argue that determining whether the Roc-A-Fella contract contains mention of any of the unreleased masters is relevant to their common law fraud counter-claim. In Illinois, “the ele-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.))**

ments of a claim for fraudulent misrepresentation are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."*W.W. Vincent & Co. v. First Colony Life Ins. Co.,* 351 Ill.App.3d 752, 286 Ill.Dec. 734, 814 N.E.2d 960, 969 (Ill.App. 1st Dist.2004) (citing *Miner v. Fashion Enters., Inc.,* 342 Ill.App.3d 405, 276 Ill.Dec. 652, 794 N.E.2d 902 (2003); *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996)). However, the reliance and harm contemplated by a fraud action is that of the relying party and not a third-party. Here, the counter-claim fraud count at issue between Defendants and Plaintiff arises from their purported oral contract from the mid-1990's. (Defs .' Countercl. ¶ 52 ("On or about September, 1995 West represented to Miller that he would work with Miller to create, write, produce, and edit the Masters so that Focus could exploit said Masters."); *id.* ¶ 53 ("These representations were false and West knew that falsity of these statements at the time they were made."); *id.* ¶ 55 ("Counter-Plaintiffs relied on the representations of West....").) Any alleged misrepresentation-fraudulent or otherwise-would relate to any oral contract between West and Defendants. West's contract with Roc-A-Fella entered into years later, has not been has not been shown to be relevant to the fraud claim here. This Court disagrees with Defendants and finds the Roc-A-Fella contract not relevant (even under its broadest definition at the discovery stage) to the fraud count brought by Defendants.

Lastly, Defendants assert that the Roc-A-Fella contract is key to establishing or leading to other discovery related to Plaintiff's motive for filing his claims. Review of the pleadings here reveals that Plaintiff's sole reference to the Roc-A-Fella contract is offered as a background fact in his complaint (Pl.'s Compl. ¶ 11), and furthermore Defendants make no references to it through any of their

counts under the counter-claim (*see generally* Defs.' Countercl). Defendants fail to specify how West's subjective motive is relevant to a claim or defense.[FN3] Without more, Defendants' motive argument is deemed waived for lack of development.

> FN3. Assuming *arguendo* for the moment that motive is relevant to a count or defense here, Defendants do not address why compelling disclosure of a confidential third-party contract would either further a point that has already been conceded by Plaintiff through his depositions answers (Defs.' Mot. Compel ¶ 5) or not be duplicative. There are many other discovery methods to utilize in determining a party's motive. Interrogatories, requests to admit, and/or depositions questions can all be used to get such information. Furthermore, Rule 26(b)(2) of the Federal Rules of Civil Procedure cautions against allowing discovery that is duplicative or inconvenient. Fed.R.Civ.P. 26(b)(2) ("The frequency or extent of use of the discovery methods ... shall be limited by the court if it determines that ... the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive....").

Simply asserting a conclusion or pointing to evidentiary backing without sufficient explanation or authority cannot sustain Defendants' initial burden for their market value, fraud, and motive arguments on relevance. *See Estate of Moreland,* 395 F.3d at 759. Even presuming Defendants could make a colorable case that the Roc-A-Fella contract is remotely relevant to a claim or defense, they would still not prevail on their requested relief due to unexcused delay.

### 4. Waiver for Undue Delay

**\*5** There are many reasons why a motion to compel

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.))**

production, like other discovery motions (including motions for an extension of discovery), filed on the eve of the discovery deadline should be granted. Fed.R.Civ.P. 26(b)(1) ( "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). And such reasons for granting are usually set out or justified by the motion for relief. But that was not done in this case.

The broad discretion afforded courts over discovery matters includes the discretion to determine whether a movant's tardiness constitutes undue delay.*Packman v. Chi. Tribune Co.,* 267 F.3d 628, 646-47 (7th Cir.2001). On assessing delay of a moving party, "courts usually focus on three questions: (i) how long was the delay; (ii) was there an explanation for it; and (iii) what happened during the delay."*Carbajal v. Household Bank, FSB, No. 00 C 0626, 2003 WL 22159473, at *9 (N.D.Ill. Sept.18, 2003)* (addressing delay in filing motion to compel arbitration).

Defendants here admit that they knew as early as April 10, 2006, that Plaintiff objected to the Roc-A-Fella production request. (Defs' Mem. Supp. Mot. Compel 2.) Yet, at the second status hearing before this Court, on April 20th, Defendants raised no concern with Plaintiff's objections to this discovery. And, in fact, Defendants stated that they did not begin their discovery efforts-in the words of defense counsel-"in earnest" until late-April 2006. Further, prior to filing their motions, Plaintiff offered to share a redacted version of the Roc-A-Fella contract in question, but Defendants failed to take him up on this offer. Essentially, Defendants opted not to conduct discovery for approximately four of the six months they had; they forewent meaningful discovery from January through April 2006 and, to some extent, even after their motion to compel was filed.

The explanation offered as to the late discovery start by Defendants was that parties had reached an informal agreement to stay discovery pending informal settlement discussions. (Defs.' Mot. Extend

¶¶ 5, 6.) An assertion that Plaintiff vigorously denies. (Pl.'s Resp. Mot. Extend ¶ 10.) This explanation, more importantly, is belied by Defendants' own actions. On or about April 5, 2006, while the purported truce on discovery was to be in effect, defense counsel sent a defective subpoena to Universal Music Group in New York City seeking recording contracts.[FN4] (Pl.'s Resp. Mot. Compel ¶¶ 7-9, Ex. A.)

> FN4. Plaintiff devotes a significant share of his first response to pointing out the execution flaws and delivery deficiencies of defense counsel in her repeated attempts to subpoena recording contracts from third parties to this litigation including Def Jam Music, Inc.; Def Jam Recordings, Inc.; Def Jam Records, Inc.; Roc-A-Fella Records, LLC; Roc-A-Fella Records, Inc.; Rush Communications a/k/a Def Jam Mobile, LLC; Sony BMG Management Co., LLC; Sony BMG Music Entertainment; and Universal Music Group. (Pl.'s Resp. Mot. Compel ¶¶ 7-12, Ex. A, C, F.) Even after this Court addressed defense counsel's noncompliance with Rule 45 of the Federal Rules of Civil Procedure in open court, apparently she continued on issuing Northern District of Illinois subpoenas through the mail to a significant share of the music industry in New York and California. Out of judicial economy, this Court declines Plaintiff's invitation to further comment on Defendants' multifaceted noncompliance with Rule 45.

There is no firm time limit on when a late discovery motion is too late. *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 332 (N.D.Ill.2005) (noting that "[g]reater uncertainty occurs where the motion is made very close to the discovery cut-off date"); *Carbajal,* 2003 WL 22159473, at *9 ("Obviously, the longer a party waits, the more likely a court will find a waiver."). And, federal courts have varied on when a delay becomes excessive. *In re Sulfuric*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.))**

*Acid Antitrust Litigation,* 231 F.R.D. at 332 (collecting cases). Nonetheless, one court in this district succinctly proclaimed that a motion to compel filed four days prior to the close of discovery was "a clear case of too little, too late ."*Ridge Chrysler Jeep L.L.C.,* 2004 WL 3021842, at *4.

**\*6** Here, Defendants' first motion to compel was filed eleven days from the close of discovery. This alone is not enough for this Court cry "too late," but when factored together with (1) four months of discovery inaction; (2) representations to this Court that no problem existed close in time to when Defendants' first learned of Plaintiff's noncompliance; (3) repeated rounds of defective subpoena attempts; (4) foregone opportunities to seek the "market value" information through less dramatic means than production of a third-party confidential contract and to depose the third-party successor-in-interest to the Roc-A-Fella contract; and (5) refusal of Plaintiff's offer to turn over a redacted version of the contract in question, this Court is inclined to exercise its discretion to find the undue delay that constitutes waiver.

### III. Motion to Extend Discovery Deadline

Defendants request an enlargement of discovery through September 11, 2006, because-as they put it-"[t]here are possibly more depositions" to be taken. (Defs.' Mot. Extend ¶ 3.) At argument, they clarified that the additional discovery time sought would be used to redepose Plaintiff and to depose third-parties to the Roc-A-Fella contract regarding representations made under the contract. Because this Court has denied Defendants' motion to compel production, Defendants' only remaining ground for an extension has been extinguished above. Lastly, the same waiver through undue delay concerns addressed above also apply to Defendants' request to extend. For these reasons, Defendants' motion to extend is hereby DENIED as moot.

### CONCLUSION

Defendants' motion to compel [Doc. No. 33] is DENIED. Defendants' motion to extend discovery deadline [Doc. No. 35] is DENIED as moot.

SO ORDERED.

N.D.Ill.,2006.
West v. Miller
Not Reported in F.Supp.2d, 2006 WL 2349988 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.